# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x
: 
In re : Chapter 11
: 
ALPHA ENTERTAINMENT LLC, : Case No. 20-10940 (LSS)
: 
Debtor.[1] : 
: 
------------------------------------------------------x

## DECLARATION OF JEFFREY N. POLLACK IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST-DAY PLEADINGS

I, Jeffrey N. Pollack, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1. Since February 5, 2019, I have served as the President and Chief Operating Officer of Alpha Entertainment LLC (the "***Debtor***"), which does business as the XFL, a professional American football league. In my capacity as the Debtor's President and Chief Operating Officer, I am familiar with the Debtor's day-to-day operations and business and financial affairs.

2. I have more than 25 years of executive experience in the sports industry with leadership roles at The Sports Business Daily, the National Basketball Association, NASCAR, the World Series of Poker, an NFL team, and other prominent organizations. I have a Bachelor's degree from the Medill School of Journalism at Northwestern University and a Master's degree in sports management from the University of Massachusetts at Amherst.

3. I submit this declaration (the "***Declaration***") in support of the First-Day Pleadings (as defined below) and to provide information to parties in interest regarding the Debtor. Except

---

[1] The last four digits of the Debtor's federal tax identification number are 7778. The Debtor's mailing address is 1266 East Main St., Stamford, CT 06902.

as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management or the Debtor's professionals, discussions with my colleagues who are also working on this matter, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial conditions.  If called as a witness, I could and would competently testify to the matters set forth in this Declaration.

4. On the date hereof (the "***Petition Date***"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), as well as certain motions and other pleadings (the "***First-Day Pleadings***"), with the Court.

5. Prior to the Petition Date, the XFL provided high-energy professional football, reimagined for the 21st century with many innovative elements designed to bring fans closer to the players and the game they love, during the time of year when they wanted more football. The league debuted on February 8, 2020 to immediate acclaim.  Nearly 70,000 fans attended the opening weekend's games, and more than 12 million viewers tuned in on television.  Just weeks after the first XFL games were played, however, the worldwide COVID-19 pandemic forced every major American sports league to suspend, if not cancel, their seasons.  On March 20, 2020, the XFL canceled the remainder of its inaugural season, costing the nascent league tens of millions of dollars in revenue.  The impossibility of knowing when the pandemic would sufficiently abate and allow the league to restart only exacerbated the problems posed by the Debtor's abrupt loss of revenue and unabated operating costs.  After considering all available strategic options, the Debtor and its professional advisors determined that the best course to preserve and maximize the value of the Debtor's estate is through a chapter 11 sale process. Americans are passionate about the game of football, and the all-too-short experience of the XFL

demonstrated that, absent global pandemics, there is a market for football beyond the professional and collegiate leagues and teams.

6. I have reviewed each of the First-Day Pleadings (including the exhibits and other attachments to such pleadings), and it is my belief that the facts set forth in each are true and correct. The relief sought in the First-Day Pleadings is necessary to the Debtor's efforts to preserve and maximize the value of its assets for the benefit of the Debtor's estate and creditors. The First-Day Pleadings are intended to enable the Debtor to operate effectively and efficiently within chapter 11 and to minimize adverse consequences that might otherwise result from the commencement of this chapter 11 case.

7. Part I of this Declaration provides a brief overview of the Debtor's business and the circumstances that prompted the commencement of the chapter 11 case. Part II provides an overview of the Debtor's significant assets and liabilities. Part III addresses the Debtor's strategy to maximize the value of its assets through chapter 11. Finally, Part IV affirms the facts that support the relief requested in the First-Day Pleadings.

**I.  Overview of the Debtor's business and the events leading to the chapter 11 filing**

8. Football is America's favorite sport, boasting more than 85 million fans—a level of demand that the traditional football season did not fully satisfy. Seizing the opportunity to meet that demand, Vince McMahon, a third-generation promoter best known for making World Wrestling Entertainment, Inc. ("***WWE***") into a global phenomenon,[2] founded the Debtor in September 2017 to explore investment opportunities across the sports and entertainment landscapes, with a specific focus on professional football. And after months of speculation in the

---

[2] Vince McMahon owns all of the Debtor's Class A (voting) units and approximately 76.5% of the Debtor's Class B (non-voting) units. The remainder of the Class B shares are held by the WWE. Vince McMahon is also the chairman, CEO, and majority owner of WWE.

media, on January 25, 2018, McMahon announced that he would start a new league—the XFL—to reimagine football for the 21st century.

