## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ALPHA ENTERTAINMENT LLC,[1]<br><br>             Debtor. | Chapter 11<br>Case No. 20-10940 (LSS)<br><br>**Objection Deadline: May 19, 2020, at 4:00 p.m. (ET)**<br>**(extended as to the Committee by consent)**<br>**Hearing Date: May 27, 2020, at 11:00 a.m. (ET)**<br><br>**Relating Docket No. 5** |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALPHA ENTERTAINMENT LLC TO THE DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING (I) THE DEBTOR TO HONOR AND REFUND CERTAIN CUSTOMER OBLIGATIONS; AND (II) BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 case of Alpha Entertainment LLC, the above-captioned debtor and debtor-in-possession (the "Debtor"), hereby files this objection (the "Objection") to the *Debtor's Motion for Entry of Interim and Final Order Authorizing (I) the Debtor to Honor and Refund Certain Customer Obligations; and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto* [Docket No. 5] (the "Ticket Refund Motion").[2] In support of its Objection, the Committee states as follows:

### PRELIMINARY STATEMENT

1.      At the outset of this case, the Debtor seeks approval to pay $650,000[3] to a single subset of prepetition unsecured creditors—the Season Ticket Holders—at the direct expense of the

---

[1] The last four digits of the Debtor's federal tax identification number are 7778. The Debtor's mailing address is 1266 East Main St., Stamford, CT 06902.

[2] Capitalized but undefined terms in this Objection shall have the same meanings as ascribed to them in the Ticket Refund Motion.

[3] The Committee is informed that a substantial portion of the $3.5 million that the Debtor initially proposed to refund through the Ticket Refund Motion has already been refunded to the respective Season Ticket Holders through credit card refunds or from other sources and that the Debtor now seeks to pay $650,000. For the avoidance of doubt, the

estate and its other unsecured creditors. Because Season Tickets are not afforded priority status under section 507(a)(7) of the Bankruptcy Code, the issuance of refunds outside of the plan context is in direct contravention of the Bankruptcy Code. By remitting full and immediate payment of the Season Ticket Holders' claims, the Debtor is clearly favoring one group of unsecured creditors over others similarly situated, which is not authorized by the Bankruptcy Code or its underlying tenets of fairness amongst creditors and equality of distribution.

2. Regardless of the priority afforded the Season Ticket Holders' claims, the refunds are not authorized under either section 105(a) or 363(b) of the Bankruptcy Code because such payments are not a sound exercise of business judgment. It is antithetical to sound business practices for the Debtor's first order of business to be draining the estate of $3.5 million or such lesser sum that is now being sought, thereby creating an unnecessary liquidity crisis. The baselessness of this request is underscored by the statements in Debtor's Motion for DIP Financing (Doc 7) that without an immediate infusion of capital, there is a risk that the Debtor will be administratively insolvent. It cannot be a sound exercise of business judgment to expend limited resources to pay a group of prepetition creditors in a case where the debtor is largely non-operational. This is an unnecessary expenditure designed to buttress the Debtor's argument that an abbreviated sales process is required and is being sought to further the efforts of the Debtor's controlling equity holder/secured lender, Vincent McMahon ("McMahon"), to acquire the Debtor at a fire sale price.

3. One of the purported reasons for issuing these refunds is to preserve goodwill and the value of the XFL brand. Seeking to preserve goodwill and the perceived value of the brand in advance of a sale of the Debtor's assets, however, is placing the cart before the horse. The

---

Committee objects to the issuance of *any* refunds to the Season Ticket Holders at this time, regardless of whether such refunds total $3.5 million or any lesser (or greater) amount.

intentions of a potential purchaser of the Debtor's assets are unknown at this time, so the Debtor cannot possibly know now with any degree of certainty whether issuing refunds to Season Ticket Holders will preserve brand value or generate goodwill or if it could possibly have the unintended opposite result of degrading the value as it could signal to the marketplace that there is no confidence that there will be a next season or will require an entirely new marketing effort by a new owner to reacquire those customers who might possibly have spent the money elsewhere. Simply put, the Ticket Refund Motion, and relief requested therein, is premature.

4.     Consistent with the Debtor's overall strategy to cram this case through chapter 11 on an unnecessarily expedited timeline, the Debtor is rushing these refunds. There is no ongoing concern to rush the payment of those claims as the Debtor is largely non-operational. Time must be allowed for a full accounting of when and if Season Ticket Holders should be refunded. Given the early stage of the proceeding, and numerous pressing issues that require immediate attention, estate resources should not be burned addressing non-urgent matters such as this.

