## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 20-10940 (LSS) |
| ALPHA ENTERTAINMENT LLC,[1] | |
| | **Obj. Deadline: May 19, 2020, at 4:00 p.m. (ET)** |
| Debtor. | **(as extended as to Committee by consent)** |
| | **Hearing Date: May 27, 2020, at 11:00 a.m. (ET)** |
| | |
| | **Relating Docket No. 55** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALPHA ENTERTAINMENT LLC TO DEBTOR'S MOTION FOR ENTRY OF: (A) AN ORDER (I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (II) SCHEDULING AN AUCTION FOR AND HEARING TO APPROVE THE SALE, (III) APPROVING NOTICE OF RESPECTIVE DATE, TIME AND PLACE FOR AUCTION AND FOR HEARING ON APPROVAL OF SALE, (IV) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (V) APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (VI) GRANTING RELATED RELIEF; AND (B) AN ORDER AUTHORIZING AND APPROVING (I) THE SALE FREE AND CLEAR OF LIENS, CLAIMS, RIGHTS, ENCUMBRANCES, AND OTHER INTERESTS, AND (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (III) RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Alpha Entertainment LLC, the above-captioned debtor and debtor-in-possession (the "Debtor"), hereby files this objection (the "Objection") to the Debtor's *Motion for Entry of: (A) an Order (I) Approving Bidding Procedures in Connection With the Sale of Substantially all of the Debtor's Assets, (II) Scheduling an Auction for and Hearing to Approve the Sale, (III) Approving Notice of Respective Date, Time and Place for Auction and for Hearing on Approval of Sale, (IV) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (V) Approving Form and Manner of Notice Thereof, and (VI) Granting*

---

[1] The last four digits of the Debtor's federal tax identification number are 7778.  The Debtor's mailing address is 1266 East Main St., Stamford, CT 06902.

*Related Relief; and (B) an Order Authorizing and Approving (I) the Sale Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests, and (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (III) Related Relief* [Docket No. 55] (the "Bid Procedures Motion")[2].  In support of its Objection, the Committee states as follows:

## PRELIMINARY STATEMENT

1.    This is a liquidating chapter 11 case and the Debtor has ceased operations.  As is typical in these type of cases, the creditors' ability to be paid is highly dependent upon the efficacy of the sales process.  The Committee's objective in this case is to ensure that procedures are in place to ensure a fulsome and fair process.  Unfortunately, the Debtor, at the behest of Vincent McMahon ("McMahon"), the Debtor's controlling shareholder and recently secured lender, while acknowledging that these are the aims to be achieved, has done little more than act as a shill for McMahon.  The Committee has requested that the sales process be extended 60 days, which request has been denied.  The Debtor can readily reach this sale date by modifying its budget with no DIP loan, or, if McMahon seeks to pay ticket holders and continue retention of assets and employees that may ultimately inure to his benefit,  he can provide a DIP loan without the crippling restrictions contained in the  proposed DIP loan.

2.    The essential steps needed to have a meaningful sales process were not taken prior to filing this chapter 11 case and have only just gotten underway.  Despite the fact that the Debtor and McMahon knew full well before the filing that this case was going to involve a sales process, and with the passage of more than 30 days since the case was filed, no data room has

---

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Bid Procedures Motion.

*ACTIVE 50266926v10*

been set up; no information memorandum, confidential or otherwise has been prepared; and prospective purchasers are being advised of deadlines to submit letters of intent and bids even though the Court has not approved such deadlines and the Bid Procedures Motion does not even mention a deadline for letters of intent. The bid process requires that McMahon receive all bids received by the Debtor along with confidential financial information about the financial wherewithal of prospective purchasers. No other prospective bidder is afforded such information. The auction sale is to be held 40 days after this hearing and if McMahon is the successful bidder, the bid procedures allow McMahon to receive a prophylactic free and clear sales order that will insulate him from claims that may be assertible against him for his conduct to date. If this is the choice afforded to creditors, the Committee prefers that this case be converted to chapter 7 so that a disinterested trustee can sell the assets in due course and bring whatever claims he deems appropriate.

