**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11<br>Case No. 20-10940 (LSS) |
| ALPHA ENTERTAINMENT LLC,[1] | |
| Debtor. | **Obj. Deadline: May 19, 2020, at 4:00 p.m. (ET)**<br>**(extended as to the Committee by consent)**<br>**Hearing Date: May 27, 2020, at 11:00 a.m. (ET)** |
| | **Relating Docket No. 7** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF ALPHA ENTERTAINMENT LLC TO THE DEBTOR'S MOTION FOR
INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTOR TO OBTAIN
POST-PETITION SECURED FINANCING, PURSUANT TO 11 U.S.C. § 105, 362, 363,
364 AND 507, (A) AUTHORIZING POST-PETITION FINANCING, (B) AUTHORIZING
USE OF CASH COLLATERAL, (C) SCHEDULING
A FINAL HEARING, AND (D) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Alpha Entertainment

LLC, the above-captioned debtor and debtor-in-possession (collectively, the "Debtor") hereby

files this objection (the "Objection") to the Debtor's *Motion For Interim And Final Orders*

*Authorizing The Debtor To Obtain Post-Petition Secured Financing, Pursuant To 11 U.S.C. § 105,*

*362, 363, 364 and 507, (A) Authorizing Post-Petition Financing, (B) Authorizing Use Of Cash*

*Collateral, (C) Scheduling A Final Hearing, And (D) Granting Related Relief* (the "DIP Motion").[2]

In support of its Objection, the Committee states as follows:[3]

**PRELIMINARY STATEMENT**

1.      While the DIP Motion initially sought approval of a $3,500,000 post-petition loan

(the "Insider DIP") from Vincent K. McMahon ("McMahon'), the controlling shareholder of the

---

[1] The last four digits of the Debtor's federal tax identification number are 7778.  The Debtor's mailing address is 1266 East Main St., Stamford, CT 06902.

[2] Concurrently with this Objection, the Committee is also filing an objection to the Debtor's' bid procedures motion (the "Bid Procedures Objection").

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Motion and the proposed Final DIP Order, as applicable.

Debtor, the Committee has been advised that in fact, the amount of the loan that will be sought is now only $1,500,000.  The stated rationale of the need for the loan is that absent the infusion of additional capital, there will be insufficient funds to allow the Debtor to hold a sales process that is the subject of a companion motion to approve bidding procedures for an auction sale of the Debtor's assets ("Bid Procedures Motion") (Doc. 55) that is to take place on July 8, 2020. (DIP Motion, ¶ 13, 14)  The process set forth in the Bid Procedures Motion will allegedly allow the Debtor to achieve the objective of maximizing the proceeds for the estate by ensuring a competitive process. (Bid Procedures Motion, ¶¶ 22,24)  This is a false narrative.  The Debtor has no need for the DIP loan, which imposes restrictions on the Debtor that essentially disable it from having an opportunity to achieve the aforementioned objective.  Any cash constraints on the Debtor are solely the result of unnecessary and unwarranted expenditures by the Debtor designed to placate the desires of McMahon, such as the payment of $650,000 in ticket refunds to unsecured creditors by an estate that allegedly may become administratively insolvent; retention of the Debtor's headquarters  in Stamford, Connecticut, which is across the street from the headquarter of McMahon's principal asset, World Wrestling Entertainment, Inc. ("WWE"); employees in that locale drawing excessive compensation rates  who are not needed for an enterprise that has shut down; and a bloated cost sharing arrangement with the WWE that has yet to be explained for unspecified finance and accounting services.  In fact, the DIP and Bid Procedures are designed to ensure that McMahon can acquire the Debtor at a fire sale price with third parties having little or no meaningful opportunity to do the diligence required to ensure a fair process. With appropriate adjustments to the DIP budget, it appears that the Debtor can readily hold a sale in mid- September 2020 without the need for a DIP loan and still have over $1 million in cash reserves.

2.      This is a liquidating chapter 11 case and the Debtor has ceased operations.  As is typical in these type of cases, the creditors' ability to be paid is highly dependent upon the efficacy of the sales process.  The Committee's objective in this case is to ensure that procedures are in place to ensure a fulsome and fair process.  Unfortunately, the Debtor, at the behest of McMahon, while acknowledging that these are the aims to be achieved, has done little more than act as a shill for McMahon.  The Committee has requested that the sales process be extended 60 days, which request has been denied.  The Debtor can readily reach this sale date by modifying its budget with no DIP loan, or, if McMahon seeks to pay ticket holders and continue retention of assets and employees that may ultimately inure to his benefit, he can provide a DIP loan without the crippling restrictions contained in the proposed DIP loan.

3.      The essential steps needed to have a meaningful sales process were not taken prior to filing this chapter 11 case and have only just gotten underway.  Despite the fact that the Debtor and McMahon knew full well before the filing that this case was going to involve a sales process, and with the passage of more than 30 days since the case was filed, no data room has been set up; no information memorandum, confidential or otherwise, has been prepared; and prospective purchasers are being advised of deadlines to submit letters of intent and bids even though the Court has not approved such deadlines and the Bid Procedures Motion does not even mention a deadline for letters of intent.  The proposed bid process requires that McMahon receive all bids received by the Debtor along with confidential financial information about the financial wherewithal of prospective purchasers.  No other prospective bidder is afforded such information. The auction sale is to be held 40 days after this hearing and if McMahon is the successful bidder, the bid procedures allow McMahon to receive a prophylactic free and clear sales order that will insulate him from claims that may be assertible against him for his conduct to date.  If this is the choice

afforded to creditors, the Committee prefers that this case be converted to chapter 7 so that a disinterested trustee can sell the assets in due course and bring whatever claims he deems appropriate.

## BACKGROUND

### A.    McMahon's Control of the Debtor

4.    There can be no dispute that the Debtor is controlled by McMahon.    As acknowledged in Exhibit 1 to the Debtor's chapter 11 petition (Doc 1), McMahon owns 100% of the Debtor's Class A stock and 76.5% of the Debtor's Class B stock.  The remaining 23.5% of the Class B stock is owned by WWE and McMahon is the controlling shareholder of that entity. McMahon has been said to have invested over $100 million into the XFL.[4] McMahon recently touted his financial wherewithal in his response to a lawsuit filed against him by the former commissioner of the XFL, noting that his publicly disclosed assets alone are in excess of $1.2 billion.[5]

### B.    McMahon's Prepetition Loan to the Debtor

5.    Pursuant to the Debtor's first day declaration[6], the Debtor's only prepetition secured debt was incurred within the weeks and days leading up to the Debtor's bankruptcy filing and is owing to McMahon under a senior secured promissory note executed by the Debtor on March 25, 2020 and amended on April 9, 2020 (as amended, the "Prepetition Note").  As of the Petition Date, the alleged principal amount owing under the Prepetition Note is $9 million (the "McMahon Debt").[7]  The Debtor maintains that the McMahon Debt is secured by "all of the

---

[4]  1.  Will Vince McMahon's Bankruptcy XFL Live to Fight Another Day, FORBES (published Apr. 15, 2020).

[5]  *Luck v. McMahon*, United States District Court, District of Connecticut, Case No. 3:20-cv-00516-VAB, Defendant Vincent K. McMahon's Opposition to Plaintiff's Application for Prejudgment Attachment (May 12, 2020 at p. 1).

