IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
: 
In re : Chapter 11
: 
ALPHA ENTERTAINMENT LLC, : Case No. 20-10940 (LSS)
: 
Debtor.[1] : **Ref. Docket Nos. 55 & 146**
: 
------------------------------------------------------------x

**DEBTOR'S REPLY IN SUPPORT OF THE DEBTOR'S BID PROCEDURES MOTION AND IN RESPONSE TO THE COMMITTEE'S OBJECTION**

Alpha Entertainment LLC (the "***Debtor***") hereby submits this reply (the "***Reply***") in support of the Debtor's motion to establish bidding procedures [Docket No. 55] (the "***Motion***")[2] and in response to the objection to the Motion [Docket No. 146] (the "***Objection***") filed by the Official Committee of Unsecured Creditors (the "***Committee***"). In support of this Reply, the Debtor respectfully states as follows:

**PRELIMINARY STATEMENT**

1. Filled to the brim with inflammatory rhetoric and unsubstantiated accusations that the Debtor rigged the Bidding Procedures in favor of Vince McMahon, the Committee's Objection is irresponsible and value-destructive. Indeed, in response to the needlessly vitriolic personal attacks in the Committee's Objection, McMahon has chosen to bid the Debtor good luck and simply walk away from any potential bid for the Debtor's assets.[3] Accordingly, all that

---

[1] The last four digits of the Debtor's federal tax identification number are 7778. The Debtor's mailing address is 1266 East Main St., Stamford, CT 06902.

[2] Capitalized terms used but not defined herein shall the meaning given to them in the Motion.

[3] *See, e.g.*, McMahon Dep. Tr. at 45:6–46:16 (McMahon: "I don't know how it got out there, but the suggestion in the media that -- and I don't know whether it came from [the Committee] or not – the suggestion in the media is that I'm trying to buy the XFL back for pennies on the dollar. Not only is that not good for my personal reputation, it's also not true. And I'm – I'm not -- not trying to buy the XFL. I'm not going to be a bidder. And the other thing, too, is that . . . you've damaged the possibility of attracting some bidders because it looks like that, oh, okay, I see

the Committee has managed to do with its overblown and baseless accusations is to chase away a potentially significant bidder for the Debtor's assets—a potential bidder who, by the way, knows the Debtor's business better than any other, who has already demonstrated the vision and drive to make the XFL a success, who believes in the XFL so much that he was willing to put at least $200 million of his money into the league, who provided critical rescue financing to fund employee payroll and preserve going-concern value, and who sought to make the XFL's season-ticket holders whole to sustain the league's reputation and goodwill for the benefit of the future owner, whoever it may be. The Committee's knee-jerk obstructionism was, and is, reckless and value-destructive. Indeed, if anything, the Committee's vendetta against McMahon risks creating confusion in the market and possibly depressing the value of the Debtor's assets by falsely signaling that McMahon is uninterested in owning the XFL.[4] In fact, McMahon put in millions of dollars of his own money into the XFL to keep the league viable after its inaugural season was canceled. And were it not for the COVID-19 pandemic, the XFL would not be available for sale in the first place.

2.    Without any supporting facts, the Committee attempts to paint the Debtor as running a sham process, but nothing could be further from the truth. In the few short weeks

---

what Vince is going to do. A lot of bidders would not come forward because, if Vince is going to be involved again, he must know what he's doing, yaddy-yaddy, and I don't know if I want to bid against him. No one helped the bidding process by getting that out there. And, secondly, it was untrue, sly, it's just not a smart thing to do. Q. If you had no interest in being a bidder, why did you reserve the right to be a bidder in the bankruptcy papers that were filed? A. I think I was trying to make up my mind. . . . I don't know why that's out there, making me out to be the bad guy, [that] I'm going to buy the XFL back for pennies on the dollar, basically. That helped me move into the direction of I'm not going to be a bidder, not going to have anything to do with it. I do hope that someone will pay a lot of money for it, and I do hope that it will survive."); McMahon Dep. Tr. at 89:17–23 (McMahon: "I didn't make up my mind actually until [May 20, 2020] whether or not I definitely was or definitely wasn't [going to bid]. Again, I think that stuff . . . pushed me way over the edge, the stuff . . . that got out in the media . . . [that] you guys did.").

