IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x
: 
In re : Chapter 11
:
ALPHA ENTERTAINMENT LLC, : Case No. 20-10940 (LSS)
:
Debtor.[1] :
:
---------------------------------------------------------x

**DECLARATION OF JEFFREY N. POLLACK IN SUPPORT OF THE DEBTOR'S BID PROCEDURES MOTION AND USE OF CASH COLLATERAL IN RESPONSE TO THE COMMITTEE'S OBJECTION**

I, Jeffrey N. Pollack, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1. Since February 5, 2019, I have served as the President and Chief Operating Officer of Alpha Entertainment LLC (the "***Debtor***" or the "***Company***"), which does business as the XFL, a professional American football league. In my capacity as the Debtor's President and Chief Operating Officer, I am familiar with the Debtor's day-to-day operations and business and financial affairs.

2. I have more than 25 years of executive experience in the sports industry with leadership roles at The Sports Business Daily, the National Basketball Association, NASCAR, the World Series of Poker, an NFL team, and other prominent organizations. I have a Bachelor's degree from the Medill School of Journalism at Northwestern University and a Master's degree in sports management from the University of Massachusetts at Amherst.

---

[1] The last four digits of the Debtor's federal tax identification number are 7778. The Debtor's mailing address is 1266 East Main St., Stamford, CT 06902.

3. I submit this declaration (the "*Declaration*") in support of the Debtor's motion to establish bidding procedures, and approval of the Debtor's request for use of cash collateral. Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management or the Debtor's professionals, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial conditions. If called as a witness, I could and would competently testify to the matters set forth in this Declaration.

**I.     Cash Collateral Negotiations**

    **a.     Background Information**

4. Prior to the Petition Date, the XFL provided high-energy professional football, reimagined for the 21st century with many innovative elements designed to bring fans closer to the players and the game they love, during the time of year when they wanted more football. Just weeks after the first XFL games were played, however, the worldwide COVID-19 pandemic forced every major American sports league to suspend, if not cancel, their seasons. On March 20, 2020, the XFL canceled the remainder of its inaugural season, costing the nascent league tens of millions of dollars in revenue. The impossibility of knowing when the pandemic would sufficiently abate and allow the league to restart only exacerbated the problems posed by the Debtor's abrupt loss of revenue and unabated operating costs.

5. With no incoming game day and ticket sales receipts due to the season's cancellation from the COVID-19 pandemic and resulting shutdown of the XFL's normal operations, Vince McMahon, founder of the Debtor, provided rescue financing to the Debtor in the form of a prepetition note (the "*Prepetition Note*"). The Prepetition Note provided the Company with up to $7 million in liquidity. The Prepetition Note was secured by all of the

Debtor's assets and carried an interest rate of four and one-quarter percent (4.25%) per annum. Subsequently, the Prepetition Note was amended to increase the maximum principal amount to $9 million. The Prepetition Note provided the Company with the liquidity to satisfy its payroll and employee-related obligations, including the payout of accrued vacation to the employees terminated shortly prior to the commencement of the Debtor's chapter 11 case (the "***Chapter 11 Case***").

      b. **The Appointment of the Independent Manager**

6.      Shortly after the cancellation of the XFL season, the Debtor appointed an independent manager, John Brecker of Drivetrain, LLC.  Mr. Brecker has been authorized by the Debtor's board to evaluate and approve any sale, financing or restructuring matters of the Debtor involving any insider of the Debtor.  The Debtor's resolution also provided the mechanism by which Vince McMahon recused himself from all financing and restructuring decisions on behalf of the Debtor in the Chapter 11 Case.

7.      Since his appointment, Mr. Brecker has overseen the negotiations with respect to the Prepetition Note, the postpetition financing, and he has played, and will continue to play, an integral role in the overall sale and restructuring process.

      c. **The Need for Use of Cash Collateral**

8.      The Debtor requires the use of cash collateral in order to, among other things, engage in a sale and marketing process for the Debtor's assets.  For this process to be successful, the Debtor will require the dedication of, and assistance from, its few remaining employees, as well as guidance from its professional advisors.  The Debtor must have access to cash collateral so that it may satisfy its postpetition obligations to these individuals, who will be entirely responsible for maximizing the value of the Debtor's assets during the Chapter 11 Case.

9. Moreover, the Debtor needs access to cash collateral in order to conduct an orderly wind down of its business, reducing unnecessary costs and expenses, while maintaining and protecting those assets that are likely to yield value as part of the sale process. Given the unique nature of the XFL, and its nationwide footprint, the Debtor's business is not simple to wind down. The Debtor operated a high-profile professional football league with teams located in eight (8) major markets, strategically placed to capture national attention and key demographics across the country, and the Debtor also operated a corporate headquarters located in an additional state. The Debtor's employees were spread throughout the United States and performed various services associated with the XFL, including, among others: football-specific services directly related to game day preparation and execution; marketing, public relations and sponsorship services that were key to successfully developing wide-spread attention and revenues for the XFL; and the front office services of the eight football teams and the XFL as a league, which all laid the groundwork for the XFL's success as a business enterprise. The wind down of the Debtor's business, while the sale process is pending, will require that consideration be paid to these, as well as other aspects of the Debtor's affairs so that while its business is wound down, value is not destroyed. And, although it likely goes without saying, the wind down of the Debtor's business has been, and will be further complicated by the unprecedented COVID-19 pandemic. Because the Debtor's offices are (or, in some cases, were) situated throughout the country, and state jurisdictions have enacted stay-at-home and essential/non-essential work orders, the Debtor has faced unparalleled difficulties in coordinating the retrieval of employee personal effects, as well as gathering and storing the Debtor's tangible assets.

