**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Case No. 20-10940-LSS |
| | ) | |
| ALPHA ENTERTAINMENT LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | **Hearing Date: 05/27/20 at 11:00 a.m.** |
| | ) | **Re: Docket Nos. 7, 55, 146, 147** |

**STATEMENT OF VINCENT K. MCMAHON IN SUPPORT OF DEBTOR'S**
**SALE MOTION AND IN RESPONSE TO THE COMMITTEE'S OBJECTIONS**

Vincent K. McMahon ("McMahon"), by and through his undersigned counsel, hereby respectfully submits this Statement in support of the Debtor's motion to approve bid procedures and a sale of substantially all of its assets [Docket No. 55] (the "Sale Motion") and in response to the objections (the "Objections") filed by the Creditors' Committee (the "Committee") [Docket Nos. 146 - 147] to the Sale Motion, and the Debtor's motion to approve debtor-in-possession financing [Docket No. 7].

McMahon founded the Debtor in 2017 with a goal of creating a viable spring professional football league, the XFL. Prior to the sudden shutdown of the league's season due to the COVID-19 pandemic, he funded the league out of his pocket entirely through equity contributions. Overall, McMahon has invested $200 million into the Debtor, of which more than $190 million was in the form of equity contributions. No one else has made any cash investments in the Debtor, whether through equity or debt.

Through McMahon's efforts and the efforts of the management team he recruited, the Debtor built a football league from scratch. The Debtor negotiated stadium, practice facility, and front office leases for each of the eight teams. The Debtor recruited players and coaches. The Debtor negotiated media contracts to broadcast all of the XFL's games. The Debtor created intellectual property for the teams and the league, entered into branding and marketing deals,

purchased football and training equipment, and did all the other things necessary to get the league up and running. As the Debtor's detail in their pleadings, the league successfully launched its inaugural season earlier this year.

Midway through the inaugural season, however, COVID-19 changed the world. The pandemic prevented the league from holding games, thereby eliminating one of its main revenue streams - ticket sales. The league was forced to cancel the remaining season while having to maintain a substantial payroll.

The Debtor and McMahon found themselves faced with a business that would continue to incur significant expenses, but had no way of generating revenue. It was unclear, and remains unclear today, when live events such as major sporting events will be able to resume in the United States and, if so, under what restrictions.

Given those factors, McMahon determined he would not continue to fund the Debtor's liabilities by making further equity contributions. The Debtor and McMahon determined that a restructuring or insolvency proceeding of some kind was likely, and the Debtor retained Young Conaway Stargatt & Taylor LLP as restructuring counsel. The Debtor also needed additional capital to cover payroll and operating costs, including preparing for a chapter 11 filing.

The Debtor turned to McMahon, the only realistic funding source available and the only funding source the Debtor has ever known. Although McMahon was agreeable to provide additional monies as secured debt, he and the Debtor recognized the fiduciary implications of McMahon being both the Debtor's controlling principal and its lender. They therefore agreed it was appropriate to bring in an independent fiduciary for the Debtor. John Brecker was brought in both to serve as that independent fiduciary and also to lend his restructuring experience to the Debtor.

Mr. Brecker approved the loan by McMahon to the Debtor and executed the note for the Debtor on March 25, 2020 (as amended, the "Note"). The Note provided a one year loan of up to $7 million secured by substantially all of the Debtor's assets. McMahon received no fees for the Note, and the Note bears interest at only 4.25% and requires no cash payments of principal or interest until maturity. The Debtor ultimately came to believe that it needed additional capital in excess of $7 million prior to the Petition Date. Once again, McMahon agreed to fund it, and so the Note was amended to increase the availability to $9 million.

Amidst other arguments, the Committee complains bitterly about the Note in its Objections. The Committee undoubtedly would have preferred for McMahon to have funded the Debtor's last $9 million in capital needs with equity, like McMahon's previous $190 million in equity contributions. Having already lost his substantial equity investment due to the pandemic, McMahon was under no obligation to provide additional funding of any kind, much less to make further equity investments in a suddenly insolvent business.

