IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x
: 
In re : Chapter 11
:
ALPHA ENTERTAINMENT LLC, : Case No. 20-10940 (LSS)
:
Debtor.[1] :
: Ref. Docket No. 55
:
---------------------------------------------------------x

**DECLARATION OF WILLIAM H. HARDIE III IN SUPPORT
OF BIDDING PROCEDURES MOTION**

I, William H. Hardie III, make this declaration (this "***Declaration***") under 28 U.S.C. § 1746 and state as follows:

1.  I am a Managing Director in the Financial Restructuring Group of Houlihan Lokey Capital, Inc. ("***Houlihan Lokey***"), proposed investment banker to the above-captioned debtor and debtor-in-possession (the "***Debtor***"). I submit this Declaration in support of the *Debtor's Motion for Entry of (A) an Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtor's Assets; (II) Scheduling an Auction for and Hearing to Approve the Sale; (III) Approving Notice of Respective Date, Time and Place for Auction and for Hearing on Approval of Sale; (IV) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (V) Approving Form and Manner of Notice Thereof; and (VI) Granting Related Relief; and (B) an Order Authorizing and Approving (I) the Sale Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests; and (II) the Assumption*

---

[1] The last four digits of the Debtor's federal tax identification number are 7778. The Debtor's mailing address is 1266 East Main St., Stamford, CT 06902.

26512375.6

*and Assignment of Certain Executory Contracts and Unexpired Leases and (III) Related Relief* [Docket No. 55] (the "**Bidding Procedures Motion**").[2]

2.  Except as otherwise indicated, all statements in this Declaration are based upon my review of relevant documents, my discussions with the Debtor and its professionals, my discussions with other members of the Houlihan Lokey team working on this engagement, and my personal knowledge and experience. If I were called upon to testify, I could and would testify to each of the facts set forth below.

**A.  Qualifications**

3.  Houlihan Lokey is an internationally recognized investment banking and financial advisory firm, with 22 offices worldwide and approximately 1,200 professionals. The firm is one of the leading providers of M&A fairness opinions and has one of the largest worldwide financial restructuring practices of any investment bank. Houlihan Lokey annually serves more than 1,000 clients ranging from closely held companies to Global 500 corporations.

4.  Houlihan Lokey's Financial Restructuring Group, which has approximately 225 professionals, is one of the leading advisors and investment bankers to debtors, unsecured and secured creditors, acquirers, and other parties-in-interest involved with financially troubled companies both in and outside of bankruptcy. Houlihan Lokey's Technology, Media & Telecom Group was ranked as the leading M&A advisor for United States technology, media, entertainment, and telecom transactions under $1 billion over the past six years.

5.  Houlihan Lokey has been, and is, involved in some of the largest restructuring cases in the United States, including representing debtors in: *In re Promise Healthcare Group, LLC,*

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures Motion.

26512375.6

2

Case No. 18-12491 (CSS) (Bankr. D. Del. November 5, 2018); *In re Heritage Home Grp. LLC*, Case No. 18-11736 (KG) (Bankr. D. Del. July 29, 2018); *In re Walter Inv. Mgmt. Corp.*, Case No. 17-13446 (JLG) (Bankr. S.D.N.Y. Nov. 30, 2017); *In re Angelica Corp.*, Case No. 17- 10870 (JLG) (Bankr. S.D.N.Y. May 9, 2017); *In re Gawker Media LLC*, Case No. 16-11700 (SMB) (Bankr. S.D.N.Y. June 10, 2016); *In re Relativity Fashion, LLC*, Case No. 15-11989 (MEW) (Bankr. S.D.N.Y. Feb. 1, 2016); *In re Phoenix Brands, LLC*, Case No. 16-11242 (BLS) (Bankr. D. Del. Jul. 5, 2016).

6. I hold a B.S. in Economics from the University of Alabama and a J.D. from Vanderbilt University.

7. Prior to joining Houlihan Lokey in January of 2000, I was Executive Vice President at Marvel Enterprises, Inc., where I led that company's efforts to acquire Marvel Entertainment Group out of Chapter 11, including arranging over $750 million in financings, managing the divestiture of several non-core businesses, managing the company's domestic and international licensing activities (motion picture, television, clothing, character statues, games, etc.), and serving as general counsel.

8. Since joining Houlihan Lokey, I have managed numerous debtor- and creditor-side restructuring assignments involving businesses in various industries, including the energy, gaming, cable operators, and general industrial sectors. During that time, I have been involved in approximately 35 chapter 11 cases, including numerous cases involving the sale of substantially all of the debtor(s) assets in which I led or co-led the engagement.

**B.    Houlihan Lokey Engagement and Involvement in the Debtor's Case**

9. Houlihan Lokey was engaged by the Debtor pursuant to an engagement letter dated May 8, 2020 (the "***Engagement Letter***").

10. At the time of Houlihan Lokey's entry into the Engagement Letter, based on discussions with the Debtor's management and advisors, I understood that the Debtor intended to undertake an efficient sale process over a period of approximately 90 days. I and my colleagues at Houlihan Lokey believe, and believed then, that this timeline was achievable. However, I understand that, as an accommodation to the Committee, the Debtor has negotiated a 25-day extension of that timeline, resulting in a 115 day process, which I and my colleagues at Houlihan Lokey likewise believe to be achievable.