9. The XFL kicked off with games beginning on February 8, 2020, and enjoyed immediate success. The XFL fit neatly into the professional sports landscape.[3] Delivering authentic, high-energy professional football for the whole family at an affordable price, during a time of year when fans wanted more football, the XFL offered fast-paced, three-hour games with fewer play stoppages and simpler rules. The XFL featured eight teams, 46-man active rosters, and a 10-week regular season schedule, with a postseason consisting of two semifinal playoff games and a championship game. The eight XFL teams were the DC Defenders, the Dallas Renegades, the Houston Roughnecks, the Los Angeles Wildcats, the New York Guardians, the St. Louis BattleHawks, the Seattle Dragons, and the Tampa Bay Vipers.

10. The games were high-profile events televised on national broadcast and cable networks, including ABC, FOX, and ESPN, with crowds averaging close to 20,000 people per game. The XFL pioneered innovative new elements in its game presentations to bring fans closer to the players and the game they love. With support from its broadcast partners, the XFL embraced the latest on- and off-field technology, providing live game coverage, content and real-time engagement across multiple platforms, giving fans greater access than ever before. The XFL also became the first professional sports league to incorporate betting information as part of the onscreen graphics presentations in its broadcasts. And betting on XFL games was robust by

---

[3] *See, e.g.*, Conor Orr, The Revamped XFL Off to Promising Start, SI.com (Feb. 9, 2020) ("[T]he XFL will snuggle neatly into the rotation with non-playoff hockey and non-tournament college basketball. It will exist within the football infrastructure and appeal to the offseason fan by not taking itself too seriously . . . . There is a market for all of this when it is packaged neatly and financed responsibly."), available at https://www.si.com/nfl/2020/02/10/xfl-opening-weekend-showed-promise.

all accounts, with legal wagering on XFL games approved in virtually every state offering legalized sports betting.

11. Play was exciting, and fans were engaged. 95% of the more than 300,000 fans who attended XFL games said that they had a positive game-day experience, and 94% said they would attend a future game. 80% of game-day fans agreed that the XFL featured "high quality football," and 80% of the national social-media conversation about XFL gameplay was positive. On television, XFL games drew 41.5 million total viewers, with an average P2+ rating of 1.9 million, and reached an average of 308,000 viewers aged 18 to 34—ranking third on this measure behind only the NFL and NBA when comparing nationally televised games. On XFL.com, the league hosted 10.8 million users across 19.4 million sessions. Since June 2019, the XFL also attracted 3.7 million followers across its various social-media channels and generated 1.2 billion impressions and 549 million video views across 23,000 social-media postings. All told, the XFL spurred 28 million instances of fan engagement on social media prior to the end of its first season.

12. The league's brand essence, raison d'être, and slogan — "For the Love of Football" — embodied the passion that players, coaches, and fans brought to every game. The level of play in the XFL surpassed expectations from the very beginning and only got better as the season progressed. Fans and experts alike lauded the XFL's gameplay innovations, such as modernizing the traditional kickoff and point-after-touchdown, and called for these innovations to be implemented across all levels of football. Hundreds of thousands of fans of attended games, and millions more watched. Attendance was strong, the games were fun, and the eight XFL teams were each truly building a local fan base.[4]

---

[4] *See, e.g.*, Ben Kercheval, XFL2020: Why start-up league should feel confident about returning in 2021 despite coronavirus shutdown, CBSSports.com (Mar. 13, 2020) ("Attendance was up. . . . [The XFL] was enjoyable and . . .

5

13. Unfortunately, the Debtor was not immune from the disruption of the global COVID-19 pandemic that has shuttered much of the United States and forced every major American sports league to suspend, if not cancel, their seasons.[5] On March 12, 2020, the Debtor canceled the remainder of its regular season, and on March 20, 2020, the Debtor made the difficult, but necessary, decision to cancel the remainder of the XFL's inaugural season after just five weeks.