5.     For these reasons, and those set forth in this Objection, the Ticket Refund Motion should be denied.

**RELEVANT BACKGROUND**

**A.     General Background**

6.     On April 13, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has continued to operate and manage its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtor's bankruptcy case.

7.     On April 23, 2020, the United States Trustee appointed a seven-member Committee consisting of: (i) Jonathan Hayes; (ii) '47 Brand LLC; (iii) NEP Supershooters LP d/b/a Bexel ESS; (iv) XOS Technologies, Inc.; (v) CP Communications; (vi) Ticketmaster; and (vii) DC

Stadium LLC. On April 28, 2020, the Committee selected Greenberg Traurig, LLP to serve as its general bankruptcy counsel.

**B.     The Ticket Refund Motion**

8.      On the Petition Date, as part of its first day motions, the Debtor filed the Ticket Refund Motion, which seeks the entry of an order authorizing (i) the Debtor to refund the value of cancelled game tickets to the Season Ticket Holders; and (ii) authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to same.

## OBJECTION

**A.     Season Tickets Do Not Have Priority Status Under Section 507(a)(7) of the Bankruptcy Code and Therefore the Distribution Should Not be Made.**

9.      Section 507(a)(7) does not afford Season Ticket Holders priority status. Section 507(a)(7) provides priority status only for "allowed unsecured claims of individuals, to the extent of $3,025 for each such individual, arising from the ***deposit***, before the commencement of the case, ***of money*** in connection with the purchase, lease, or rental of property, or the purchase of services . . . ***that were not delivered or provided***." 11 U.S.C. § 507(a)(7) (emphasis added). "The Bankruptcy Code does not define the term 'deposit.'" *In re City Sports, Inc.*, 554 B.R. 329, 334 (Bankr. D. Del. 2016). Nevertheless, courts in this District have found that "the meaning of the term 'deposit' is clear": "the term 'deposit' connotes a ***temporal relationship*** between the time consideration is given and the time the right to use or possess is vested in the individual giving the consideration." *Id.* at 335 (emphasis in original) (quoting *In re Nittany Enters., Inc.*, 502 B.R. 447, 455 (Bankr. W.D. Va. 2012)).

10.     In *City Sports*, Judge Gross held that section 507(a)(7) does not afford money orders, store credit, or gift cards priority status because such transactions are complete once those instruments are issued:

> The purchase of a gift card is a short transaction, without a temporal relationship: the consumer makes payment and simultaneously receives the gift card. Whether the consumer uses the gift card in a future transaction, or gives the card to another party and that party uses it in a future transaction, is beyond the scope of the inquiry.

*Id.* at 335-36, 338.[4]

11. Like the gift cards at issue in *City Sports*, the Season Tickets here are "more akin to the purchase of a product (a transferable instrument) for immediate delivery." *Id.* at 336-37 (quoting *In re Nw. Fin. Express, Inc.*, 950 F.2d 561, 563 (8th Cir. 1991)). Pursuant to the Terms of Use, available at https://am.ticketmaster.com/xfl/terms#/ and attached hereto as "**Exhibit A**," Season Ticket Holders may "forward [their] season tickets to another person." *See* Terms of Use – Season Ticket Forwarding. Season Ticket Holders are expressly permitted to use Advanced Services (as that term is defined in the Terms of Use) to sell their tickets through Ticketmaster. *See* Terms of Use – Posting Tickets for Sale.

12. The purchase of Season Tickets is a short transaction, without a temporal relationship. The Season Ticket Holder makes payment and simultaneously receives the Season Tickets. Whether the Season Ticket Holder attends each game or gives the tickets to another party and that party attends each game is beyond the scope of the inquiry. *See City Sports*, 554 B.R. at 335-36; *In re Util. Craft, Inc.*, No. 06-10816, 2008 Bankr. LEXIS 3564, at *11 (Bankr. M.D.N.C. Dec. 29, 2008) ("[W]hether the Creditor decided to use the Store Credit is not part of the inquiry."). The Season Tickets, therefore, do not come under the definition of "deposit," and section 507(a)(7) does not afford them priority status.

---

[4] The Debtor relies on *In re WW Warehouse, Inc.*, 313 B.R. 588 (Bankr. D. Del. 2004), as its sole support for its position that Season Tickets Holders may have priority claims under section 507(a)(7) of the Bankruptcy Code. *See* Ticket Refund Motion, at ¶ 14. The court in *WW Warehouse* found gift cards fell under the definitional reach of "deposit" because "[c]onsumers do not purchase gift certificates…as the ultimate purchase." *Id.* at 595. In other words, a gift card entails a temporal relationship because purchase of the card contemplates an additional step—use of the card to purchase property or service from the seller. However, as explained by the court in *City Stores*, the court in *WW Warehouse* wrongly focused on "the ultimate purchase," an amorphous concept with potentially unlimited temporal extension. The court should have focused on the limits of the *transaction*: *i.e.*, the purchase and simultaneous receipt of the gift card itself.