3.     The Debtor proposes an unnecessarily compressed sale timeline that is not designed to maximize value. Rather it is designed to minimize the opportunity for third parties to evaluate and bid upon assets that the insider to the Debtor, McMahon, seeks to acquire at the expense of the creditors of this estate. On the eve of the bankruptcy filing, McMahon made a low interest secured loan to the Debtor that has been coupled with a DIP lending facility[3] and requires as a condition of the loan that there be an unreasonably abbreviated time period for prospective purchasers to conduct due diligence and bid on the Debtor's assets. Thus, in consideration for making a short term favorable loan, McMahon more than offsets any benefit

---

[3]   Concurrently with this Objection, the Committee is also filing an objection to the Debtor's DIP Motion (the "DIP Objection").

the estate would otherwise enjoy, subverting the right of third parties to have a robust auction process.

4.      An unnecessarily expedited sale process in this case does not make sense for, without limitation, the following reasons:

❖      **No Depreciation or Dissipation of Assets**. The Debtor's assets are not depreciating or dissipating—there is no "melting ice cube". The unnecessarily compressed timeline mistakenly signals that there is a need for a quick sale and may depress sales price.

❖      **No Pre-petition Marketing**. There was no pre-petition marketing of the Debtor's assets.

❖      **Investment Banker Needs Time**. The Debtor is only just retaining an investment banker to commence post-petition marketing of the Debtor's assets. The Debtor's assets are unique and require a bespoke sales process. The Committee and its professionals are also not aware of any ready list of potential buyers here and the investment banker needs to be incentivized to find interested third party bidders.

❖      **COVID-19**. The pandemic restrictions remain and continue to cause market disruption. There will be greater clarity on the live sports and entertainment market in a few months.

❖      **Complexity and Diligence**. The Debtor's assets include intricate and complex intellectual property rights associated with a professional sporting league that will require significant due diligence.

❖      **Limited Operations and Cost.** The Cost of extending the sale timeline is marginal since the Debtor's business is largely non-operational.

The Bidding Procedures should, therefore, be modified to provide an extended sale timeline that will enable the Debtor to maximize the value of its assets for the benefit of all stakeholders.

5.      While, in certain instances, courts may be inclined to approve a sale under section 363 of the Bankruptcy Code on an accelerated timeline, the facts here do not support such relief: (i) these assets are complex, require meaningful due diligence and are not depreciating; (ii) these

4

assets have not been marketed *at all* pre-petition and post-petition marketing has yet to commence; (iii) the Debtor's is largely non-operational such that the additional cost to run a longer process is marginal when compared to the potential value that a longer process might unlock; (iv) the Debtor has not yet setup a data room to facilitate potential purchaser due diligence and no information memorandum has been prepared; (v) these are not normal times or market conditions; (vi) the ability to interact in person with potential purchasers is largely unavailable; and (vii) no onsite due diligence.  The Debtor's ability to attract competing bidders for a robust auction of its assets is hampered by the COVID-19 pandemic such that any attempt to advance a sale process on the proposed truncated timeline cannot possibly be viewed as trying to maximize value for the Debtor's assets, which the Debtor concedes it has a fiduciary duty to do.

6.      Corrective measures are also needed to address overreaches that have taken place in the limited time that the Debtor's investment banker has been put in place.  Teasers have been sent to prospective purchasers advising of an June 12 deadline to submit letters of intent. Although this date may be subject to change, it was selected without prior notice to the Court and parties in interest, nor was it mentioned in the Bid Procedures Motion.  It certainly has not approved by the Court.  These steps are detrimental to the sales process and prospective purchasers may elect to pass on the sale given the unreasonably short time periods involved. These missteps create the likelihood that some parties who may have otherwise been interested in the sale pass on the opportunity and that a false impression will be created that the Debtor was actively and properly marketed when such is not the case. Whether prospective purchasers will be willing to take a second look at the opportunity after having been given misleading information remains to be seen.  In any event, this fosters an environment where purchasers, who

5

may be concerned about a process that has been dominated to date by McMahon, the ultimate insider, will be fairly run.