[6]  Docket No. 8 (the "Pollack Declaration").

[7]  *Id*. at ¶18.

Debtor's assets"[8] and that it has no secured debt obligations of any kind other than the McMahon Debt.

6.      In an attempt to cast this loan as an arms-length transaction, the Debtor says that prior to the commencement of the bankruptcy case, the Debtor appointed an independent manager, John Brecker of Drivetrain, LLC ("Brecker"), and that Brecker "has overseen and directed the negotiations over the Debtor's prepetition and postpetition financing." DIP Motion, ¶ 2.  At best, this statement is misleading.  The Debtor conveniently omits that Brecker was appointed as manager on March 25, 2020, the very day that McMahon made the loan to the Debtor.  Brecker could not have had time to assess whether encumbering all of the Debtor's assets with a loan from McMahon was the Debtor's best option.  A bankruptcy filing was undoubtedly in prospect at that time and as the Debtor has also noted, McMahon will not consent to any priming liens and has insisted upon a rapid sales process. DIP Motion, ¶ 15.  Further, if the Debtor's position is correct— which it is not—that without the DIP loan there will not be sufficient liquidity to have a sales process that will end in mid-July, then Brecker's action in approving the loan demonstrates a glaring failure to understand the chapter 11 process and gross mismanagement.  Had the interest of creditors, rather than McMahon been taken into account, it should have been recognized that the cost of the payment of a higher interest rate and fees would be more than offset by the benefits to be realized by a fulsome sales process.  As acknowledged by the Debtor, the Debtor is duty bound to maximize the value for creditors.  DIP Motion, ¶ 25. No independent manager shopped the prepetition loan or made any efforts to consider alternative financing for a debtor who had no encumbered assets.

---

[8] *Id.*

*ACTIVE 50240261v12*

### C.    The Debtor's Bankruptcy Filing

7.    On April 13, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtor's bankruptcy case.

### D.    The Interim Hearing for Cash Collateral Use and Interim DIP Loan

8.    The Court conducted an interim hearing on the DIP Motion on April 15, 2020 (the "Interim Hearing").  While the Court approved the Debtor's use of cash collateral on an interim basis, it did not approve the Debtor's request to incur post-petition financing.[9]

9.    In the DIP Motion, the Debtor erroneously stated that there was an immediate need to obtain financing.  DIP Motion, ¶ 31.  Thankfully, the Court reviewed the budget and noted that on its face the budget demonstrated that this was not correct. Transcript of Telephonic Hearing, April 15, 2020, p. 35, ll. 10-19; p. 37, l. 25; p. 38, ll. 1-9.

10.    Importantly, the Debtor made no attempt to secure financing from any source other than McMahon.  This Court was not so advised, and the Debtor cites to authority which requires a showing that reasonable efforts to seek alternative financing were made.  DIP Motion, ¶ 27. While the Debtor says that Brecker oversaw this process, it did not submit his declaration to support the financing.  Instead, the Debtor relied on the Declaration of Jeffrey Pollack ("Pollack"), the President of the Debtor. Pollack simply makes a conclusory statement that in the Debtor's business judgment, the financing from McMahon was the "best available option." (Doc 8, ¶ 24) Pollack neglected to advise the Court that it was the only option since the loan was never shopped.

---

[9] Docket No. 51.

*ACTIVE 50240261v12*

### E. The Committee is Appointed

11.     On April 23, 2020, the United States Trustee appointed a seven-member Committee consisting of: (i) Ticketmaster; (ii) '47 Brand LLC; (iii) Jonathan Hayes; (iv) NEP Supershooters LP d/b/a Bexel ESS; (v) XOS Technologies Inc.; (vi) CP Communications; and (vii) DC Stadium LLC.[10]  The Committee has selected Greenberg Traurig, LLP as its general bankruptcy counsel.

12.     While the Debtor has yet to file its Schedules in this case, and has requested an extension to file them until June 1, 2020, at the Interim Hearing Debtor's counsel disclosed to the Court a belief that the Debtor's unsecured obligations, including season ticket holders with alleged collective claims totaling $3.5 million, are in the range of $15 to $16 million.[11]

### F. The Final Hearing to Approve the DIP Motion Is Continued and the Committee's Efforts to Obtain Information Are Frustrated

13.     The Final Hearing to approve the DIP Motion was originally scheduled on May 13, 2020.  As a condition of cooperating in moving dates, the Debtor required the Committee to submit a draft of its objection on May 6, 2020. The draft objection apprised the Debtor of the Committee's concern about the failure to seek alternative financing, the problems with the terms of the loan, and inadequacies with the proposed budget.

14.     Since that date, none of the DIP terms have been changed save for the amount of the loan.  The amount of the DIP loan is now smaller, but only because credit card companies paid a large number of the ticketholders a refund for unused tickets.  The Debtor's "independent" manager, Brecker, and Pollack, have been less than cooperative with the Committee's financial advisor and investment banker, Dundon.  For example, requests for more detailed information concerning the duties of the highly compensated employees were flatly rejected.  Dundon was

---

[10] Docket Nos. 65 & 67.

[11] The Committee believes this figure to be grossly underestimated.

advised that no further information would be provided on this and other fronts until after the deadline for the Committee to file this objection. The Debtor has still failed to seek alternative forms of financing.  The representation in the DIP Motion that the DIP loan was negotiated in good faith (DIP Motion, ¶ 15) rings hollow.  No supplemental declarations have been filed to provide evidentiary support for the need for this funding or the propriety of the Bid Motion, leaving the Committee in a position where it faces a final hearing without an inkling of what evidence will be offered to support the relief that is being requested.  Given the import of the relief that is sought, trial by ambush is a tactic that should not be condoned.

15.    As a consequence of these actions, the Committee propounded document requests and scheduled depositions.  The discovery will proceed on the day this Objection is due and thereafter, so the Committee may need to supplement this Objection with what is learned in advance of the Final Hearing.  Further, very few documents have been turned over by the Debtor notwithstanding having received a document request over two weeks ago.  It is expected that few, if any, documents that have been requested will have been received, let alone reviewed by the Committee, by the time the depositions are conducted.  Thus, the Committee has been frustrated in its efforts to be able to properly prepare for this hearing.

16.    Before engaging in this effort to obtain discovery, the Committee pointed out to the Debtor and McMahon that all sides would have to expend fees in this regard and that the monies would be better spent funding the Debtor's operations so that this dispute could be avoided.  This notion fell on deaf ears.  While that would be a reasonable approach, such measures would allow bidders other than McMahon an opportunity to vet the assets.  That is an outcome that neither McMahon or the Debtor support.

ACTIVE 50240261v12

### G.    The Final DIP Motion Hearing

17.    A hearing to approve the DIP Facility on a final basis is scheduled for May 27, 2020 (the "Final DIP Hearing").  No interim DIP order has been entered.  A proposed form of Final Order approving the DIP Motion was filed with the Court on April 29, 2020 ("Final DIP Order")[12].