[4] *Cf.* McMahon Dep. Tr. at 48:7–14 ("Q. Did you have any understanding that by keeping open the possibility that you would be a bidder that you might dissuade other potential bidders from participating in the process? A. No. On the contrary. I think to a certain extent, the fact that I was a potential bidder, it -- it meant, obviously, that I thought XFL had value. It does.")

following the cancellation of the season, the Debtor acted promptly to implement appropriate and recognized governance safeguards by, among other things, appointing John Brecker, who had no prior relationship or affiliation with McMahon, to serve as an independent manager and endowing him with sole authority to make decisions for the Debtor regarding any insider transactions. *See, e.g.*, First Day Declaration ¶ 22. The Debtor designed the Bidding Procedures to facilitate an open and fair public sale designed to maximize value for the estate. The proposed Bidding Procedures are not novel. The terms of the proposed Bidding Procedures are customary, routinely approved in this jurisdiction, and entirely appropriate. McMahon did not receive any special treatment beyond the typical provisions designed to allow a lender to monitor the disposition of his collateral. The Debtor adjourned the previously scheduled bid procedures hearing and extended the Committee's objection deadline nearly two weeks in an attempt to work through the Committee's concerns. The Debtor's personnel have, contrary to the Committee's assertions, made themselves available to the Committee and its professionals and have worked tirelessly to respond to the Committee's numerous diligence requests. And the Debtor's investment banker, Houlihan Lokey, is currently in active discussions with dozens of potential third-party purchasers. There is thus no legitimate criticism that the sale process here is anything but a full and fair process designed to maximize value for the estate.

3. The Committee's Objection throws every conceivable argument at the Bidding Procedures to see if something will find traction with the Court. Now that the Committee has chased McMahon away from bidding, however, most of the arguments raised in the Objection are irrelevant. As a result, the Committee's only real gripe is that 90 days is not enough time for the Debtor to run a sale process that will maximize the value of the estate's assets. Delaying the sale process, however, will undoubtedly increase the duration of the Chapter 11 Case and the

administrative costs to the estate, thereby reducing potential recoveries to the Debtor's stakeholders and jeopardizing the potential pool of interested purchasers.

4. The Committee has no factual support for its contention that delaying the sale process will result in more value. Even so, as an accommodation to the Committee, the Debtor has negotiated an extension of approximately 25 days to the sale timeline set forth in the Bidding Procedures. This is the absolute best that the Debtor can do. Delaying the sale beyond the first week of August will jeopardize a purchaser's ability to restart the league in 2021, which would likely decrease the number of potentially interested bidders and the amounts those bidders would be willing to pay. As noted above, the Debtor's investment banker, Houlihan Lokey, is currently in active discussions with dozens of potential purchasers, and substantially all potential purchasers have indicated that the potential for an XFL season in spring 2021 is important to them. The longer the Committee is able to drag out the sale process, the less likely it is that the ultimate purchaser would have time to position the XFL to have a season in spring 2021. The Committee's actions, in fact, are sure to harm the very constituents whose interests the Committee is charged with protecting—unsecured creditors who will have a continuing business relationship with the XFL. And while the Debtor has been able to reduce its costs by, among other things, efficiently winding down operations, the Debtor's cash collateral simply will not support the extended sale process the Committee suggests.

5. The Committee attempts to justify its stall tactics with the argument that the Debtor cannot possibly sell the XFL amid the global health and economic crises related to COVID-19. To the contrary, the pandemic will not materially affect the Debtor's ability to market and sell its assets. Indeed, the Debtor's core asset is the XFL itself—its brand, trademarks, knowhow, goodwill, and other intangible property. These are not the sort of assets

that require extensive factory tours, retail operations, or site visits. Thus, even with the COVID-19 pandemic, potential purchasers can perform the requisite due diligence and submit their bids from the comfort and safety of their own homes. Indeed, Houlihan Lokey has had discussions with numerous potential purchasers, and not a single one has indicated that the Debtor's Bidding Procedures or proposed sale timeline would prohibit them from performing the necessary due diligence and submitting a bid.

6. In sum, for all of these reasons, and as set forth more fully below and in the *Declaration of William H. Hardie III in Support of Bidding Procedures Motion* (the "**Hardie Declaration**") and the *Declaration of Jeffrey N. Pollack in Support of the Debtor's Bid Procedure Motion and Use of Cash Collateral in Response to the Committee' Objection* (the "**Pollack Declaration**") filed concurrently herewith, the Court should overrule the Committee's Objection. The Committee has attempted to damage McMahon's reputation and alienated him from the sale process, and, thus, the Court and any potential bidders or other parties in interest, even the Committee, should have comfort that there is not (and never was) any intent to tilt the Chapter 11 Case or to prejudice the Debtor's creditors or potential bidders. The Debtor's Bidding Procedures set forth a full and fair process designed to maximize the value of the Debtor's assets. The Court should grant the Motion.