10. Finally, the use of cash collateral is necessary to maintain the infrastructure and support the go-forward operating model of the XFL, which will allow for the possibility of

restarting the league in 2021. Although the Debtor's employees and professionals have worked, and will continue to work, tirelessly to reduce and otherwise eliminate costs while the Chapter 11 Case is pending, certain assets must be maintained if the ability to restart the league in the spring of 2021 is to be preserved. These assets include, among other things, the Debtor's intellectual property, including trademarks and digital content; football equipment for all eight (8) teams; technology infrastructure; league- and team-branded merchandise; and corporate headquarters infrastructure. Based on my experience, with an understanding of the XFL and the Debtor's business, preserving these and other key assets so that the possibility of a 2021 season remains intact, is necessary to maximizing value through the sale process. On the other hand, if the Debtor's limited framework of remaining assets is not maintained while the Chapter 11 Case is pending, the potential exists that the XFL will be stripped of its going-concern value at great cost to the Debtor's creditors and stakeholders. The challenges of running a professional football league are complicated and unique. Therefore, unless the Debtor is permitted to maintain its core group of assets, it will be improbable, if not impossible, for the XFL to be relaunched in the near future.

11. Absent the Debtor's ability to use cash and pay the expenses provided in the budget, the value of the business will be jeopardized. The Debtor underwent a detailed process, in consultation with its advisors, to prepare a budget that eliminates unnecessary expenses, yet allows the Debtor to accomplish its goals in the Chapter 11 Case and ultimately provide for a value-maximizing sale. The Debtor has continued to refine the budget and has been successful in reducing costs that were originally budgeted by approximately $600K.

      **d. The Sale Milestones**

12.    In accordance with negotiating the use of cash collateral, the Debtor and the prepetition secured lender negotiated for sale milestones.  The prepetition secured lender originally proposed a 60-day sale timeline, but the Debtor was successful in negotiating an additional thirty (30) days in order to provide for a more fulsome process.  And, following further discussions with the prepetition secured lender, the Debtor has been able to negotiate an additional three (3) weeks of time to market and sell the assets.

13.    Although I understand that the additional time by which the Debtor has been able to extend the sale process is beneficial, I also understand that there is risk associated with extending the process as the Official Committee of Unsecured Creditor Creditors (the "*Committee*") suggests.  Specifically, any further extension of the process significantly jeopardizes the ability to restart the XFL in the spring of 2021 and capture and maintain the significant, positive, national momentum achieved this past season for the XFL brand.  If the Debtor's sale process is extended by sixty (60) days, bids would likely suffer because potential bidders would be forced to calculate bids based on the increased risk of not being able to generate revenue until 2022.  Further, the Debtor's budget reflects that the Debtor will not have cash collateral to operate and achieve its chapter 11 goals if the process is extended.

14.    I believe that the sale process timeline proposed by the Debtor balances the desire of the Debtor to run a fulsome and transparent marketing process, against the Debtor's liquidity constraints and ordinary course expenses.

## II. The Sale and Bidding Procedures

### a. The Bidding Procedures and Sale Process are Fair and Reasonable

15. Since April 13, 2020, when the Debtor filed the Chapter 11 Case, and prior to the Debtor's engagement of Houlihan Lokey ("**Houlihan**"), numerous parties contacted me and expressed interest in purchasing the Debtor's assets.

16. Since the Debtor's engagement of Houlihan, additional parties have expressed an interest in pursuing a potential transaction with the Debtor. Specifically, I have been informed that Houlihan's discussions with potential buyers have developed substantial interest across many different companies, agencies, high net worth individuals and private equity groups. With considerable input from the Debtor's employees, Houlihan has also developed a teaser and comprehensive information memorandum on the XFL that accurately and positively reflects the value of the brand to a potential purchaser.

### b. Timing of the Sale

17. Based on my experience and knowledge of the Debtor, I feel that it is important to pursue and consummate a sale no later than the first week of August in order to position the Debtor to relaunch the XFL in the spring of 2021. I believe that a potential purchaser will recognize the importance of holding a 2021 XFL season in order to avoid the risk created by a new market entrant. The formula for the success of the XFL is unique, but the notion of professional spring football is not. Moreover, in running the XFL, we recognized that, in part, the success of the league is dependent upon the timing of its season. Any purchaser of the Debtor's assets will likely agree that important keys to the XFL's success are capitalizing on the lack of football following the conclusion of the NFL season, and commencing the XFL season after the Super Bowl and prior to the start of the MLB season, and the NHL and NBA playoffs.

A potential XFL relaunch in the spring of 2021 is only possible, in my opinion, with the consummation of a transaction no later than the first week of August. I personally have spoken with various bidders interested in the prospect of a transaction for the Debtor's assets and none have expressed concerns about the sale process timeline.

18. In sum, extending the sale process as the Committee suggests only jeopardizes the value of the XFL brand. The XFL is positioned for a sale within the proposed timeline in order to capitalize on the positive attention and acclaim of the league in its inaugural year. I believe that if the Debtor is forced to extend the process beyond the first week of August, the Debtor will suffer from not just incremental operational cost, but lost opportunity cost and potential loss of value if competitors step in, players and coaches find new opportunities and venues and even fans move on from their relationship with the XFL.

### III. CONCLUSION

For all the reasons described herein and in the Reply, I respectfully request that the Court grant the relief requested and approve the bidding procedures and use of cash collateral.

Dated: May 26, 2020                    /s/ Jeffrey N. Pollack
                                       Jeffrey N. Pollack