Instead, he decided to provide a secured loan so the Debtor would be able to fund a well-organized sale of the league via a chapter 11 case. The hope was, and is, that it could be marketed as an opportunity for a well-capitalized buyer that believes in the spring football business to step in and quickly restart the XFL. The XFL had achieved wide support while operating, and the goal was to provide buyers the ability to capitalize on that goodwill, retain the momentum created by McMahon and the Debtor's organization, and use the Debtor's existing operational structure to restart the XFL in time for a new season in 2021.

As it prepared for bankruptcy, the Debtor projected its likely cash needs during the case. The Debtor determined it would need DIP financing of up to $3.5 million to sustain itself

through completion of a sale, which McMahon once again agreed to provide on the same favorable terms as his initial $7 million commitment.

A major cost anticipated by the Debtors at this time was $3.5 million in refunds to season ticketholders. These customers had not received many of the games they'd paid for, and the Debtors determined it was important to refund these critical customers to protect the XFL's goodwill and ensure they would be there for a restarted league. McMahon agreed and was willing to fund DIP financing in part to cover the refunds.

The Debtor, through its bankruptcy counsel and Brecker, also negotiated the milestones for a sale process with McMahon. The Debtor's budget showed it could, with the requested DIP financing from McMahon, sustain a sale process which would conclude by mid-July. The Debtor and McMahon accordingly negotiated for milestones requiring the sale order to be entered by July 15.

At the first day hearing, the Court deferred a decision on the season ticketholder refunds to the second day hearing. Afterwards, the Debtor determined much of the refunds to season ticketholders had already been made prepetition by the Debtor's credit card processors. After accounting for the card processor refunds, only $650,000 remained due to season ticketholders. In the main, these remaining refunds are due to people who paid either by check or by a credit card that is no longer valid, and therefore are not capable of receiving electronic refunds.

In part because of this, and also due to other favorable updates to the Debtor's cash projections in the early weeks of the case, the Debtor ultimately reduced its DIP financing request to McMahon to $1.5 million. As before, this was the amount the Debtor projected as necessary to provide sufficient liquidity for the Debtors to complete a sale process by mid-July. McMahon once again agreed to provide this financing on the same generous terms as before.

Late last week, the Debtor further revised its cash projections. The Debtor now believes, due to substantial savings achieved to date, that the Debtor does not need DIP financing to complete the sale process on the contemplated timeline. The Debtor is accordingly withdrawing its request for DIP financing, and the Debtor and McMahon have instead negotiated for the Debtor's continued use of cash collateral through the sale process.

As this narrative reflects, McMahon has supported the Debtor at every turn through this process and has acted scrupulously as a fiduciary. Indeed, since the filing, and during the time he was considering whether to be a bidder, McMahon recused himself from making major decisions by the Debtor, including for example the hiring of an investment banker. Instead, these decisions have been made by Mr. Brecker and Jeffrey Pollack, the Debtor's President, in consultation with the Debtor's counsel.

Despite this, and perhaps proving the maxim "no good deed goes unpunished," the Committee has chosen to approach this case as an opportunity to attack McMahon on whatever specious grounds the Committee can conjure. The Committee's principal theme in attacking McMahon, widely publicized in the media, is the false narrative that the Debtor's sale process has been set up to allow McMahon to acquire the Debtor's assets at a low price.[1] As set forth above, this has no basis in fact. Further, as the Committee is aware, McMahon announced last week during his deposition by Committee counsel that he will not be a bidder for the Debtor's assets. Thus falls the center of the Committee's house of cards. In the process, however, there is now one less potential bidder for the assets, which hardly benefits creditors.

---

[1] See *Objection of the Official Committee of Unsecured Creditors of Alpha Entertainment LLC to the Debtor's Motion for Interim and Final Orders Authorizing the Debtor to Obtain Post-Petition Secured Financing, Pursuant to 11 U.S.C. § 105, 362, 363, 364 and 507, (A) Authorizing Post-Petition Financing, (B) Authorizing Use of Cash Collateral, (C) Scheduling a Final Hearing, and (D) Granting Related Relief* [Docket No. 147] at 2 ("In fact, the DIP and Bid Procedures are designed to ensure that McMahon can acquire the Debtor at a fire sale price with third parties having little or no meaningful opportunity to do the due diligence required to ensure a fair process." ).