11. Since our engagement, I and my colleagues at Houlihan Lokey have worked extensively with the Debtor's management to prepare for and advance the Debtor's sale process on the proposed timeline, including performing necessary due diligence, establishing a confidential data room, and preparing marketing materials such as a teaser, a process letter, and a detailed confidential information memorandum ("*CIM*") to be provided to prospective purchasers. I and other Houlihan Lokey team members worked closely with the Debtor's management to develop and finalize the CIM, including undertaking a thorough analysis of the financial model and other projections underlying the business plan set forth in the CIM.

12. I believe that the creation of the foregoing marketing materials would not have been possible without the assistance of the Debtor's remaining employees. Relatedly, the Debtor's remaining employees have substantial institutional knowledge about the XFL that will be critical to a value-maximizing sale process and a potentially valuable asset from the perspective of interested bidders, particularly those hoping to re-launch the league for the 2021 season.

C.  **The Bidding Procedures and Sale Timeline**

13. I have reviewed and am familiar with the Bidding Procedures Motion and the related Bidding Procedures.

14. I believe the Bidding Procedures will establish a fair, open, and competitive postpetition bidding and auction process. It is my opinion that the Bidding Procedures and the Debtor's proposed sale timeline (as extended, the "*Sale Timeline*") will allow the Debtor to obtain the highest or otherwise best value for the Debtor's assets under the circumstances of the Chapter 11 Case. More specifically, I believe the Sale Timeline, including the proposed Stalking Horse Bid Deadline and Bid Deadline and proposed Auction and Sale Hearing dates, is achievable and appropriate under the circumstances of the Chapter 11 Case.

15. Such circumstances include that, under the Debtor's current budget, the Debtor's cash collateral will run out by mid-August, whereupon the Debtor would require access to debtor-in-possession financing to continue to fund the Chapter 11 Case and sale process.

16. I believe that the proposed 115-day sale process is particularly appropriate here for several reasons. The potential for the XFL season to have a football season in spring 2021 is one of the most significant factors driving the value of the Debtor's assets. Houlihan Lokey is currently in active conversations with dozens of potential purchasers. Substantially all potential purchasers have indicated to Houlihan Lokey that the potential for an XFL season in spring 2021 is important to them. Reasons include a desire to generate revenue and further establish the league in a content starved environment in spring 2021 and to avoid leaving white space out to 2022 allowing others to act on such opportunity. Potential purchasers have expressly informed Houlihan Lokey that without a spring 2021 season they would likely offer a lower purchase price, or may choose not to bid all together.

17. It is my opinion that delaying the Debtor's sale process by another 40 days like the Committee suggests would make it less likely that the XFL would be in position to have a season in spring 2021. Accordingly, I believe that delaying the Debtor's sale process by another 40 days

like the Committee suggests would decrease the number of potentially interested bidders. I further believe that, if the Debtor's sale process is delayed for another 40 days like the Committee suggests, bids would be lower because potential bidders would be forced to price in the increased risk that the XFL would not be able to generate any revenue until 2022.

18. The marketing process for the Debtor's assets is well underway. As of May 25, 2020, Houlihan Lokey had distributed teasers to approximately 235 potential purchasers. As of that date, 20 potential purchasers had executed NDAs and gained access to a data room containing extensive diligence materials, including a Confidential Information Memorandum that Houlihan Lokey added to the data room on May 21, 2020. As of May 25, 2020, an additional 6 potential purchasers were in the process of executing NDAs to gain access to the data room. Based on preliminary feedback, I believe there is a robust market for the Debtor's assets, including a number of potentially interested private equity firms and other financial sponsors. Indeed, the XFL's bankruptcy is high-profile and has received extensive media coverage outside of the restructuring industry itself. In addition to the potential purchasers that Houlihan Lokey contacted, Houlihan Lokey has received 26 unsolicited inquiries from parties potentially interested in submitting a bid for the Debtor's assets.

19. Accordingly, I do not believe the current global health and economic crises related to COVID-19 will materially affect the Debtor's ability to market and sell its assets. Potential purchasers are buying the concept of the XFL, its brand, and its unique platform. The Debtor's core assets are intangible property—specifically, intellectual property. These assets require desktop diligence and conversations with management; they do not require significant inspection or other onsite diligence. Further, because the Debtor was only in its inaugural season, potential purchasers do not have years of historical financial data to diligence. As I explained above,

26512375.6

6

Houlihan Lokey is currently in active discussions with dozens of potentially interested parties. Even with the COVID-19 pandemic, none of these potentially interested parties have indicated, or even suggested, that the Debtor's proposed Sale Timeline would not provide enough time for their due diligence.

20.    Were it not for the COVID-19 pandemic, the XFL would not be for sale in the first place.  Prior to the cancellation of its inaugural season, the Debtor demonstrated the XFL's significant potential.  I believe that potential purchasers recognize that the COVID-19 pandemic has presented a unique opportunity to buy assets that would not otherwise available for sale, including this once-in-a-lifetime opportunity to buy a professional sports league.  I believe that the XFL is particularly well suited to succeed despite the COVID-19 pandemic.  In fact, I understand the Debtor has modeled for 2021 a "made-for-TV," 12-week tournament-style approach to its business – since the XFL is particularly well suited for a crowd-free experience that could thrive in the current environment, given its existing innovations such as in-game audio from players and coaches and live on-screen sports wagering information.

21.    In conclusion, I believe that approval of the proposed Bidding Procedures and Sale Timeline will enable the Debtor to obtain the highest or otherwise best offer for its assets under the circumstances and will thereby maximize value for the benefit of all stakeholders in the Chapter 11 Case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

/s/ William H. Hardie III
William H. Hardie III
Managing Director
Houlihan Lokey Capital, Inc.