14. It is estimated that cancellation of the final five weeks of league's regular season "negated approximately $27 million in fan spending on gameday-related items" such as ticket sales and food, beverage, and merchandise purchases, to say nothing of the revenue from playoff games or the lost opportunities for sponsorship revenue and brand development.[6] With the league shuttered and no games being played (or revenue being generated), the COVID-19 pandemic left the Debtor facing near-term liquidity issues. With the duration of the pandemic uncertain and the Debtor's operating expenses continuing unabated, the Debtor was left with few viable alternatives outside of chapter 11.

---

well-run. The in-game access separated it from a lot of other sports. The entertainment value was always there . . . ."), available at https://www.cbssports.com/xfl/news/xfl-2020-why-start-up-league-should-feel-confident-about-returning-in-2021-despite-coronavirus-shutdown; Hannah Smothers, Sorry to Other Sports, But I Want the XFL Back Most of All, VICE (Mar. 25, 2020) ("[S]ports are meant to be fun and cool, which the XFL seems to have kept in mind."), available at https://www.vice.com/en_us/article/dygjea/xfl-why-we-need-new-sports.

[5] Ben Kercheval, XFL2020: Why start-up league should feel confident about returning in 2021 despite coronavirus shutdown, CBSSports.com (Mar. 13, 2020) ("[T]he XFL season ended because of an act of God. Nobody -- not the NBA, not the PGA, not even late-night talk shows -- have been immune to that."), available at https://www.cbssports.com/xfl/news/xfl-2020-why-start-up-league-should-feel-confident-about-returning-in-2021-despite-coronavirus-shutdown/; Patrick Rishe, Why XFL Players Being Signed By NFL Presents More Opportunities Than Challenges For Upstart League, Forbes.com (Mar. 3, 2020) ("The XFL's first season in its new incarnation certainly didn't end the way league officials had envisioned. Let's face it...no one could have envisioned what has transpired in the last month . . . ."), available at https://www.forbes.com/sites/prishe/2020/03/31/why-xfl-players-being-signed-by-nfl-teams-presents-more-opportunities-than-challenges-for-the-upstart-league/#29cfd18c668b.

[6] Patrick Rishe, Why XFL Players Being Signed By NFL Presents More Opportunities Than Challenges For Upstart League, Forbes.com (Mar. 3, 2020), available at https://www.forbes.com/sites/prishe/2020/03/31/why-xfl-players-being-signed-by-nfl-teams-presents-more-opportunities-than-challenges-for-the-upstart-league/#29cfd18c668b.

15. Accordingly, the Debtor and its professional advisors, after considering all available strategic options, determined to commence this chapter 11 case to preserve and maximize the value of the estate. As noted above, the all-too-short experience of the XFL has demonstrated that, absent global pandemics, there is a market for football in the spring time and beyond that offered by established professional and collegiate leagues and teams. To that end, and as discussed in more detail below, Vince McMahon has committed to personally provide rescue financing and fund a chapter 11 process that will preserve and maximize the value of the Debtor's estate for the benefit of its stakeholders and football fans everywhere.

**II.     Overview of the Debtor's assets and liabilities**

16. The Debtor's most significant assets include the XFL brand and the trademarks and other intellectual property associated with the brand, including the league's "For the Love of Football" slogan. As Vince McMahon stated in his press conference announcing the XFL, "there's only so many things that have 'FL' on the end of them and those are already taken." And "nothing resonate[s] like the XFL." In addition, in contrast to many professional sports leagues, the XFL did not utilize a franchise system in which each team has a separate owner; rather, the Debtor centrally owns each of the eight XFL teams. As a result, the Debtor's assets also include the football equipment, merchandise, and intellectual property of the XFL's constituent teams, including all of the brands, trademarks, and other intellectual property associated with XFL teams.

17. The Debtor's year-to-date revenue through February 2020, encompassing the lead-up to the season and the first 3½ weeks of gameplay, was approximately $14 million. The Debtor's net losses during this period totaled approximately $44 million, and as of the Petition Date, the Debtor's cash on hand was approximately $5.6 million.

18. On March 25, 2020, the Debtor executed a senior secured promissory note (the "*Note*") with Vince McMahon in the principal amount of $7 million to provide the XFL with liquidity in the face of a shortfall. All of the Debtor's assets are collateral under the Note. On March 25, 2020, an initial advance of $5 million under the Note was made to fund, among other things, employee payroll. On April 9, 2020, the Debtor borrowed an additional $ 4 million under the Note, which was amended and restated to a principal amount of $9 million. As of the Petition Date, the Debtor has no other outstanding funded secured debt obligations other than the Note and believes that it has no other secured obligations of any kind other than any potential statutory liens claims of taxing authorities or vendors arising in the ordinary course under applicable state law.