13.     Because Season Tickets are not afforded priority under section 507(a)(7) of the Bankruptcy Code, the Debtor's request that it be permitted to refund the value of any cancelled game tickets to Season Ticket Holders not only requires this Court to create substantive rights not found in the Bankruptcy Code, but is also in direct contradiction to other, substantive provisions of the Bankruptcy Code requiring that all creditors of the same class be treated fairly and equally. *See, e.g.*, 11 U.S.C. § 1129(b).  By requesting permission to refund the Season Ticket Holders, the Debtor discriminates against the estate's unsecured creditors for the benefit of the lucky few.[5]

14.     The Debtor's attempt to favor certain unsecured creditors over other creditors with similar claims is not authorized by the Bankruptcy Code or its underlying tenets of fairness amongst creditors and equality of distributions.  Accordingly, the Ticket Refund Motion should be denied.

**B.    It Is Premature to Suggest that Issuing Refunds to Season Ticket Holders Will Preserve or Enhance the Value of the Debtor's Estate.**

15.     Refunding the value of the Season Tickets to the Season Ticket Holders will drain the estate of substantial resources and may not provide any correspondent benefit.  As if this were an operating retail case, the Debtor suggests that issuing the Season Ticket refunds will promote loyalty and generate goodwill.  With the Debtor's cancellation of the XFL season and the termination of almost all its employees, however, the Debtor is largely non-operational such that the customer loyalty parallel to an operating retail case, for example, fails.  Without knowing who the purchaser of the Debtor's assets will be and what the purchaser's intentions are with respect to

---

[5] The Debtor cites the COVID-19 crisis and the resulting financial difficulties facing Americans as support for the refunds.  The Debtor's statement that the refund is needed by ticket holders to address economic problems caused by the pandemic has not been supported by evidence.  Even so, the Committee and its counsel are not unsympathetic to those that have suffered economic hardships resulting from the COVID-19 pandemic.  Nevertheless, such hardships (even if proven) are not limited to the Season Ticket Holders: the COVID-19 pandemic has likely had some negative financial impact on nearly all (if not all) of the estate's creditors.  Indeed, and unfortunately, the economic consequences of the COVID-19 pandemic are widespread, with many individuals and corporations facing financial difficulties.  The claims of the Season Ticket Holders should not be paid first over the claims of other similarly situated—and equally affected—creditors.

the assets, the Debtor cannot possibly know at this time whether issuing refunds to Season Ticket Holders will preserve the value of the Debtor estate's or benefit any creditor, other than possibly McMahon. The Ticket Refund Motion is, therefore, premature.

16. In lieu of the Debtor's risky value proposition, the Committee recommends that the Debtor adopt a more prudent "wait and see" approach with respect to any further refunds to Season Ticket Holders. The value associated with any issuing refunds to Season Ticket Holders is likely to become clearer in connection with or following the sale of the Debtor's assets, such that, at a minimum, no further refunds should be authorized until that time (and only if the value associated with issuance of such refunds can be adequately established by the Debtor).

17. Finally, if the goodwill associated with the Season Ticket Holders is determined to represent a material component of the Debtor's assets to be sold, the payment of the Ticket Refunds could be included as a potential assumed obligation of any purchaser of the Debtor's assets. Providing an asset purchaser with the option to assume the Ticket Refund obligation would provide the purchaser with maximum flexibility and would let the market determine the value associated with the goodwill. More importantly, the estate would not bear the cost or be compelled to secure post-petition financing to satisfy these claims, to the detriment of the unsecured creditor body.

**C.    Alternatively, and Additionally, Sections 105(a) and 363(b) of the Bankruptcy Code Do Not Authorize Payments to the Season Ticket Holders**

18. The Debtor relies on sections 105(a) and 363(b) of the Bankruptcy Code as support for its refunds to the Season Ticket Holders. Under section 363(b), the debtor may use property of the estate outside the ordinary course of business[6] only when it has demonstrated that the use of such property represents "the sound exercise of business judgment." *In re Elpida Memory, Inc.*,

---

[6] Mass refunds necessitated by a global pandemic fall far outside the parameters of "ordinary course transaction." According to counsel for the Debtor, the refunds account for approximately twenty-one to twenty-three percent of the estate's total unsecured obligations. *See* Transcript of April 15, 2020 "First Day Hearings", p. 8, ll. 20–25.