7.      The notion of an unnecessarily compressed timeline is also inconsistent with the Debtor's desire to secure the Insider DIP which, if approved, would enable the Debtor to have more than sufficient liquidity to run a sale process for at least an additional few months in order to maximize value for the estate and its creditors.[4]  The Bidding Procedures should, therefore, be modified to extend the sale process by at least 60 days to facilitate appropriate market-testing for the assets and to ensure that there is a level playing field for all bidders.

8.      McMahon's sale deadline process presents a significant impediment to achieving the highest value for the Debtor's assets.  The Bidding Procedures propose to afford McMahon the ability to credit bid his purported pre-petition secured debt and any amounts he may advance under the Insider DIP, and do not require him to disclose his intent to do so until the Bid Deadline.  As set forth in greater detail in the DIP Objection, the Committee has not had the opportunity to investigate the propriety of the purported secured advances made by McMahon— the Debtor's largest shareholder and control person[5]—to the Debtor, including $4 million advanced just days before the Petition Date.  Permitting McMahon to delay his election to credit bid would chill bidding for the Debtor's assets to the detriment of unsecured creditors.

9.      McMahon should also be required to disclose now whether he intends to credit bid and on what terms.  Affording McMahon the ability to disguise his credit bid intentions until the Bid Deadline will be highly prejudicial to the sale process and unquestionably chill third-

---

[4] As set forth in greater detail in the DIP Objection, based on the Debtor's proposed budget, the Debtor has sufficient liquidity even without the Insider DIP to extend the sale process by several months.

[5] McMahon owns 100% of the Class A voting equity interests in the Debtor and 73.5% of the non-voting Class B equity interests.

party interest in the Debtor's assets in an already challenging sale market.  The Court should require McMahon to disclose now whether and in what amount he intends to attempt to credit bid his debt.

10.    At minimum, the proposed Bidding Procedures should be significantly modified in order to create a fair and open process.  As detailed herein, those modifications should include, without limitation, the following:

> ❖    **Artificial and Prejudicial Bid Deadline.** The Bidding Procedures impose an artificial and arbitrary Bid Deadline of July 6, 2020 for third parties to submit Qualifying Bids.  The Bid Deadline coinciding with a July 4th holiday weekend effectively truncates the proposed timeline even further.  The entire sale process should be expanded by *approximately 60 days* to give all potential bidders an opportunity to perform meaningful due diligence and submit bids for the Debtor's assets.

> ❖    **McMahon Should Not be Permitted to Credit Bid**.  McMahon should be precluded from credit bidding unless and until the Committee has had sufficient time to investigate McMahon's alleged secured position.  In addition, McMahon should need to disclose, well in advance of the Bid Deadline, whether he intends to assert his alleged credit bid right.  Giving McMahon the flexibility to only first disclose his intent to credit bid on the Bid Deadline is sure to chill the interest in and bidding on the Debtor's assets.

> ❖    **McMahon Should Not be a "Consultation Party"**.  The Bidding Procedures improperly include McMahon as a "Consultation Party."  Under no circumstances should McMahon be permitted to be both a "Consultation Party" and a bidder.  For lack of a better term, such a procedure would permit McMahon to bid based upon "insider information."

> ❖    **No Stalking Horse Bid Protections**.  Given that this case is being run largely for the benefit of McMahon, there is no basis for providing any bid protections under these abbreviated sale timelines and where the proposed Bid Deadline is just days after the proposed Stalking Horse Bid Deadline.  Furthermore, and in any event, should McMahon enter into a Stalking Horse Agreement with the Debtor, he should not be entitled to any bid protections.  McMahon already has the most knowledge and information about the Debtor's assets.

> ❖    **The Committee Should Have Unfettered Access to Due Diligence Materials**.  Allows the Debtor to provide the Committee "due diligence access or additional information" as the Debtor and McMahon "deem reasonable and appropriate under the circumstances." *See* Bidding Procedures, at § Vi.  The

Committee should be consulted throughout the sale process and provided unfettered access to due diligence materials. The Committee should not be beholden to the Debtor (and certainly not to McMahon) to serve as the gatekeeper of information.