18.    Even if the Debtor had a genuine need for post-petition financing (which it does not), the proposed Insider DIP suffers from unjustifiably compressed Milestones and a series of improper provisions.  The Milestones require the sale process to proceed at an unnecessary speed during a period of unprecedented economic unrest and are not designed to maximize value.  As admitted by the Debtor, while the XFL was forced to cancel its season the Debtor acknowledges that its ticket sales and television viewership were highly successful.  While this season is lost, the league structure, infrastructure and intellectual property remains intact and could be easily and fully exploited by a purchaser with respect to the upcoming season, and yet the Debtor now proposes a sale while the same economic concerns remain.  The Milestones should, at minimum, be modified to afford the Debtor sufficient time to market its assets for sale through an investment banker upon a timeline that the investment banker believes is optimal to maximize value, not one predetermined and imposed upon the investment banker by the Debtor and McMahon.  The Committee intends to propose an alternative schedule for the marketing and sale of the Debtor's assets, which schedule the Committee believes will best maximize the value of the Debtor's estate and assure its successful emergence from chapter 11.

19.    The DIP Motion should also be denied because many of the provisions of the proposed Insider DIP contravene applicable provisions of the Bankruptcy Code and seek to

---

[12] Docket No. 78.

*ACTIVE 50240261v12*

inappropriately hinder the Debtor's and the Committee's ability to fulfill their respective fiduciary duties. The Committee's concerns with the Insider DIP include, among those set forth above and other concerns, the following:

> **Improper Liens on Proceeds of Avoidance Actions**. The proposed Final DIP Order contemplates that McMahon will be granted liens and claims on proceeds of avoidance actions. Avoidance actions, however, are to be pursued for the benefit of the estate and thus unsecured creditors. Any proceeds realized from the prosecution of avoidance actions should similarly be preserved for the benefit of unsecured creditors. This is even more pronounced here where the Committee believes that avoidance actions may exist against insiders of the Debtor and, possibly, McMahon. In effect, by providing the Insider DIP, McMahon is seeking a release of potential avoidance actions where he might be a possible defendant.

> **Inadequate Budget for Committee**. The Budget and Insider DIP restrict the Committee's ability to fulfill its fiduciary duties by provided for only (i) $20,000 to investigate the liens and claims granted in respect of the Debtor's pre-petition secured indebtedness, and (ii) $200,000, in the aggregate, for all Committee's professionals, which is less than half the amount budgeted for Debtor's counsel during the 13-week Budget period. While the Debtor says on the one hand that the services to be rendered by the Committee are not limited on the other it states that there will be no funds available to pay for those services. This is a transparent attempt to emasculate and foreclose the right of creditors to vigorous representation that is most certainly needed in light of the scheme concocted by McMahon to acquire assets on the cheap at the expense of unsecured creditors.

> **Insufficient Carve-Out**. McMahon has authorized the Debtor to pay, in the aggregate, only $205,000 for any fees and expenses of the Debtor's and Committee's professionals (only $30,000 of which is attributable to the Committee) incurred after the continuance of an event of default under the DIP Facility. The Post-Default Carve-Out, as it relates to Committee professionals, is unreasonably low and should be eliminated.

> **Improper Section 506(c) Waiver**. The Insider DIP contemplates a waiver by the Debtor of its right to surcharge collateral pursuant to Bankruptcy Code section 506(c). This waiver is inappropriate and should be stricken.

> **Improper Section 552(b) Waiver**. The Insider DIP contemplates a waiver of the "equities of the case" exception under Bankruptcy Code section 552(b). As recoveries for unsecured creditors are uncertain at this point in time, a prospective finding that the "equities of the case" exception contained in section 552(b) is waived is wholly inappropriate, and should be stricken.

> **Improper Marshalling Waiver**. The Insider DIP contemplates a marshalling waiver. Marshalling rights, however. should be preserved for the Committee.

McMahon should be required to exhaust all other collateral before seeking satisfaction from unencumbered assets, the value of which would otherwise be available for the benefit of unsecured creditors.

➢ **Greater Budget Transparency**.  The Debtor has failed to justify why it is continuing to pay for 18 employees or provide an appropriate level of detail supporting the "disbursement" line item, which reflects disbursements totaling over $3.4 million (excluding the ticketholder refunds) during the Budget period.

➢ **No Modification of Automatic Stay Post-Default**. The automatic stay under section 362(a) of the Bankruptcy Code should not be automatically modified following an Event of Default.  It is inappropriate to shift the burden to the Debtor, and its estate, to preserve the stay where McMahon is an insider and the Debtor's assets are not depreciating in value – the Debtor's most significant assets are intellectual property.

➢ **Debtor Should Provide DIP Credit Agreement**.  The Debtor has failed to provide the Committee with the underlying DIP Credit Agreement.  The DIP Credit Agreement and attendant documents should be provided and reviewed.  The notion that the Court should approve a DIP Credit Agreement that the Court and creditors have never seen should be unacceptable.  The Committee reserves all rights to supplement these objections after its review of the DIP Credit Agreement.

➢ **The Proposed Adequate Protection Liens should be Subject to Subordination**. The Adequate Protection Liens and adequate protection claims proposed to be granted to McMahon on account of his pre-petition loan should be subject to disallowance if the pre-petition debt is subordinated.

➢ **DIP Fees and Expenses Should be Subject to Review**.  DIP Fees and Expenses incurred by McMahon's counsel should be subject to Committee review to ensure they are reasonable.[13]  In addition, in accordance with the DIP Term Sheet, the DIP Fees and Expenses should be payable upon the Maturity Date of the Insider DIP and not monthly, as set forth in the proposed Final DIP Order.  Regardless, for purposes of cash collateral usage, McMahon is receiving sufficient adequate protection on account of his pre-petition loan such that he should not also receive payment of his legal fees and expenses.

➢ **Committee Should Receive All Reporting**.  All notices and reports, including, but not limited to, any financial updates, variance reports and analyses required to be provided by the Debtor to McMahon should be contemporaneously provided to the Committee.

➢ **Requirement for Bid Procedures that Chill Bidding and Give McMahon an Improper Advantage in the Sales Process**.  While set forth in more detail in the

---

[13] To date, all or virtually all calls with McMahon's counsel have involved at least 3 partners from the firm representing McMahon.  While McMahon is certainly wealthy enough to afford this, the estate is not.

Committee's Objection to the Bid Procedures Motion, those procedures allow McMahon to receive the bids submitted by any other bidder along with confidential information about their financial wherewithal which right extends to two days before the proposed sale and only terminates if McMahon submits a bid. This outlandish advantage, bought for an unshopped $1.5 million loan secured by all of the Debtor's assets, allows McMahon to wait until the eleventh hour before submitting his bid to obtain a competitive advantage and potentially acquire the Debtor for far less than he would otherwise pay if he were denied access to such confidential information.

➢ **Improper Restriction on Debtor's Ability to Obtain Alternative Financing**. If the DIP loan is approved, it is an event of default to file a motion seeking a priming lien. Thus, regardless of the value of the Debtor, which the Debtor has failed to provide and which Dundon is unable to opine about because it has been denied essential information, no showing is allowed to be made that McMahon is substantially oversecured.

➢ **McMahon, as Potential Acquirer, Should Not have the Right to Control the Bidding Procedures**. It is an event of default if bidding procedures to McMahon's liking are not approved by a date certain. As noted above, the procedures he has insisted upon are unreasonable and designed to chill bidding and ensure that McMahon is the successful bidder.