## REPLY

**I. The Bidding Procedures are a product of the Debtor's sound business judgment.**

7. The Debtor's overriding goal in the chapter 11 case is to maximize recovery for the benefit of the Debtor's estate through a sale, and courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Integrated Resources, Inc.*, 147 B.R. 650, 656–57

5

(S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee or debtor in possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *see also In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) ("Indeed, under normal circumstances the court would defer to the [debtor's] business judgment so long as there is a legitimate business justification."); *In re Spansion, Inc.*, 426 B.R. 114, 140 (Bankr. D. Del. 2010) (noting that "[i]t is not appropriate to substitute the judgment of . . . creditors over the business judgment of the [d]ebtors," in the context of a dispute over the proper direction of a debtor's reorganization).

8. As here, the paramount goal in any proposed sale of property under § 363 of the Bankruptcy Code is to maximize value to the estates. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (internal quotation marks omitted)).

9. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g.*, *Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

10. Approval of the Bidding Procedures is in the best interest of the Debtor's estate because they will provide certainty to potential bidders in the market and facilitate the Debtor's ongoing efforts to maximize the value of its assets in order to secure the greatest possible benefit for all of the Debtor's stakeholders.

## II. The Committee's arguments are largely irrelevant because McMahon is not bidding for the Debtor's assets.

11. Most of the Objection is premised on the Committee's baseless accusation that the Debtor rigged the Bidding Procedures to allow McMahon to re-acquire the Debtor's assets on the cheap. In his deposition testimony, however, McMahon made clear that he will not be a bidder for the Debtor's assets. *See* McMahon Dep. Tr. at 45:13–14 (McMahon: "I'm not -- not trying to buy the XFL. I'm not going to be a bidder."); McMahon Dep. Tr. at 46:17–21 ("Q. Do you intend to file -- do you intend to file papers with the Court indicating that you're not going to be a bidder? A. I do, if that's what's -- if that's what's necessary, yes."); McMahon Dep. Tr. at 95:1–5 ("Q. Do you have any issue with our making public that you are not going to be a bidder for the assets? A. None whatsoever."). Accordingly, the vast majority of the Committee's objections fall away completely.

12. For instance, the Committee devoted fully half of its argument section to the contention that the Court should deny McMahon his right to credit bid under § 363(k) unless McMahon were also to make a cash bid that would provide a "meaningful distribution" to unsecured creditors. Obj. ¶ 32; *see generally* Obj. ¶¶ 23–34.[5] The Committee's position on this

---

[5] Of course, McMahon already attempted to make a meaningful distribution to unsecured creditors—the season ticket holders—for the good of the XFL, but he was forced to abandon the effort in the face of vociferous opposition from the Committee. *See, e.g.*, McMahon Dep. Tr. at 7:17–8:14 ("Q. Are you aware that Alpha also filed a motion in its bankruptcy case seeking authority to pay $3.5 million in ticket refunds to ticket holders who purchased tickets for XFL games? A. Yes, I am. I thought that was extremely important because you want to continue with XFL, whoever has the highest bid, seems to me, you certainly want to pay them, . . . and . . . the XFL would not really want to have ticked off season ticket holders. It's so important because the relationship with XFL is . . . everything. [I]t's the audience. You don't want to burn the audience. It's extremely important, whoever buys it . . . . I think

issue was not supported by the facts or the law. *See* 11 U.S.C. § 363(k); *In re Aéropostale, Inc.*, 555 B.R. 369, 415 (Bankr. S.D.N.Y. 2016) ("The 'modification or denial of credit bid rights should be the extraordinary exception and not the norm.'" (quoting *In re RML Dev., Inc.*, 528 B.R. 150, 155 (Bankr. W.D. Tenn. 2014))). But since McMahon will not be submitting any bid for the Debtor's assets, let alone exercising his right to credit bid, the Committee's argument is now wholly irrelevant.

13. Similarly, the Committee argued that the Court should not permit the Debtor to consult with McMahon about the disposition of his collateral because those consultations could give McMahon an advantage over other potential bidders for the Debtor's assets. Obj. ¶¶ 35–36. In fact, it is customary and appropriate for a lender not actively bidding for the debtor's assets to consult with the debtor regarding the disposition of the collateral. *See, e.g.*, *In re Avenue Stores, LLC*, Case No. 19-11842 (LSS) (Bankr. D. Del. Sept. 13, 2019). But again, the Committee's argument is wholly irrelevant given that McMahon will not be a bidder for the Debtor's assets.