The Committee also repeatedly complains about the timing of the sale process and the Debtor's operating costs, arguing the sale process should be extended and resulting increased administrative costs paid for through unspecified cuts to the Debtor's personnel. The timing for the sale process has been set, and continues to be set, largely by what the Debtor can afford. And the Debtor has done a remarkable job reducing its operating expenses while preserving the core employees needed for a purchaser to re-start the business. Indeed, the Debtor's management has successfully reduced costs to such an extent that the Debtor no longer needs DIP financing, something you would have thought the Committee would celebrate.

The Committee has even suggested, without a shred of evidentiary support, that McMahon is encouraging the Debtor to pay the remaining refunds to season ticketholders in an effort to avoid  personal liability for those payments under some guaranty. The Committee's counsel questioned McMahon extensively on this point during his deposition, despite the fact that there is  *no guaranty* by McMahon which would expose him to personal liability for those payments. Quite to the contrary of the Committee's unfounded assertion on this point, the fact that McMahon has been willing to fund the payment of these refunds through additional DIP lending to the Debtor even though there is no personal financial benefit to him from doing so, only demonstrates once again that McMahon is doing all that he can to preserve the value of the XFL for its next owner.

The Debtor's goal, which McMahon shares, is to allow an opportunity for a buyer to acquire the assets and employees needed to restart the XFL for a 2021 season. The Debtor could take an alternative approach of terminating everyone and simply selling the intellectual property for the XFL. That approach would likely make it impossible for a buyer to restart the league in time for a 2021 season, effectively throwing away much of the XFL's goodwill and the

momentum and energy created by the league in the run up to its pandemic-shortened maiden season. McMahon concurs with the Debtor's business judgment that this would be the wrong approach.

Finally, the Committee complains about the current cash collateral order's restrictions on using cash collateral to pay the Committee's professional fees. First, to the contrary of the Committee's allegations, the cash collateral order places no restrictions on the Committee's actions. The order contains no stipulations or timeline for the Committee to assert claims. The Committee's real complaint is that it wants McMahon to consent to more of the cash collateral being spent on the Committee's professional fees, rather than for those professionals being forced to rely for payment on the Bankruptcy Code's priority scheme.

In fact, McMahon has agreed to use of cash collateral to pay up to $200,000 of the Committee's professional fees. This is 50% of the original budget for the Debtor's counsel, Young Conaway - and Young Conaway is responsible for running the sale process. McMahon has also agreed to a carve out from his recoveries in favor of the Committee's professionals up to (1) subject to court allowance, the amount incurred prior to an event of default up to the limits in the cash collateral budget, plus (2) subject to court allowance, $30,000 incurred after an event of default. Given the Committee has no entitlement to a carve out of any kind under the Code, this is more than sufficient.

Finally, in terms of an investigation by the Committee of McMahon's prepetition secured note and liens, McMahon has agreed to allow $20,000 of cash collateral to be used for this purpose. As the prepetition note, its single amendment, and the accompanying UCC-1 filing combine for less than 20 pages (including signature pages), it is difficult to understand how $20,000 could be insufficient.

WHEREFORE, McMahon requests that the Court approve the bid procedures proposed in the Sale Motion, approve use of cash collateral on a final basis on the terms negotiated between the Debtor and McMahon, and grant such other relief as the Court deems just and proper.

May 26, 2020

CONNOLLY GALLAGHER LLP

/s/ Jeffrey C. Wisler
Jeffrey C. Wisler (No. 2795)
Kelly M. Conlan (No. 4786)
1201 North Market Street, 20th Floor
Wilmington, DE 19801
Telephone: (302) 757-7300
Email: jwisler@connollygallagher.com
            kconlan@connollygallagher.com

-and-

John A. Bicks
Jerry S. McDevitt
James A. Wright III
K&L Gates
599 Lexington Avenue
New York, NY 10022-6030
Telephone: (212) 536-3900
Email: john.bicks@klgates.com
            jerry.mcdevitt@klgates.com
            james.wright@klgates.com

*Attorneys for Vincent K. McMahon*

#05535150

8