19. The vast majority of the Debtor's liabilities are unsecured obligations owed to the Debtor's lessors or licensors, employees, and trade vendors. The Debtor is party to numerous agreements under which the Debtor licenses the right to use the football stadiums, practice facilities, and office space that the league and its eight teams need to operate. Additionally, the Debtor is party to a shared-services agreement with the WWE. Under the shared-services agreement, the WWE provides the Debtor with certain centralized corporate and administrative services, principally finance and accounting services.[7] As of the Petition Date, the Debtor is current on its obligations to the WWE.

20. Immediately prior to the Petition Date, the XFL employed approximately 400 individuals in various roles ranging from team presidents and football-operations staff to social-media directors, marketing directors, and community managers. The Debtor also employed

---

[7] The shared-service agreement also covers certain additional services, such as HR and marketing, that were initially provided by the WWE before being transitioned to the Debtor. As noted above, the WWE principally provided finance-related services as of the Petition Date.

8

approximately 500 football players.[8]  Unfortunately, on April 10, 2020, the Debtor terminated all but 18 of its employees and paid the employees' accrued wages and unused vacation.

**III.   The Chapter 11 Case**

21.     The Debtor, in consultation with its professional advisors, has diligently evaluated a range of strategic alternatives to address the near-term liquidity challenges created by the COVID-19 pandemic.  To address these challenges, the Debtor and its professional advisors, after considering all available strategic options, have determined that the best course of action is pursue a robust and independent chapter 11 sale process that will preserve and maximize the value of the Debtor's estate.

22.     To that end, the Debtor appointed an independent manager, John Brecker of Drivetrain, LLC, to oversee the Debtor's chapter 11 efforts.  Mr. Brecker is an executive with director and management experience specializing in distressed debt and equities, including serving as a board member for several public and private companies, including Ditech Holding Corporation; US Wells Services, Inc.; Colt Manufacturing Company; Nelson Education Ltd.; ACA Financial Guaranty Corp.; PMI Group, Inc.; and Catalyst Paper Company, Inc.  Any sale, financing, or restructuring of the Debtor that involves any of the Debtor's insiders is subject to Mr. Brecker's evaluation and approval.  Since his appointment, Mr. Brecker has overseen the negotiations over the Debtor's postpetition financing, and he has played, and will continue to play, an integral role in the overall sale and restructuring process.

23.     Under Mr. Brecker's oversight, the Debtor has determined it is necessary to commence this chapter 11 case with a debtor-in-possession financing facility consisting of

---

[8] In addition to the eight teams in the league, the XFL has a separate "Team 9" that does not play league games but serves as a centralized practice squad and farm team for the rest of the league.  Team 9 shares practice facilities with the Dallas Renegades but maintains a separate coaching staff and a roster of 35 to 40 players.

9

entirely new money from Vince McMahon, including an interim draw of $750,000, to fund the Debtor's payroll and allow the Debtor the time and resources necessary to conduct a robust chapter 11 sale process. The Debtor is optimistic that the sale process will generate significant interest from potential purchasers, and the Debtor intends to hold an auction for its assets if it receives multiple bids in accordance with Court-approved bid procedures.

24. The Debtor has determined in its business judgment that the postpetition-financing proposal provided by Vince McMahon is the best available option under the circumstances. Immediate access to incremental liquidity in the form of the debtor-in-possession facility is critical to preserving the value of the Debtor's estate and a value-maximizing sale transaction.