No. 12-10947, 2012 Bankr. LEXIS 5367, at *18 (Bankr. D. Del. Nov. 16, 2012). This standard is "well-settled." *Id.* Additionally, "section 105(a) cannot be used to craft new remedies that contravene existing statutory provisions or create substantive rights that are otherwise unavailable under applicable law." *Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 242 F. Supp. 3d 322, 330 n.12 (D. Del. 2017) (citations omitted).

19. There is no justification, much less a sound one, to drain $3.5 million or such lesser sum, from the estate to pay the claims of the Season Ticket Holders at this early stage. As recognized by this Court at the First Day Hearings, there is no requirement to refund the Season Ticket Holders at this time (or at any time prior to confirmation). *See* Transcript of April 15, 2020 "First Day Hearings", p. 26, ll. 5–13 (Court: "This is not the situation like we have, for example, in retail cases, . . . where you bring people in the door to get their refunds, and then they spend money right there, and you're trying to grab that customer base. . . . [I]t does not strike me as the same benefit to getting those refunds started immediately . . . ."). Also at the First Day Hearings, counsel for the Debtor clarified that the Season Ticket Holders covered by the Ticket Refund Motion "had decided to roll their games forward. . . . These are the people who said I want to roll my tickets forward, in an effort to hope that there's a season for next year." *Id.* at p. 27, ll. 3–9. The alleged urgency to issue the refunds was created by the Debtor, which informed the Season Ticket Holders that elected the rollover option that each would receive a refund instead.

20. Despite there being no legitimate need for the immediate issuance of refunds, the Debtor nevertheless seeks to rush and make these payments to the Season Ticket Holders at the outset of this case. It is premature (and improper), however, for the Debtor to make significant payments to the Season Ticket Holders at this juncture.

21.     As set forth in greater detail in the Committee's objection to the DIP Motion,[7] if the Debtor does not refund the Season Ticket Holders at this early stage, the Debtor will likely have sufficient liquidity to support its limited operations for the first 13 weeks of the case without the need for any post-petition financing.  Avoiding unnecessary post-petition financing is critical, as such financing could have the effect of chilling the bidding in connection with the sale of the Debtor's assets and would make the Debtor even more beholden to McMahon, an already influential insider.  Although the Debtor markets the refunds as a way to give back during the COVID19 crisis, and the Committee sympathizes with the economic hardships faced by many individuals and companies alike during these uncertain times, the dominant factor motivating such refunds is the depletion of the estate to the point of requiring post-petition financing.

22.     The Debtor's desire to drain its liquidity at the outset of the case—to the point of requiring post-petition financing—does not make sound business sense unless it is being driven by the desire of McMahon, an already influential insider, to capitalize off the market disruption caused by the pandemic and the opportunity to acquire the Debtor's assets on the cheap.  Therefore, the Ticket Refund Motion should be denied.

## RESERVATION OF RIGHTS

23.     The Committee and its professionals reserve the right to amend, supplement, and modify this Objection, including by filing a declaration in support thereof, to introduce evidence

---

[7] Concurrently with this Objection, the Committee is also filing an objection (the "DIP Objection") to the Debtor's *Motion for Interim and Final Orders, Pursuant To 11 U.S.C. §§ 105, 362, 363, 364 and 507 (A) Authorizing Post-Petition Financing, (B) Authorizing Use of Cash Collateral, (C) Scheduling a Final Hearing, and (D) Granting Related Relief* [Docket No. 7] (the "DIP Motion").  All arguments against the unnecessary post-petition financing that are set forth in the DIP Objection are fully incorporated herein.  For brevity's sake, such arguments will not be repeated in this Objection.

at any hearing(s) relating to this Objection and the Ticket Refund Motion, and to further object to the Ticket Refund Motion or any other relief that the Debtor may seek in this case.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an order (i) sustaining this Objection, (ii) denying the Ticket Refund Motion, and (iii) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
May 19, 2020

**GREENBERG TRAURIG, LLP**

By: */s/ Dennis A. Meloro*
Dennis A. Meloro (DE Bar. No. 4435)
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7395
Facsimile: (302) 661-7165
Email: melorod@gtlaw.com

Howard J. Steinberg (CA Bar No 89291)
1840 Century Park East, Suite 1900
Los Angeles, California 90067
Telephone: (310) 586-7700
Facsimile: (310) 586-7800
Email: steinbergh@gtlaw.com

Shari L. Heyen (*pro hac vice* pending)
1000 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 374-3500
Facsimile: (713) 374-3505
Email: heyens@gtlaw.com

David B. Kurzweil (*pro hac vice* pending)
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2212
Email: kurzweild@gtlaw.com

**PROPOSED COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALPHA ENTERTAINMENT LLC**