❖    **Requirement for In-Person Auction Should be Removed**.    The requirement that the Auction be conducted in-person in Delaware should be modified, upon consultation with the Committee.  If the Auction proceeds on the timeline as currently scheduled and social distancing measures remain in place, upon consultation with the Committee, the Debtor should propose to conduct the auction through a video-conferencing platform such as Zoom or another similar platform.

The foregoing provisions should all be modified in order for the sale process to proceed in a fair and open manner in which all parties are placed on equal footing and value can be maximized.

11.    This Objection articulates the Committee's initial concerns with the Bid Procedures and reserves the Committee's right to raise additional objections to prior to and at the Sale Hearing. The Committee respectfully requests that, unless the issues raised herein are adequately resolved, the Bid Procedures Motion should be denied.

## BACKGROUND

A.    <u>**General Background**</u>

12.    On April 13, 2020 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has continued to operate and manage its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtor's bankruptcy case.

13.    On   April 13, 2020, the Debtor filed a Motion (the "<u>DIP Motion</u>") seeking authority to secure $3,500,000 in post-petition financing from McMahon (the "<u>Insider DIP</u>"). The proposed Insider DIP includes certain milestones, including the entry of an order approving

the Bid Procedures Motion by no later than May 15, 2020 and the entry of an order approving the sale of the Debtor's assets by no later than July 13, 2020.

14.    On April 23, 2020, the United States Trustee appointed a seven-member Committee consisting of (i) Jonathan Hayes; (ii) '47 Brand LLC; (iii) NEP Supershooters LP d/b/a Bexel ESS; (iv) XOS Technologies, Inc.; (v) CP Communications; (vi) Ticketmaster; and (vii) DC Stadium LLC.  On April 28, 2020, the Committee selected Greenberg Traurig, LLP to serve as its general bankruptcy counsel.

**B.    <u>The Bid Procedures Motion</u>**

15.    On April 21, 2020, the Debtor filed the Bid Procedures Motion, which seeks the entry of an order (i) approving the Bidding Procedures in connection with the sale of substantially all of the Debtor's asses; (ii) scheduling an auction for, and hearing to approve, the sale of the Debtor's assets; (iii) approving notice procedures; and (iv) approving assumption and assignment procedures and notices procedures related thereto.

16.    The proposed Bidding Procedures contemplate the following timeline:

- May 13, 2020 – Hearing to approve the Bidding Procedures (now continued to May 27, 2020).

- May 27, 2020 – Service of Notice of Assumption and Assignment Notice.

- July 1, 2020 – Stalking Horse Bid Deadline.

- July 6, 2020 at 4:00 p.m. (ET) – Sale Objection Deadline and Cure Cost/Assignment Objection Deadline.

- July 6, 2020 at 5:00 p.m. (ET) – Bid Deadline.

- July 8, 2020 at 10:00 a.m. (ET) – Auction.

- July 10, 2020 at 4:00 p.m. (ET) – Post-Auction Objection Deadline.

- July 13, 2020 at 10:00 a.m. (ET) – Sale Hearing.

**OBJECTION**

17.    While the Committee does not *per se* oppose the Debtor selling its assets in order to maximize value for its estate and creditors, the proposed Bidding Procedures are not designed to have that effect.  Rather, the Bidding Procedures, if left unmodified, propose a process that will discourage third-party bidders and likely result in a sale of the assets to McMahon for less than fair value and to the detriment of the Debtor's other creditors.  The Bidding Procedures should, therefore, be modified in order to foster a fair and robust sales environment that will achieve the highest value for the Debtor's assets.

18.    "The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."  *In re John Joseph Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2004); *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004).  As proposed, and as discussed herein, the Bidding Procedures do not seek to maximize value.  That should change.

A.    **The Sale Timeline Should be Extended to Ensure that the Sale Process Maximizes Value.**

19.    The sale timeline should be modified to ensure that the sale process maximizes value.  The unforeseen outbreak of COVID-19 has been unprecedented, upending all areas of life.  Businesses have screeched to a halt and the business of sports has been no different.  Indeed, the Debtor is one such casualty of the pandemic's effects on the professional sports market.