20.    The Committee only asks for a fair process and fair sale hearing so that creditors receive an opportunity to receive a dividend reflective of the Debtor's true value. There is also an alternative budget that assumes reasonable modifications to the budget and demonstrates that there can be a sales process with no DIP loan that can be held in mid -September which will still leave the debtor with an excess of $1 million in cash on hand.

21.    The Milestones require the entry of the Final DIP Order and an order approving bidding procedures for the sale of substantially all of the Debtor's assets, both in form and substance satisfactory to McMahon, by no later than May 15, 2020, and the entry of an order approving the sale of substantially all of the Debtor's assets, in form and substance satisfactory to

McMahon, by no later than July 15, 2020.[14]  Notwithstanding the passage of time, the Milestones have yet to be modified.

## **OBJECTION**

22.    As identified by the Court at the Interim Hearing[15] and based on the Committee's review of the Budget, the Debtor does not require postpetition financing at this time.  The Insider DIP, and its purported need, appears to be the product of an insider exerting his influence over the operations of the Debtor and this case.  Courts routinely recognize that "[d]ebtors in possession generally enjoy little negotiating power with a proposed lender, particularly when the lender has a prepetition lien on cash collateral."  *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992).  This is especially so here, where the insider is not only the purported pre-petition lender, but also the control person of the Debtor.  As a result, courts are cautious not to approve financing terms that are considered harmful to an estate and its creditors.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

23.    Thus, while certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts have not approved financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the sole (or primary) benefit of the lender.  *See, e.g., Ames,* 115 B.R. at 38*; (*citing *In re Tenney Vill.*

---

[14] The DIP Milestones are inextricably linked to the deadlines proposed in the Bid Procedures Motion, which include a "Bid Deadline" of July 6, 2020, an "Auction" on July 8, 2020, a "Sale Hearing" on July 13, 2020 and an outside "Closing Date" of July 31, 2020.

[15] Transcript of April 15, 2020 "First Day Hearings", p. 35, ll. 10 – p. 39, ll. 16.

*ACTIVE 50240261v12*

*Co.,* 104 B.R. 562, 568 (Bankr. D.N.H. 1989)) (holding that the terms of a postpetition financing facility must not "pervert the reorganizational process from one designed to accommodate all classes of creditors . . . to one specially crafted for the benefit" of one creditor).

24.     As discussed in greater detail below, the Debtor's attempt to procure post-petition financing and enter into the proposed Insider DIP at this stage of the case – when it has over $5 million of available liquidity – is premature.  Furthermore, in the unlikely event that the Court were to permit the Debtor to procure a modicum of post-petition financing from McMahon at this time, the proposed Insider DIP incorporates a number of provisions that (i) prejudice the rights and powers that the Bankruptcy Code confers on the Court, the Debtor and the Committee, (ii) unjustifiably benefit McMahon at the expense of the Debtor's estate and their unsecured creditors, and (iii) are likely to give the McMahon undue control over this case.  As such, the Insider DIP, as proposed, should not be approved.  For these reasons and those set forth below, the proposed Insider DIP should be denied (or, at minimum, modified as set forth herein).

**I.      The Insider DIP Should Not be Approved Because it Fails to Satisfy the Legal Standards for Post-Petition Financing.**

25.     The Insider DIP should not be approved because the Debtor's fails to meet the requisite legal standards to approve post-petition financing.  The law is well-settled that a debtor may not obtain approval for debtor-in-possession financing unless it first establishes that it is otherwise unable to reasonably obtain unsecured credit, and the credit is necessary for the debtor's continued operation.  11 U.S.C. § 364(d)(1); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG) 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) (citing *Ames*, 115 B.R. at 37); *In re Aqua Assocs.,* 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (stating that requests for postpetition financing must show the funds are "necessary to preserve the assets of the estate").  Once these two elements are established, the court must then consider whether the terms of the proposed

financing are fair, reasonable and adequate. *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (citing *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D.Pa. 1987)); *Aqua Assocs.*, 123 B.R. at 195-96; *Barbara K. Enters.*, 2008 WL 2439649, at *10.

26.    As the Debtor acknowledges in the DIP Motion, a debtor must show that it has made a reasonable effort to seek other sources of financing under §§ 364(a) and (b) of the Bankruptcy Code. *In re Ames Dep't Stores*, 115 B.R. 38 (Bankr. S.D.N.Y. 1990). DIP Motion, ¶ 27.

27.    Courts routinely consider the following factors (the "Farmland Factors") when considering whether the terms of a postpetition financing facility are fair, reasonable and adequate: (i) whether the proposed facility is an exercise of the debtor's reasonable business judgment; (ii) whether the proposed facility is in the best interests of both the estate and its creditors; (iii) whether the transaction is both (a) necessary to preserve estate assets and (b) necessary and essential for the continued operation of the debtor's business; (iv) whether the terms of the proposed transactions are fair and reasonable given the circumstances; and (v) whether the proposed facility was negotiated in good faith and at arm's length. *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (*appeal dismissed*, No. 03- 00472 (W.D. Mo. Jan. 9, 2004)); *In re Mid-State Raceway, Inc.*, 323 B.R. 40 (Bankr. N.D.N.Y. 2005) (same). Here, there is no evidence that the loan was shopped, no evidence of the value of underlying collateral and no evidence that a priming lien would even be necessary.

28.    A court will not approve proposed financing "where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." *Ames*, 115 B.R. at 39 (citing *Crouse Group*, 71 B.R. at 544); *see Aqua Assocs.*, 123 B.R. at 196. As discussed in more detail below,

the Debtor has failed to demonstrate that the terms of the Insider DIP are fair, reasonable and adequate in accordance with applicable law.

**A.     The DIP Motion Should be Denied in its Entirety Because the Debtor Cannot Demonstrate a Present Need for the Insider DIP.**

29.     The proposed Insider DIP violates several of the Farmland Factors.   Most prominently, the Debtor has no need (and certainly no immediate need) for the Insider DIP.   The Debtor does not require post-petition financing to preserve estate assets nor is post-petition financing "necessary and essential for the continued operation of the debtor's business." *Farmland*, 294 B.R. 855, 881.  The request to approve the Insider DIP should, therefore, be denied.

30.     The Debtor's purported need for post-petition financing is predicated upon the Court's approval of its request to issue $650,000 in ticket refunds to certain of the Debtor's creditors (the "Refund Motion")[16].  As set forth in greater detail in the Committee's objection to the Refund Motion, however, and as discussed at the Interim Hearing on April 15, 2020,[17] there is no pressing need to issue the ticket refunds at this time and the issuance of those refunds to only one subset of creditors may be inappropriate altogether.   There is no evidence to support the Debtor's statement that refunds to ticketholders are needed to address economic harm as a consequence of the pandemic.   Revising the Budget to account for the $650,000 not being disbursed, the Debtor has more than sufficient liquidity to fund its limited operations for the first 13 weeks of the case without the need for any post-petition financing.

31.     More specifically, as of the Petition Date, the Budget reflects that the Debtor had $5.6 million in available cash.   At the conclusion of the 13-week period, assuming the Debtor does not issue the ticket refunds, the Budget reflects that the Debtor should have a positive cash balance

---

[16] Docket No. 5.