14. The Committee's more cursory arguments also largely fall by the wayside. For instance, the Committee objected that McMahon would have a conflict of interest because the Bidding Procedures provide that the winning bids shall be "reasonably acceptable" to McMahon in his capacity as the DIP Lender. Bidding Procedures at 8. Again, this language is customary and entirely appropriate. *See, e.g.*, *In re Avenue Stores, LLC*, Case No. 19-11842 (LSS) (Bankr. D. Del. Sept. 13, 2019); *cf.* 11 U.S.C. § 363(f)(2) (providing that a debtor can sell property free and clear of a lien if the secured party consents). Even so, the Committee's purported "conflict of interest" disappears entirely since McMahon is not bidding for the Debtor's assets. The

---

there's something on your end or someone's end as to whether or not we should refund season ticket holders. If you don't that would probably be certainly one of the worst things you could do, in terms of reputation with XFL.").

Committee also argued that the Court should require the Debtor to obtain the Committee's consent before rejecting any Bid. This proposal was a needless overreach in the first place, but now that McMahon has decided not to compete for the Debtor's assets, the Committee's proposed interference with the Debtor's sale process is entirely unjustifiable.

15. Accordingly, putting aside the overheated rhetoric and the demonstrably false accusations about McMahon, the Committee's only real gripe is that the sale process should be extended to 155 days.[6] The Debtor has negotiated for an extension of the sale process until the first week of August, for a total process of 115 days, but the Debtor understands that this is still not acceptable to the Committee. As explained in more detail below, however, there is nothing to gain from the Committee's proposed further delay, and much to lose.

**III.   The Debtor's proposed sale timeline is appropriate.**

16. The Bidding Procedures and the Debtor's proposed sale timeline (as modified, the "*Sale Timeline*") will allow the Debtor to obtain the highest and best value for the Debtor's assets under the circumstances of the Chapter 11 Case.

17. The initial term sheet for the Debtor's proposed postpetition financing would have established a 60-day sale process, and the Debtor successfully negotiated for an additional 30

---

[6] The Committee has interposed three other kitchen-sink objections that are barely worth mentioning. First, the Committee objected that Bidders should have the opportunity to cure defective Bids even after the Bid Deadline. The Bid Deadline, however, provides the Debtor and other parties in interest with necessary certainty and facilitates an orderly sale process. Potential Bidders are welcome to submit their Bids in advance of the Bid Deadline to ensure that they have an opportunity to cure any defects in advance of the Bid Deadline. Second, the Committee objected to the potential existence of bid protections. The Bidding Procedures make clear, however, that the hypothetical bid protections that concern the Committee would require a further motion and order of the Court, and thus, the Committee's objection is premature. Finally, the Committee argues that it should have "unfettered access to due diligence materials" and that it "should not be beholden to the Debtor . . . to serve as the gatekeeper of information." Obj. ¶ 37 at 19. It is unclear who else the Committee believes should or could serve as the gatekeeper of the Debtor's information, but in any event, the Committee appears to misunderstand the Bidding Procedures. As a Consultation Party, the Committee has unfettered access to the data room containing all necessary due-diligence materials, and the Debtor has further agreed, upon request, to provide additional information as reasonable and appropriate. *See* Bidding Procedures at 2–3. This is more than sufficient.

9

days. Pollack Declaration ¶ 12; *cf.* McMahon Dep. Tr. at 44:17–45:1 (McMahon: "I would look at it from this standpoint, the sooner the better, because what you don't want to do is you don't want to lose momentum. And you have -- if someone is going to play the '21 season, the sooner, the better, because they've got to get busy. The sooner you can have that momentum, the fastest you can do this would be -- it gets stale. It's like, if you do it any later than this, you know, it won't help [the XFL] at all."). As noted above, the Debtor has, as an accommodation to the Committee, negotiated an extension of the sale process of approximately 25 days, for a total process of 115 days. Under the Debtor's current budget, however, the Debtor's cash collateral will run out by mid-August, whereupon the Debtor would require access to debtor-in-possession financing to continue to fund the Chapter 11 Case and sale process. *See* Hardie Declaration ¶ 15; Pollack Declaration ¶ 13.