## IV. The First-Day Pleadings

25. The Debtor has filed a number of First-Day Pleadings in this chapter 11 case seeking orders granting various forms of relief intended to stabilize the Debtor's business operations and facilitate the efficient administration of the chapter 11 case. The First-Day Pleadings include:

(a) Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Cash Management System; (II) Authorizing Use of Prepetition Bank Accounts and Certain Payment Methods; (III) Waiving the Requirements of 11 U.S.C. § 345(B) on an Interim Basis; and (IV) Granting Related Relief;

(b) Debtor's Motion for Entry of Interim and Final Orders Authorizing (I) the Debtor to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto;

(c) Debtor's Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtor to Pay and Honor Certain (A) Prepetition Wages, Benefits, and Other Compensation Obligations, (B) Prepetition Employee Business Expenses, and (C) Workers' Compensation Obligations; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (III) Granting Related Relief;

(d) Debtor's Motion for Entry of Interim and Final Orders Authorizing (I) the Debtor to Honor and Refund Certain Customer Obligations; and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto;

(e) Application for Authorization to Employ and Retain Donlin Recano & Company, Inc. as Claims and Noticing Agent Effective as of the Petition Date; and

(f) Motion for Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 362, 363, 364 and 507, (A) Authorizing Post-Petition Financing, (B) Authorizing use of Cash Collateral, (C) Scheduling a Final Hearing, and (D) Granting Related Relief.

26. The First-Day Pleadings seek authority to, among other things, obtain debtor-in-possession financing, honor employee-related wages and benefits obligations, and ensure the continuation of the Debtor's cash-management systems and other business operations without interruption. I believe that the relief requested in the First-Day Pleadings is necessary to give the Debtor an opportunity to work towards a successful chapter 11 case that will benefit all of the Debtor's stakeholders.

27. As explained above, facing tightening liquidity due to the COVID-19 pandemic and the cancellation of the XFL's inaugural season, the Debtor, in consultation with its legal and financial advisors, made the good-faith decision to commence the chapter 11 case and to pursue a potential sale of any or all of the Debtor's assets.

28. The Debtor requires postpetition financing and the use of cash collateral to, among other things, pay the costs and expenses associated with administering the chapter 11 case; continue the orderly operation, wind-down, and marketing of the Debtor's business; maximize and preserve the Debtor's going-concern value; make payroll; and satisfy other working-capital and general corporate purposes. To that end, the Debtor has contemporaneously filed a motion (the "***DIP Motion***") seeking interim and final orders (together, the "***DIP Orders***") authorizing postpetition financing and the use of cash collateral. Without access to the DIP Facility (as defined in the DIP Motion) and the continued use of Cash Collateral (as defined in

the DIP Motion), the Debtor and its estate would suffer immediate and irreparable harm. The Debtor does not have sufficient available sources of working capital and financing to operate its businesses or maintain its properties in the ordinary course of business without access to the DIP Facility and the authorized use of Cash Collateral.

29. All of the Debtor's assets constitute the collateral of Vince McMahon under the Note. In negotiating the terms of the proposed postpetition financing, Vince McMahon was unwilling to consent to the priming of his prepetition lien by a third-party lender, even if such third-party lender was willing to lend. The proposed debtor-in-possession financing was negotiated in good faith and at arms' length. The proposed postpetition financing proposes certain highly favorable terms that I believe a different lender would be unwilling to offer, including (i) no fees such as unused line or closing fees and (ii) no postpetition debt-service payments. The proposed financing terms are therefore fair and reasonable.

30. Under the circumstances, the Debtor is unable to obtain (i) adequate unsecured credit allowable either (a) under §§ 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under § 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of their estates under § 364(c)(2) of the Bankruptcy Code or (y) a junior lien on encumbered assets under § 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under § 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender (as defined in the DIP Motion) on terms more favorable than the terms of the DIP Facility. The only viable source of secured credit available to the Debtor, other than the use of Cash Collateral, is the DIP Facility. The Debtor requires both additional financing under the DIP Facility and the continued use of Cash Collateral under the terms of the DIP Orders to satisfy its postpetition liquidity needs.

31. Additionally, several of the First-Day Pleadings request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtor has narrowly tailored its requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estates. Other relief will be deferred for consideration at a later hearing.

32. I am familiar with the content and substance of the First-Day Pleadings. The facts stated therein are true and correct to the best of my knowledge, information, and belief. In addition, I believe that the relief sought in each of the First-Day Pleadings (i) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its business operations and (ii) constitutes a critical element in successfully implementing the Debtor's chapter 11 strategy.

## V.  CONCLUSION

For all the reasons described herein and in the First-Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First-Day Pleadings.

Dated: April 13, 2020

*/s/ Jeffrey N. Pollack*
Jeffrey N. Pollack