20.    Despite acknowledging the calamitous effects of the virus and acknowledging that the XFL cancelled its season and sought chapter 11 relief due to the COVID-19 pandemic, the Debtor still proposes to sell its prized XFL league (and attendant intellectual property and

personal property) while the same economic and social challenges remain.  There is no rush; no melting ice cube; no need for an unnecessarily compressed timeline in this case.  The Debtor is largely non-operational, the assets it is selling are not depreciating and it engaged in no pre-petition marketing whatsoever.  The 'most important' factor for the court in determining whether to approve an accelerated § 363 sale is whether the asset is decreasing in value." *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 180 (Bankr.S.D.N.Y. 2011) (recognizing that a court should only approve an expedited pre-plan sale of assets "when the court is faced with the situation of a so-called 'melting ice cube.'")*; see also In re Chrysler LLC*, 405 B.R. 84, 96 (Bankr.S.D.N.Y. 2009) (finding that the debtors established a good business reason for the sale of their assets in the early stage of the cases where they had engaged in a two-year marketing process prepetition and "the only other alternative is the immediate liquidation of the company"); *In re Chrysler LLC*, 576 F. 3d 108, 119 (2d Cir. 2009) ("With its revenues sinking, its factories dark, and its massive debts growing, Chrysler fit the paradigm of the melting ice cube"), *vacated by Ind. Police Pension Trust v. Chrysler LLC*, 556 U.S. 960 (2009).

21.    Moreover, the Debtor's assets include considerable intellectual property that will require extensive due diligence and analysis by any potential purchaser.  Proposing a quick sale process will freeze out many potential purchasers unwilling to rush or forego necessary due diligence.  The Debtor's insistence on an aggressive sale timeline makes no sense.  Unless, of course, the Debtor's actions are being dictated by McMahon, who appears intent on re-acquiring the XFL football league at a discount, free of all its liabilities.

22.    Regardless of the motivations behind this process, one thing is clear: the sale should not proceed on its current timeline.  Given the uncertainty in the marketplace, with an investment banker only just being retained and to ensure that the value for the Debtor's unique

11

assets is being maximized, the entire sale process should be extended by approximately 90 days to give all potential bidders an opportunity to perform meaningful due diligence and submit bids for the Debtor's assets. Accordingly, the Committee proposes that the Debtor's sale timeline be modified as follows:

| Date | Event |
|------|-------|
| July 21, 2020 | Service of Notice of Assumption and Assignment Notice |
| August 14, 2020 | Stalking Horse Bid Deadline |
| September 2, 2020 4:00 p.m. (ET) | Sale Objection Deadline<br>Cure Cost/Assignment Objection Deadline |
| September 2, 2020, 5:00 p.m. (ET) | Bid Deadline |
| September 7, 2020, 10:00 a.m. (ET) | Auction |
| September 10, 2020, 4:00 p.m. (ET) | Post-Auction Objection Deadline |
| September 14, 2020, 10:00 a.m. (ET) | Sale Hearing |

**B.    McMahon Should Not be Permitted to Credit Bid.**

23.    In addition to a constrained timeline, the proposed Bidding Procedures also allow McMahon, pursuant to section 363(k) of the Bankruptcy Code, to credit bid the amount of his prepetition indebtedness and, in the unlikely event it gets approved, the proposed Insider DIP. Bankruptcy courts have discretion to deny a secured creditor the ability to credit bid for "cause". *See* 11 U.S.C. § 363(k). While the Bankruptcy Code does not define "cause", cause is a "flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis." *In re NJ Affordable Homes Corp.*, Case No. 05-60442-DHS, 2006 WL 2128624 at *16 (Bankr. D.N.J. June 29, 2006).

24.    McMahon should not be permitted to credit bid with claims that have yet to be formally reviewed and investigated by the Committee. This is especially so where the liens purportedly granted to McMahon were in connection with loans made to the Debtor in the days

leading up to the filing of this case, at a time when the Debtor may have been insolvent.  The Committee intends to fully explore all potential causes of action against McMahon, which may include, among other causes of action, breach of fiduciary duty and equitable subordination on account of an apparent scheme designed to shut out third party lenders that provide McMahon an advantage in a forthcoming bankruptcy proceeding.