[17] Transcript of April 15, 2020 "First Day Hearings", p. 23, ll. 24 – p. 26, ll. 13.

of over $2.25 million without accounting for any post-petition financing.  There is, thus, no basis at this time to authorize the Debtor to incur any post-petition financing, let alone under the Insider DIP from McMahon.

32.     To the extent the Debtor establishes a need for post-petition financing later in the case, the Debtor should be required at that time to establish that the Insider DIP terms proposed by McMahon were entirely fair and adequately shopped, and that more favorable terms for post-petition financing were not available to the Debtor and its estate.

**B.     The DIP Motion Should be Denied Because the Insider DIP has Not Been Proposed in Good Faith and is an Improper Attempt by McMahon to Gain Further Control Over the Case.**

33.     The proposed Insider DIP, while purportedly on favorable terms for the Debtor, is an attempt by McMahon to wrest control of the case from the Debtor and further the loan-to-own strategy he began to implement in the weeks prior to the Petition Date.  Just 20 days prior to the bankruptcy case, and after the XFL had already announced the cancellation of its season, McMahon began advancing funds to the Debtor on a purported secured basis.  McMahon, however, appears to have been laying the groundwork for a strategy that would enable him to re-acquire the Debtor's assets (and re-start the XFL) free of its many and mounting liabilities.

34.     McMahon's intentions are laid to bare when considering his decision to shutter the league and then advance debt to the company, rather than infuse equity, in the face of the many public statements and reports that McMahon was prepared to invest several hundred million dollars in the league and absorb significant losses over a several year period in order to ensure the ultimate success of the enterprise.  Instead, seizing an opportunity to shed significant liabilities and at the expense of the many creditors and vendors that detrimentally relied on McMahon's comments and commitment to backstop the league as it matured into a profitable enterprise, McMahon is the principal architect of a loan-to-own strategy that that would benefit him at the expense of

17

unsecured creditors.  The Debtor cannot establish that the Insider DIP, which further advances McMahon's objectives, is proposed in good faith.

35.    While the Debtor touts the Insider DIP for its favorable interest rate and no closing fees, those benefits are outweighed by the potential harm to the estate if the Debtor is forced to comply with the Milestones and rush through a sale of substantially all of its assets.  A low interest loan for a short period of time is a small price to pay for the ability to acquire substantial assets pursuant to a flawed and abbreviated sales process.  Missing the forest for the trees, the Debtor appears intent on risking millions of dollars (or more) in value on a hurried sale in exchange for the much more limited benefit associated with a low-cost DIP.

36.    The Insider DIP also includes non-economic features—such as the Milestones—that are artificial and designed to benefit McMahon at the expense of the estate and its creditors.  These provisions reflect non-arm's-length nature of the Insider DIP.  For example, a post-petition lender under these circumstances— where its source of recovery is the proceeds of a sale of the debtor's assets—should propose an extended sale timeline to ensure that the value of the assets can be maximized to repay the post-petition debt and to secure interest over a longer period.  The Debtor, as a fiduciary to the estate and its creditors, should similarly be seeking to ensure that any sale timeline—whether imposed by a post-petition lender or not—provides sufficient time to maximize value.  And yet, the Debtor and McMahon propose the Insider DIP, which is tied to a quick sale process that is unlikely to unlock the highest value for the Debtor's assets.

37.    The Debtor also acknowledges that it did not "shop" the Insider DIP and maintains that any ability to secure reasonable third-party financing was made impractical by McMahon's refusal to permit his pre-petition liens to be primed.  Those pre-petition liens, however, are the product of questionable circumstances intended to give McMahon the inside track in any

18

subsequent bankruptcy filing.  The proposed Insider DIP—and the attendant increased credit bid—is yet a further attempt by McMahon to influence this case and gain control of the Debtor's valuable assets.  In an economic environment in which competitive bidding may already prove challenging, permitting McMahon to increase his purported secured debt by up to another $3.5 million – up to $12.5 million – would not serve the best interests of the Debtor's estate and unsecured creditors.  The Debtor should be actively pursuing a path and process that seeks to maximize the value of the Debtor's assets for the benefit of all constituents.  The Insider DIP, however, restricts the Debtor from doing that.

38.     Accordingly, for this reason as well, the Debtor's request to procure post-petition financing from McMahon should be denied.

### C.     The DIP Motion Should be Denied Because the Sale Milestones Contained in the Proposed Final DIP Order Will Hinder the Debtor's Ability to Maximize the Value of Its Estate.

39.     The proposed Insider DIP cannot be approved because it restricts the ability of the Debtor to maximize the value of its assets for the benefit its estate.  If left unmodified, the Insider DIP would require the Debtor to market and sell its otherwise valuable assets on a highly compressed timeframe in a depressed and challenging economic environment.  The result of that process would be to harm the Debtor's estate and unsecured creditors, not maximize value for their benefit.

40.     The proposed Final DIP Order contains several Milestones with respect to the sale of the Debtor's assets.  *See* Final DIP Order, at ¶15.  These Milestones require the Court's entry of an order approving the sale of substantially all of the Debtor's assets, in a form acceptable to McMahon, by no later than July 15, 2020.  *Id.*  The failure to comply with this milestone constitutes an Event of Default under the Insider DIP.  *Id.* at ¶16.  In addition, the DIP Milestones are inextricably linked to the deadlines proposed in the Bid Procedures Motion, which further

19

compress the sale timeline, and include a "Bid Deadline" of July 6, 2020, an "Auction" on July 8, 2020, a "Sale Hearing" on July 13, 2020 and an outside "Closing Date" of July 31, 2020.

41.     Through these Milestones, the Debtor (as prompted by McMahon) seeks to jam through a sell of its assets on an accelerated timeline during the worst pandemic the United States has experienced in over 100 years.  The Debtor acknowledges that the pandemic was the source of its pre-petition financial distress, causing the XFL season to be cancelled and precipitating this chapter 11 filing, and yet McMahon is forcing (and the Debtor is advancing) a process that would seek to have those same assets sold quickly and with limited marketing in the same challenging market.  Indeed, as of the date hereof, the Debtor recently retained an investment bank to market these unique and prized assets for sale.

42.     The Milestones reflect McMahon's attempt to control the case by creating urgency and emergency that do not exist.  There is no rush and the financial consequences to unsecured creditors if the sale is jammed through on the timeline proposed—and especially if McMahon is permitted to credit bid both his pre-petition and any post-petition debt—could be severe.

43.     In order to provide the Debtor with sufficient time to market and sell its assets to the highest and best bidder and maximize the value of its estate, the Milestones contained in the proposed Final DIP Order should be either modified or waived in their entirety.  To that end, the Committee intends to propose modified milestones that it believes will best maximize the value of the Debtor's assets and ensure the Debtor's successful emergence from chapter 11.

44.     An extended sale process should enjoy the support of every creditor constituency in this case—including McMahon.  Indeed, extending the milestones to comply with a more realistic timeline would not harm McMahon, as a pre-petition lender, and could benefit McMahon

insofar as the Debtor would have the ability to obtain more—not less—value for distribution to all stakeholders.