        18.      In addition, it is critical to maintain the current Sale Timeline to maximize the value of the Debtor's assets. *See* Hardie Declaration ¶¶ 16–17. The first week of August is the latest that the sale process can go and still allow the ultimate purchaser a reasonable opportunity to prepare the XFL to play games in spring 2021. *See* Pollack Declaration ¶ 17; *see also* Pollack Dep. Tr. at 27:6–12 ("[I]f we are to resume playing in 2021, we would need to be in a go mode ideally by August 1st of this year, and I think there is the chance for us to be in a position to play next year, and so doing would, I think, be good for the business on an ongoing basis."); Pollack Dep. Tr. at 56:6–9 ("For us to play at approximately the same time that we played this year, to play at approximately the same time in 2021, we should get started in August."). The potential for the XFL season to have a football season in spring 2021 is one of the most significant factors driving the value of the Debtor's assets. Hardie Declaration ¶ 16. Houlihan Lokey is currently in active conversations with dozens of potential purchasers. Hardie Declaration ¶ 16.

Substantially all potential purchasers have indicated to Houlihan Lokey that the potential for an XFL season in spring 2021 is important to them.  Hardie Declaration ¶ 16.  Their reasons include a desire to generate revenue and to further establish the league in a content-starved environment in spring 2021 and to avoid leaving space out to 2022 that would allow others to act on the opportunity.  Hardie Declaration ¶ 16.  Potential purchasers have expressly informed Houlihan Lokey that, without a spring 2021 season, they would likely offer a lower purchase price or may choose not to bid all together.  Hardie Declaration ¶ 16.

19. Delaying the Debtor's sale process by another 40 days like the Committee suggests would make it less likely that the XFL would be in position to have a season in spring 2021.  *See* Hardie Declaration ¶ 17; *see also* Pollack Declaration ¶¶ 13, 17.  Accordingly, delaying the Debtor's sale process by 40 days would likely decrease the number of potentially interested bidders.  *See* Hardie Declaration ¶ 17.  And if the Debtor's sale process is delayed for 40 days, bids would be likely lower because potential bidders would be forced to price in the increased risk that the XFL would not be able to generate any revenue until 2022.  *See* Hardie Declaration ¶ 17.

20. The sale of the Debtor's assets must stick to the proposed Sale Timeline so that a potential purchaser would have time to position the XFL to present a spring 2021 season.  *See* Pollack Declaration ¶¶ 13, 17.  The Committee's suggested delay would jeopardize the potential purchaser's ability to present an XFL season in spring 2021.  *See* Pollack Declaration ¶¶ 13, 17.  According to the Committee, the XFL has a six-month window in which the XFL could host its season without competing against the NFL or college football.  The Committee thus suggests that the XFL could delay the start of its spring 2021 season to accommodate the Committee's delay to the sale process.  The Committee is wrong.  First of all, if the XFL season does not

follow closely on to the end of the NFL season, the XFL loses momentum and the opportunity to segue the NFL audience to the XFL. *See, e.g.*, McMahon Dep. Tr. at 51:17–21 (McMahon: "It was important to me that – that after the NFL had their Super Bowl, people would still be watching football or want to watch football and we would segue some of that audience into XFL."). In addition, the NFL is not the XFL's only competition for the time and money of sports fans. Delaying the start of the XFL season would bring the XFL into direct competition with marquee events in other sports, including the NBA playoffs, the NHL playoffs, the start of the MLB season, and even the NFL draft, which has become a sports event unto itself. *See* Pollack Declaration ¶ 17.

21.     The potential destruction that would be caused by delaying the Debtor's sale process by another 40 days is uncontroverted, and there is no need for it. The marketing process for the Debtor's assets is robust and already well underway. Hardie Declaration ¶ 18. Moreover, given the XFL's high profile, it has been well known since the commencement of the Chapter 11 Case that the Debtor is for sale. In fact, interested parties reached out almost immediately. *See* Pollack Declaration ¶ 15. As of May 25, 2020, Houlihan Lokey had distributed teasers to 235 potential purchasers. Hardie Declaration ¶ 18. As of that date, 20 potential purchasers had executed NDAs and gained access to a data room containing extensive diligence materials, including a Confidential Information Memorandum that Houlihan Lokey added to the data room on May 21, 2020. Hardie Declaration ¶ 18. As of May 25, 2020, six more potential purchasers were in the process of executing NDAs to gain access to the data room. Hardie Declaration ¶ 18. Based on preliminary feedback, there is a robust market for the Debtor's assets, including a number of potentially interested private equity firms and other strategic and financial sponsors. Hardie Declaration ¶ 18. Indeed, the XFL's bankruptcy is high-profile and has received

extensive media coverage outside of the restructuring industry itself.  Hardie Declaration ¶ 18. In addition to the potential purchasers that Houlihan Lokey contacted, Houlihan Lokey has received 26 unsolicited inquiries from parties potentially interested in submitting a bid for the Debtor's assets.  Hardie Declaration ¶ 18.