25.     While the Bankruptcy Code entitles a secured creditor to credit bid its allowed secured claim, "[t]he law is equally clear, as Section 363(k) provides, that the Court may 'for cause order[] otherwise.'"  *ln re Fisker Automotive Holdings*. Inc., 510 B.R. 55, 59 (Bankr. D. Del. 2014); *see also In re Free Lance-Star Publ'g Co*., 512 B.R. 798, 805 (Bankr. E.D. Va.) (noting that credit bidding is "not an absolute right").  Indeed, "the Code plainly contemplates situations in which assets encumbered by liens are sold without affording secured lenders the right to credit bid." *Fisker*, 510 B.R. at 59.

26.     Further, as this court expressly concluded in *Fisker*, the "for cause" exemption in section 363(k) is not limited to situations where a secured creditor has engaged in inequitable conduct, but that a court may deny credit bidding "in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment."  *Id*. (quoting *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, fn.14 (3d Cir. 2010)).

27.     Credit bidding should not be allowed when it would chill bidding and threaten notions of fairness in the bankruptcy process.  *See In re Philadelphia Newspapers*, 599 F.3d 298; *Fisker*, 510 B.R. at 60-61.  Bidders are often unenthused at the prospect of competing with a secured creditor who does not have to go out of pocket to match a competing bid.  *See In re Antaeus Technical Servs., lnc.*, 345 B.R. 556, 564 (Bankr. W.D. Va. 2005) ("Such a sale is like

ACTIVE 50266926v10

getting into an auction in which the other party is actually the owner of the property being sold, whose interest is not in actually obtaining the subject property but in playing poker to see what is the highest bid which the independent bidder is willing to make.").  Indeed, like the hypothetical considered by the court in *Antaeus*, here, McMahon is the owner, only disguised for this transaction as the lender.

28.    Absent bankruptcy, if an insider of the Debtor designed a sale process where an enterprise such as the Debtor were to be sold within 50 days to himself, there is no question that the insider would be subject to a variety of tort claims.  A company's directors breach their fiduciary duty of loyalty when they expedite a sale process for their own benefit rather than seek the highest value available to the company.  *See, e.g., Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 565 (Bankr. D. Del. 2008) (finding that directors and officers breached their fiduciary duty of loyalty and failed to act in good faith by, among other things, failing adequately to monitor execution of the company's "sell strategy" resulting in an abbreviated 30-day sale process on the eve of bankruptcy without a competitive bid process and only cursory contacts with strategic buyers); *In re Answers Corp. S'holder Litig.*, No. 6170-VCN, 2012 Del. Ch. LEXIS 162, *16 (Del. Ch. July 19, 2012) (denying defendants' motion to reconsider court's finding that complaint stated cause of action for breach of duty of loyalty by independent directors who acquiesced in interested directors' desire to expedite sale process, which primarily benefited majority shareholder, before public shareholders learned that the company was worth more than the sale price).  Indeed, "once a board has initiated a sales process, it has a duty to seek the highest value reasonably available for the company's shareholders regardless of where that value comes from."  *In re Answers Corp. S'holders Litig.*, No. 6170-VCN, 2012 Del. Ch. LEXIS 76, *23 (Del. Ch. Apr. 11, 2012) (emphasis in original).

29.     Bankruptcy is intended to provide greater, not lesser, protection to unsecured creditors to ensure a fair sales process.  Here, McMahon is subverting the process and will be seeking a free and clear sale order to accomplish through bankruptcy what he could not dream of accomplishing outside of it.  The Court should see through the scheme, to wit, provide low interest loans secured by all of the Debtor's assets that are tied to a failed sales process that will chill bidding.  A below market interest rate for a very limited period of time is a small price to pay to subvert the sales process and hinder competitive bidding.