      **D.**      **The DIP Motion Should be Denied Because the Insider DIP Cannot Satisfy the Heightened "Entire Fairness" Standard.**

45.      The DIP Financing proposed by McMahon fails to satisfy the requisite legal standard applicable to insider post-petition financing.  The business decisions of a Delaware company, including those in chapter 11 are generally subject to the deferential business judgment standard.  *See, e.g., Los Angeles Dodgers*, 457 B.R. at 313 (deciding the standard of judicial review for a Delaware limited liability company in chapter 11) (citing *Aronson v. Lewis*, 473 A.2d 805, 811-12 (Del. Supr. 1984) and *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. Supr. 1984)).

46.      That deferential standard, however, does not apply if a party can show one of four elements: "(1) the directors did not in fact make a decision, (2) the directors' decision was uninformed; (3) the directors were not disinterested or independent; or (4) the directors were grossly negligent."  *Id.*  If the opposing party shows one of these elements, a debtor must show the "entire fairness" of the transaction—"fair dealing and fair price."  *Los Angeles Dodgers*, 457 B.R. at 314.

47.      Here, the Debtor is not "disinterested" or "independent" from McMahon.  As an insider transaction, the proposed Insider DIP is subject to "rigorous scrutiny" by this Court, and the Debtor must show the "entire fairness" of the proposed Insider DIP.  *See Pepper v. Litton*, 308 U.S. 295, 306 (1939) (finding that a dominant or controlling shareholder is a fiduciary, whose "dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the…stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein."); *see also In re Winstar Cmmcn's, Inc.,* 554 F.3d

382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts.") (citation and internal quotation marks omitted); *WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship)*, 227 B.R. 445, 454 (S.D.N.Y. 1998) ("[S]ince there is an incentive and opportunity to take advantage…insiders' loans in a bankruptcy must be subject to rigorous scrutiny."), *aff'd*, 198 F.3d 234 (2d Cir. 1999); *Los Angeles Dodgers LLC*, 457 B.R. at 314 (holding that proposed DIP loan benefited insider, and denying DIP motion because debtor failed to show the entire fairness of the transaction).

48.     As discussed in greater detail throughout this Objection, even under the more deferential business judgment standard, the Insider DIP does not pass muster.  This is one of those "rare cases [where] a transaction [is] so egregious on its face" that the Debtor's conduct cannot be the product of a valid exercise of business judgment.  *Kaufman v. Belmont*, 479 A.2d 282, 288 (Del. Ch. 1984) ("In rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.") (citation and internal quotation marks omitted).

49.     The Debtor has not sought to secure financing from any other source, is proposing an unreasonable sale timeline driven by the Insider DIP Milestones and largely abdicates its fiduciary duties in favor of McMahon.  Significant concerns abound relating to the McMahon Debt and the Debtor's purported need to borrower funds from McMahon to fund expenses after the Debtor had already determined to cancel the XFL season.

50.     While the strict financial terms of the proposed Insider DIP may not be unduly onerous, when coupled with the Milestones and certain other provisions of the Insider DIP described herein, the Debtor's entry into the Insider DIP cannot be characterized as a legitimate attempt to borrow funds to sufficiently capitalize the estate to ensure that value can be maximized

for all stakeholders.  For example, while the Insider DIP might boast a favorable interest rate, the Milestones requiring the entry of an order approving a sale of substantially all of the Debtor's asset by no later than July 15, 2020 vitiates the benefit associated with that low interest rate and some of the other financial incentives.  It is far more important to the Committee that the Debtor and its investment banker have sufficient time to market the Debtor's valuable assets for sale than the incremental benefit associated with a slightly higher or lower interest rate or certain other modest fees.  These same concerns should be shared equally by the Debtor, but McMahon's imprint on this case is ever-present and the Debtor appear resigned to accept that fate.  That is not acceptable to the Committee.

> **E.    A Reduced Insider DIP is Equally Objectionable.**

51.    The Committee understands that the Debtor may pivot and seek to reduce the requested funding under the Insider DIP to $1,500,000.   The proposed reduction of the Insider DIP, however, is illustrative of the influence McMahon holds over this case.  By reducing the Insider DIP, the Debtor and McMahon seek to manufacture a liquidity shortfall that they can then argue necessitates an unnecessarily expedited sale process.  All other objections to the Insider DIP aside, and in light of certain other anticipated revisions to the DIP budget, an Insider DIP in the amount of $3.5 million should at least give the Debtor sufficient liquidity to run a meaningful and robust sale process for the Debtor's unique and coveted assets.  The proposed reduction of the Insider DIP, however, reflects an intent to subvert any sale process long enough to realize the full value of the Debtor's assets and seeks to ensure that there are insufficient funds available to pay Committee professionals to address this exploitation.

52.    Assuming *arguendo* that the Court were to approve the Insider DIP, at minimum, the Milestones should be extended commensurate with an appropriate marketing period and the

23

amount advanced under the Insider DIP should afford the Debtor sufficient liquidity to run that process.

## II.    The Court Should Reject the Limitations Placed on the Committee's Ability to <u>Investigate and Pursue Lender Claims</u>.

### A.    The Committee's Investigative Cap Should be Increased.

53.    The proposed Final DIP Order caps the amount of funds available to the Committee for the investigation of claims against McMahon, as pre-petition lender, at $20,000.  This unreasonably restrictive cap seeks to shield McMahon and his improvident pre-petition loans from potential claims at the unacceptable expense of the Committee's ability to fulfill its duty to represent the interests of unsecured creditors and the adversary system envisioned by the Bankruptcy Code.

54.    Courts in this District routinely approve caps well above $20,000 for funds available for committees for the investigation of claims against prepetition lenders.  For a chapter 11 case to be administered effectively, statutory fiduciaries, such as the Committee, must be represented by qualified professionals who are equipped to represent the interests of their clients.  Thus, the actions of the Committee's professionals should not be dictated by McMahon but, rather, by the duties imposed upon such professionals by the Bankruptcy Code.  Indeed, it is inappropriate for McMahon to obtain the benefits of chapter 11 while at the same time refusing to accept the costs, especially where legitimate concerns exist over the nature of the insider debt advanced to the Debtor purportedly on a secured basis just before the Petition Date.

55.    The integrity of the bankruptcy process mandates that the Committee's professionals be permitted to advocate on behalf of unsecured creditors without being subject to the control of third parties whose interests are adverse to those of the Debtor's estate.  This is especially so where an insider has used his status to advance his interests at the expense of

24

creditors.  The Committee, therefore, requests that the arbitrary limits placed upon the amount of fees and expenses incurred by its professionals be deleted in their entirety.

> **B.    The Amount Budgeted for Committee Professionals Should be Increased and Should Not be Capped.**

56.    Pursuant to the Budget annexed to the DIP Motion, the Committee's professionals are limited to no more than $200,000 during the initial 13-week period of this case.  Separate and apart from counsel, the Committee may need to retain experts to address flaws in the sales process, assess the proposed expenditures, and provide feedback on ways to ensure a more fulsome sales process.  By contrast, Debtor's counsel alone is allocated $425,000 for that same period.