22. Accordingly, the current global health and economic crises related to COVID-19 is not materially affecting the Debtor's ability to market and sell its assets.  *See* Hardie Declaration ¶ 19.  Potential purchasers are buying the XFL's concept and its unique platform— its brand, trademarks, knowhow, goodwill, and other intangible property.  *See* Hardie Declaration ¶ 19.  These assets require desktop diligence and conversations with management; they are not the sort of assets that require extensive factory tours, retail operations, or site visits. *See* Hardie Declaration ¶ 19.  Further, because the Debtor was only in its inaugural season, potential purchasers do not have years of historical financial data to diligence.  Hardie Declaration ¶ 19.  As explained above, Houlihan Lokey is currently in active discussions with dozens of potentially interested parties.  Hardie Declaration ¶ 19.  Even with the COVID-19 pandemic, none of these potentially interested parties have indicated, or even suggested, that the Debtor's proposed Sale Timeline would not provide enough time for their due diligence.  Hardie Declaration ¶ 19.

23. Were it not for the COVID-19 pandemic, the XFL would not be for sale in the first place.  Hardie Declaration ¶ 20.  Prior to the cancellation of its inaugural season, the Debtor demonstrated the XFL's significant potential.  Potential purchasers recognize that the COVID-19 pandemic has presented a unique opportunity to buy assets that would not otherwise available for sale, including this once-in-a-lifetime opportunity to buy a professional sports league.  Hardie Declaration ¶ 20.  The XFL is particularly well suited to succeed despite the COVID-19

pandemic.  *See* Hardie Declaration ¶ 20.  The Debtor has modeled for 2021 a "made-for-TV," 12-week tournament-style approach to its business.  *See* Hardie Declaration ¶ 20.  The XFL is also well positioned to, if necessary, deliver a crowd-free experience that could thrive in the current environment, given the XFL's existing innovations such as in-game audio from players and coaches and live on-screen sports wagering information.  *See, e.g.*, Hardie Declaration ¶ 20; First Day Declaration ¶ 10.

24.     Given the popularity and success of the National Football League, there are incredibly high barriers to entry for another professional football league.  The Debtor has demonstrated that spring football can be successful and has a proven framework and infrastructure already in place—a framework and infrastructure that cost hundreds of millions of dollars to implement.  The XFL thus had significant momentum and a head-start over any other professional football league.  However, that momentum will dissipate if the Debtor cannot consummate a transaction so that a prospective buyer can restart the league by the spring of 2021.  There is nothing particularly unique about football in the spring, and there is nothing to prevent a competitor from launching a rival football league to take advantage of the XFL's absence.  Pollack Declaration ¶¶ 17–18; *see also* Hardie Declaration ¶ 16.  In light of the cancellation of the Debtor's inaugural season, many of the best venues, coaches, and players are currently available, but it may not stay that way for long.  Pollack Declaration ¶ 18.  Extending the Sale Timeline for another 40 days as the Committee suggests would serve only to create space that another professional football league could attempt to exploit—particularly given that the Committee's proposed delay would likely force the adjournment of the league until 2022.  *See* Hardie Declaration ¶ 16; Pollack Declaration ¶¶ 17–18.

25.     In conclusion, the Committee should not be allowed to "roll the dice" with the Debtor's limited resources, particularly when it is abundantly clear that the sale process will be fair and open.  Potential purchasers have indicated that, while they are currently ready, willing, and able to bid for the Debtor's assets, the longer the Debtor's sale process drags out, the less interested they would be in bidding.  The proposed Bidding Procedures and Sale Timeline are appropriate and achievable and will enable the Debtor to obtain the highest and best offer for its assets under the circumstances, thereby maximizing value for the benefit of all stakeholders in the Chapter 11 Case.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court overrule the Objection and grant the Motion and such other and further relief as the Court deems just and proper.

Dated: May 26, 2020
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Matthew B. Lunn*
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Kenneth J. Enos (No. 4544)
Michael S. Neiburg (No. 5275)
Travis G. Buchanan (No. 5595)
Shane M. Reil (No. 6195)
Matthew P. Milana (No. 6681)
1000 N. King Street
Rodney Square
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Counsel to the Debtor and Debtor in Possession*