30.     The Bidding Procedures should facilitate "an open and fair public sale", which cannot be achieved if McMahon retains the right to credit bid and does not need to disclose his intent to bid in advance.  *See In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (The Court denied "approval of the bid procedures [as they] would not enhance the bid process and may in fact chill bidder interest").  "Cause," therefore, exists to deny, or at a minimum amend, McMahon's ability to credit bid giving chilling effect it will have on third party interest in the Debtor's assets.

31.     Moreover, section 363(k) of the Bankruptcy Code permits credit bidding of allowed claims only.  *See* 11 U.S.C. § 363(k).  Whether McMahon has an allowed claim (or any claim) on account of the pre-petition advances remains a legitimate question.  The Committee's investigation into McMahon's alleged secured position has only just begun, and, especially given the highly questionable circumstances surrounding the pre-petition date, McMahon should not be presumed to have a valid, secured pre-petition claim, unless and until the Committee completes its investigation and reaches that conclusion.

32.     In the event that the Court permits McMahon to credit bid, he should at least be required to disclose whether and upon what terms he intends to bid and such credit bidding

*ACTIVE 50266926v10*

should only be permitted in combination with a cash bid sufficient to: (a) pay all administrative expenses and priority claims associated with the sale; (b) provide adequate funding to administer and wind-down the Debtor's estate; (c) provide a meaningful distribution to general unsecured creditors; and (d) preclude payments to him of a breakup fee.  Courts, both within and outside of this Circuit, have routinely stated that the bankruptcy process cannot be used solely for the benefit of a debtor's secured lender.  *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992); *PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935 (5th Cir. 1983), *reh'g denied*, 705 F.2d 450 (5th Cir. 1983); *In re Encore Healthcare Assocs.*, 312 B.R. 52, 54-55 (Bankr. E.D. Pa. 2004).  This is even more pronounced here where the Debtor's purported secured lender is also its majority and controlling equity holder.

33.      "[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein." *Citicorp Venture Capital. Ltd. v. Comm. Of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), *aff'd*, 160 F.3d 982 (3d Cir. 1998); *see also Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 29 (S.D.N.Y. 2005) ("Courts have held that transactions that benefit insiders must withstand heightened scrutiny before they can be approved under§ 363(b)."); *Gavin v. Tousignant (ln re Ultimate Escapes Holdings, LLC)*, No. 12-50849 (BLS), 2014 WL 5861764, at *9 (Bankr. D. Del. Nov. 12, 2014) (entire fairness doctrine applied where independence of decision making at risk due to "extraneous considerations or influences").  This demanding approach is well established.  *See Pepper v. Litton*, 308 U.S. 295, 307 (1939).

16

34.     Finally, if the Court allows McMahon to credit bid and he exercises that option, any order approving the Bidding Procedures should be amended to expressly preserve the Committee's ongoing ability to challenge the validity, extent, and priority of McMahon's alleged liens.

C.     **To Ensure a Fair and Open Sale Process McMahon Should Not be a "Consultation Party".**

35.     The Bid Procedures designate McMahon as a Consultation Party and afford him the right to receive all bids for the Debtor's assets, weigh in on whether the bidder should be deemed qualified, and receive all financial information provided by the bidders to support the notion that there is adequate assurance that they will perform.  McMahon has the right to receive this information until such time as he submits a bid, which can occur two days before the auction sale.  This is an outlandish right to give a prospective bidder, a right no other prospective bidder is afforded.  Such sensitive information should not be shared until all bids are in.  It also allows McMahon the opportunity to make a low ball offer at the eleventh hour if he knows that no other bidder has come forward.  In addition, such information permits McMahon to lay low and bid only enough to outbid any other offers that come in.

36.     This procedure was approved by the Debtor's "independent" manager, John Brecker ("Brecker"), who likewise approved loans pledging all of the Debtor's assets to McMahon which impose onerous conditions without ever having shopped the loans.  The notion that Brecker's actions can support an argument that the bidding procedures represent an exercise of reasonable business judgment is not colorable.  McMahon must be stripped of this right.  This said, the damage has already been done.  Third parties need to have confidence that a fair process will be conducted under Brecker's watch.