57.    With so few resources earmarked for paying seasoned professionals to assist the Committee in the analysis, investigation and diligence of the many issues that will arise in this chapter 11 case, the Committee is certain to exceed its allocated $200,000 during the relevant period.  The cap proposed by the Debtor and McMahon, if approved, would impermissibly force the Committee's professionals to finance matters related to the Debtor's effective reorganization and harm the adversary system characteristic of the chapter 11 process.  *See Tenney Vill. Co.*, 104 B.R. at 568-69 (finding cap on fees unacceptably limited the right of debtor's counsel to payment for bringing actions against the postpetition lender, creating an economic incentive to avoid bringing such actions in disregard of its fiduciary duties toward the estate, and therefore, refusing to approve the postpetition financing); *In re Channel Master Holdings, Inc.*, No. 03-13004, 2004 Bankr. LEXIS 576, at *8-9 (Bankr. D. Del. Apr. 26, 2004) (refusing to enforce a $75,000 cap on committee's professional fees under a postpetition financing facility, finding such cap unreasonable in light of the much larger caps on the other professionals in the case and after a thorough review of all actions of the committee's professionals and determining that the cap on the committee's fees was inadequate to compensate for such activities); *Ames*, 115 B.R. at 40

(stating that "failure to provide a reasonable sum for professionals has, in other cases before this Court, left estates, creditors' committees and trustees without the assistance of counsel and the Court without the adversary system contemplated by Congress").

58.    The Budget should, therefore, be increased as it relates to Committee professionals to appropriately estimate for the reasonable work be performed by Committee professionals, in exercising their fiduciary duties.  In any event, though, the budgeted amount should not act as a cap on any fees incurred by Committee professionals that are approved by the Court.

59.    Furthermore, the Budget applicable to Committee professional fees should provide that if the amount actually paid to the professional is less than as budgeted, the difference between the budgeted amount and the actual amount shall be added to the budgeted amounts for such professional for the immediately following month, such that the entire line item is available for the entire case, for the purposes of calculating the Carve-Out.

60.    For these reasons, the amounts budgeted for Committee professionals should be increased, at minimum, to align with the budgeted amounts allocated to the Debtor's professionals and the unreasonable cap on Committee professional fees should be eliminated.

**III.    The DIP Collateral Should Not Include Liens on Avoidance Action Proceeds Nor Should Superpriority Claims be Paid from Avoidance Action Proceeds.**

61.    While the DIP Term Sheet provides that the DIP Collateral securing the Insider DIP excludes avoidance actions, the DIP Collateral includes the proceeds of the Debtor's claims and causes of action arising under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 and 553, and any other avoidance or similar action under bankruptcy law upon entry of a final order. The grant of liens on the proceeds of avoidance actions, however, is fundamentally at odds with the unique purposes served by avoidance actions.  Avoidance actions are distinct creatures of bankruptcy law designed to benefit, and ensure equality of distribution among, general unsecured

26

creditors. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.*), 226 F.3d 237, 244 (3d Cir. 2000), *rev'd en banc*, 330 F.3d 548 (3d Cir. 2003) (identifying underlying intent of avoidance powers to recover valuable assets for estate's benefit); *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries").

62.     As an important potential source of recovery for general unsecured creditors, avoidance actions and their proceeds should remain free of any encumbrances and instead should be available for distribution to all creditors. *See, e.g., In re Excel Maritime Carriers, Ltd.*, No. 13-23060 (RDD) (D.I. 133) (Bankr. S.D.N.Y. Aug. 6, 2013) (excluding avoidance actions and proceeds thereof from property that could be used to pay superpriority claims under § 507(b); excluding avoidance actions and proceeds from the scope of adequate protection liens); *In re Hostess Brands, Inc.*, No. 12-22052 (RDD) (D.I. 254) (Bankr. S.D.N.Y. Feb. 3, 2012) (same).

63.     The Debtor has not provided any justification for the extraordinary grant of liens on the proceeds of avoidance actions, or for the potential payment of superpriority claims with the proceeds of such actions. To the contrary, there is no legal basis for this Court to grant McMahon a lien on the proceeds thereof. Accordingly, avoidance action proceeds should be excluded from the DIP Collateral and reserved for the benefit of the Debtor's unsecured creditors. Moreover, given that the fundamental purpose of avoidance actions is to recover valuable assets on behalf of the estate and its unsecured creditors—and not its secured creditors—such proceeds should similarly be excluded from property used to pay any superpriority claims arising under Bankruptcy Code section 507(b) on account of the DIP Financing.

**IV.    The Proposed Final DIP Order (and/or Cash Collateral Order) Should be Modified to Accommodate the Committee's Objections.**

64.    To approve post-petition financing, a court must determine whether the terms of the underlying credit transactions are fair, reasonable and adequate under the circumstances of the case. *Crouse Group, Inc.,* 71 B.R. at 546.  As noted above, the DIP Motion should be denied other than to permit the continued use of cash collateral on reasonable terms consistent with this Objection.  In the unlikely event, however, that the Court were to permit the Debtor to incur some amount of post-petition financing at this time (which it should not), the proposed form of Final DIP Order should be removed or modified as it includes the following provisions that are inappropriate.

**A.    No Waiver of Bankruptcy Code Section 506(c).**

65.    The proposed Final DIP Order provides for a waiver by the Debtor of its right to surcharge the DIP Collateral pursuant to Bankruptcy Code section 506(c).  This waiver is inappropriate.  Section 506(c) is a rule of fundamental fairness for all parties in interest, providing that secured creditors share some of the burden of administrative expenses in a bankruptcy case where it is reasonable and appropriate for surcharges to be ordered.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000).  This section is designed to "prevent a windfall to the secured creditor…*[Section 506(c)] understandably shifts to the secured party…the costs of preserving or disposing of the secured party's collateral*, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate." *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (emphasis added).  A 506(c) waiver is wholly inappropriate absent the payment of all administrative expenses.  *See, e.g., In re The Sports Authority, Inc., et al.*, Case No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) (D.I. 1699) (preserving 506(c) rights for the debtors or any party with requisite standing in

28

the final DIP financing order); *In re Motor Coach Indus. Intl, Inc.*, Case No. 08-12136 (BLS) (Bankr. D. Del. Oct. 22, 2008) (D.I. 244) (removing a section 506(c) waiver from the final postpetition financing order after the creditors' committee objection); *In re NEC Holdings Corp.*, Case No. 10-11890 (PJW) Hearing Transcript (D.I. 224) (Bankr. D. Del. July 13, 2010) (requiring that secured creditors pay the "freight" of the bankruptcy by ensuring an administratively solvent estate).

66.     In addition, in *Hartford Underwriters*, 530 U.S. at 12, the United States Supreme Court ruled that only the debtor is vested with standing to seek administrative surcharges under section 506(c).  Thus, if the Court were to approve the abrogation of the Debtor's section 506(c) rights, all parties in interest could lose this valuable Bankruptcy Code protection.  Accordingly, the Committee requests that the waiver of the Debtor's section 506(c) rights be stricken. Alternatively, if the Court is unwilling to strike the Debtor's waiver of their section 506(c) rights, the Committee should, in any final DIP order, be explicitly vested with standing to seek a surcharge against the DIP Collateral if the facts ultimately prove that a surcharge is appropriate.  Providing the Committee with standing to seek a section 506(c) surcharge, if appropriate, will preserve estate assets for the benefit of all unsecured creditors.