17

**D.    The Committee's Additional Objections Should be Resolved Before the Bidding Procedures Proceed.**

37.    In addition to the foregoing issues, the following provisions of the Bidding Procedures are objectionable to the Committee for the reasons stated below and should be resolved in order for the Bidding Procedures to proceed:

❖    **Bidders Should Have the Opportunity to Cure Non-Qualified Bids.**  If a bid is received by the Bid Deadline, but deemed not a Qualified Bid, the bidder should have the opportunity to cure the defects prior to the Auction. The Auction should not be immediately cancelled.

❖    **Committee Consent Rights over Any Rejected Bids.**  The Committee should be granted consent rights, not consultation rights, over any bid rejected by the Debtor.  This is especially so if McMahon is going to be bidding or otherwise involved in deciding whether a bid should be rejected.

❖    **McMahon Conflict of Interest.**  The Debtor should not be required to secure McMahon's approval of the highest bid prior to the conclusion of the Auction, especially if the bid is in an amount sufficient to satisfy his debt in full or if he is an active bidder at the Auction.  In either case, giving McMahon a veto right over bids at the Auction creates a potential conflict of interest, will chill third-party bidding and could invite unnecessary litigation.

❖    **No Stalking Horse Bid Protections**.  There is no basis for providing any bid protections under these abbreviated sale timelines that are being proposed for the sole benefit of McMahon, especially where the Stalking Horse Bid Deadline is only five days prior to the Bid Deadline.  Unless the sale timeline is extended, there is not sufficient time for a Stalking Horse Bidder to enhance the competitive bidding process or enhance the value of the estate. Furthermore, and in any event, should McMahon enter into a Stalking Horse Agreement with the Debtor, he should not be entitled to any bid protections. McMahon already has the most knowledge and information about the Debtor's assets and, if the use of cash collateral and/or the Insider DIP is approved, has sufficient protections in place.[6]

❖    **The Committee Should be Granted Unfettered Access to Due Diligence Information and Documents.**  The Committee should be consulted

---

[6]  The Committee opposes any attempt to pre-approve bid protections unless and until the Stalking Horse Bidder is identified and the Debtor obtains court approval for any such proposed bid protections.  The Committee reserves all rights in respect of any proposed stalking horse bid protections.

*ACTIVE 50266926v10*

throughout the sale process and provided unfettered access to due diligence materials. The Committee should not be beholden to the Debtor (and certainly not to McMahon) to serve as the gatekeeper of information. *See* Bidding Procedures, at § VI (Authorizing the Debtor to provide the Committee "due diligence access or additional information" as the Debtor and McMahon "deem reasonable and appropriate under the circumstances.").

## **RESERVATION OF RIGHTS**

The Committee expressly reserves the right to: (i) supplement this Objection at any time prior to the hearing on the Bid Procedures Motion and/or the Sale Hearing; and (ii) raise additional or further objections to the Bid Procedures Motion at any hearing on the Bid Procedures Motion or the Sale Hearing.

*[Remainder of Page Intentionally Left Blank]*

*ACTIVE 50266926v10*

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an order (i) approving the Bid Procedures Motion, as modified by this Objection; and (ii) granting such other and further relief as the Court deems just and proper.

Dated:   Wilmington, Delaware
         May 19, 2020

**GREENBERG TRAURIG, LLP**

*/s/ DRAFT*
Dennis A. Meloro (DE Bar. No. 4435)
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7395
Facsimile: (302) 661-7165
Email: melorod@gtlaw.com

Howard J. Steinberg (CA Bar No. 89291)
1840 Century Park East, Suite 1900
Los Angeles, California 90067
Telephone:  (310) 586-7700
Facsimile:   (310) 586-7800
Email: steinbergh@gtlaw.com

Shari L. Heyen (*pro hac vice pending*)
1000 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 374-3500
Facsimile: (713) 374-3505
Email: heyens@gtlaw.com

David B. Kurzweil (*pro hac vice pending*)
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2212
Email: kurzweild@gtlaw.com

***Proposed Counsel to the Official Committee of Unsecured Creditors of Alpha Entertainment LLC***

*ACTIVE 50266926v10*