**B.     No Waiver of Bankruptcy Code Section 552(b).**

67.     The proposed Final DIP Order also provides for a waiver of the "equities of the case" exception under Bankruptcy Code section 552(b), which would otherwise allow the Debtor, the Committee or other parties in interest to assert that equitable considerations warrant the exclusion of postpetition proceeds from the collateral securing the Debtor's prepetition debt.  As recoveries for unsecured creditors are uncertain at this point in time, a prospective finding that the "equities of the case" exception contained in section 552(b) is waived is wholly inappropriate, and should be stricken.  *See In re Metaldyne*, No. 09-13412 (MG) 2009 WL 2883045, at *6 (Bankr.

S.D.N.Y. June 23, 2009) (holding, in the context of a proposed 552(b) waiver, that "the waiver of an equitable rule is not a finding of fact…and the Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make"); *see also In re iGPS Co. LLC*, No. 13-11459 (KG) 2013 WL 4777667, at *5 (Bankr. D. Del. July 1, 2013) (no waiver of the "equities of the case" exception with respect to creditors committee); *In re Namco, LLC*, No. 13-10610 (PJW) 2013 WL 1332581 (Bankr. D. Del. Mar. 24, 2013) (same).

### C.    No Waiver of any Rights in Respect of Marshalling.

68.    The Debtor should also not waive any rights with respect to the marshalling doctrine in the proposed Final DIP Order.  Such rights should be preserved for the Committee.  Marshalling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security."  *Meyer v. U.S.*, 375 U.S. 233, 237 (1963).  McMahon should be required to exhaust all other collateral before seeking satisfaction from unencumbered assets (which as noted above should exclude Avoidance Action proceeds), the value of which would otherwise be available for the benefit of unsecured creditors.

### D.    No Modification of Automatic Stay upon Event of Default.

69.    The automatic stay under section 362(a) of the Bankruptcy Code should not be automatically modified following an Event of Default.  While the proposed Final DIP Order provides that the Debtor may oppose the lifting of the stay, the burden should not be placed on the Debtor (or the Committee) to have to oppose stay relief upon an Event of Default.  Rather, if appropriate at the time, McMahon can seek relief from stay and should need to establish an adequate basis to support his request.  It is inappropriate to shift the burden to the Debtor, and its estate, where McMahon is an insider and the Debtor's assets are not depreciating in value – the Debtor's most significant assets are intellectual property.  Accordingly, the automatic stay

30

provision should be modified to provide that, subject to section 362(a), McMahon may seek stay

relief following an Event of Default.

> ### E. The Committee Requests Additional Modifications to the Form of Final DIP (or Cash Collateral) Order.

70.     The Committee is troubled by, and opposes, certain other provisions of the

proposed form of Final DIP Order and, as a condition of approval to any post-petition financing

or cash collateral usage, requests that the following provisions be clarified or modified, as

appropriate:

> ➢ **The Post-Default Carve-Out Should be Eliminated**.  Pursuant to the DIP Motion, McMahon has authorized the Debtor to pay, in accordance with the Budget and to the extent authorized by the Court, $205,000 in the aggregate for any fees and expenses of the Debtor's and the Committee's professionals (the "Restructuring Professionals") incurred after the continuance of an Event of Default under the DIP Term Sheet (the "Post-Default Carve-Out").  The Post-Default Carve-Out, however, is unreasonably low and impermissibly constrains the actions of the Restructuring Professionals in this chapter 11 case.  Absent such modification, the terms of the DIP Financing effectively prohibit the Debtor, the Committee, and their professionals from satisfying their fiduciary obligations.  Again, McMahon cannot reap the benefits of the chapter 11 process without shouldering the responsibilities imposed thereby.

> ➢ **The Proposed Adequate Protection Liens should be Subject to Subordination**. The Adequate Protection Liens and adequate protection claims proposed to be granted to McMahon on account of his pre-petition loan should be subject to disallowance if the pre-petition debt is subordinated.

> ➢ **The Debtor Should Correct DIP Budget Deficiencies**.  The Budget reflects anticipated disbursements over the 13-week Budget period of more than $3.4 million, but does not provide any supporting explanation of the significant disbursements for a company that is largely non-operational.  The Debtor should provide the Committee with a revised budget and information supporting the disbursement figures.

> ➢ **The DIP Fees and Expenses Should be Subject to Committee Review**.  Given that McMahon plays many different roles in this chapter 11 case – equity holder, pre-petition lender, potential asset purchase and proposed DIP lender, the DIP Fees and Expenses incurred by his counsel should be subject to Committee review to ensure that they are reasonable and that McMahon is not saddling the estate with any of his legal fees and expenses in a capacity other than proposed DIP lender, in the unlikely event that the Insider DIP is approved.  In addition, in accordance with

31

the DIP Term Sheet, the DIP Fees and Expenses should be payable upon the Maturity Date of the Insider DIP[18] and not monthly, as set forth in the proposed Final DIP Order.  Regardless, for purposes of cash collateral usage, McMahon is receiving sufficient adequate protection such that it should not also include payment of his legal fees and expenses on account of his pre-petition loan.

➢ **All DIP Reporting Requirements Should Include the Committee**.  All notices and reports, including, but not limited to, any financial updates, variance reports and analyses required to be provided by the Debtor to McMahon should be contemporaneously provided to the Committee.

➢ **The Debtor Should Provide the Committee with a Copy of the DIP Credit Agreement**.  The Debtor should disclose, and provide the Committee with, with a full copy of the "DIP Credit Agreement".  To date, the Committee has only been provided with a copy of the DIP Term Sheet, as attached to the DIP Motion.

## RESERVATION OF RIGHTS

The Committee and its professionals reserve the right to further object, supplement and amend this Objection, including by filing a declaration in support thereof, to introduce evidence at any hearing relating to this Objection and the DIP Motion and to further object to the DIP Motion or any other relief that the Debtor may seek in this chapter 11 case.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an order (i) denying the DIP Motion; (ii) granting the Debtor authority to continue to use cash collateral, but subject to the modifications requested in this Objection; and (iii) granting such other and further relief as the Court deems just and proper.

*[Signature Page Follows]*

---

[18] *See* DIP Term Sheet, at p. 3 ("…which amounts shall be added to the total amount due under the DIP Facility and payable on the Maturity Date").

Dated: Wilmington, Delaware
      May 19, 2020

**GREENBERG TRAURIG, LLP**

*/s/ Dennis A. Meloro*
Dennis A. Meloro (DE Bar. No. 4435)
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7395
Facsimile: (302) 661-7165
Email: melorod@gtlaw.com

Howard J. Steinberg (CA Bar No. 89291)
1840 Century Park East, Suite 1900
Los Angeles, California 90067
Telephone: (310) 586-7700
Facsimile:  (310) 586-7800
Email:  steinbergh@gtlaw.com

Shari L. Heyen (*pro hac vice pending*)
1000 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 374-3500
Facsimile: (713) 374-3505
Email: heyens@gtlaw.com

David B. Kurzweil (*pro hac vice pending*)
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2212
Email: kurzweild@gtlaw.com

***Proposed Counsel to the Official Committee
of Alpha Entertainment LLC***

*ACTIVE 50240261v12*