# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ALPHA ENTERTAINMENT LLC, | Case No. 20-10940 (LSS) |
| Debtor.[1] | Hearing Date: December 7, 2021 at 11:00 a.m. (ET) |
| | Related Doc. Nos.: 634 & 710 |

## PLAN ADMINISTRATOR'S OBJECTION TO MOTION TO ALLOW ADMINISTRATIVE CLAIM OF WORKDAY, INC.

Peter Hurwitz, solely in his capacity as plan administrator (the "Plan Administrator") for the above-captioned debtor and post-effective date debtor (the "Debtor") submits this objection (this "Objection") to the *Motion to Allow Administrative Claim of Workday, Inc.* [Docket No. 634] the "Motion") filed by Workday, Inc. ("Workday"). In support of this Objection, the Plan Administrator states:

### PRELIMINARY STATEMENT

1.  Workday seeks an administrative expense claim of over $187,000 against the estate despite providing almost no value to the estate during the period for which it is seeking the allowance and payment of that claim. Post-petition, the Debtor had limited business operations before selling what was left of the XFL football league in August 2020 and thereafter having almost no further operations. Even so, Workday ignores well-established case law addressing the allowance of administrative expense claims and seeks to have the estate pay full freight for a full

---

[1] The last four digits of the Debtor's federal tax identification number are 7778. The Debtor's mailing address is c/o Peter Hurwitz, Plan Administrator, 40 Half Moon Lane, Irvington, NY 10533.

suite of human capital management and related software services the Debtor no longer needed and used only sparingly.

2.  For these reasons, and those discussed in greater detail below, the Motion should be denied, and the estate should only be required to pay an amount equal to the actual benefit to the Debtor from the use of Workday's software and related services during the relevant post-petition period and prior to the Effective Date (as defined below).

## GENERAL BACKGROUND

3.  On April 13, 2020 (the "Petition Date"), the Debtor commenced this bankruptcy case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. No requests have been made for the appointment of a trustee or examiner in the Chapter 11 Case.

4.  Prior to the Petition Date, the Debtor employed approximately 400 full-time and part-time employees, as well as approximately 500 football players and coaches. *See Declaration of Jeffrey N. Pollack in Support of Chapter 11 Petition and First-Day Pleadings* (the "First Day Declaration") [Docket No. 8]. Unfortunately, just prior to the Petition Date, the Debtor terminated all but 18 of its employees. *Id.*

5.  Additional information about the Debtor's business and the events leading up to the Petition Date can be found in the First Day Declaration and *Disclosure Statement for the 1st Amended Chapter 11 Plan of Alpha Entertainment LLC* [Docket No. 503].

6.  On July 13, 2020, Workday filed a proof of claim asserting a general unsecured claim in the amount of $258,559.98 for "Saas Subscription Fee, Tenant Fee" [Claim No. 220; ECN 192] (the "Workday POC"). Two of the invoices attached to the Workday POC—totaling

$258,559.98 and for which Workday asserts a general unsecured claim—are also attached to the Motion as allegedly being entitled to an administrative expense claim.

7. On August 7, 2020, the Court approved a sale of substantially all of the Debtor's assets to Alpha Acquico, LLC (the "Sale"). The Sale closed on August 21, 2020, and the Debtor terminated almost all of its remaining employees.

8. On December 10, 2020, the Debtor filed the *2nd Amended Chapter 11 Plan of Alpha Entertainment LLC* [Docket No. 583] (the "Plan"). In accordance with the Plan, the Plan Administrator is responsible for administering and objecting to all Claims against the Debtor's estate (the "Estate"). *See* Plan, § 5.4.3.[2]

9. On December 11, 2020, the Court entered an order confirming the Plan [Docket No. 592], which approved the appointment of the Plan Administrator as of the Effective Date. *Id.* at ¶ 18. The Effective Date occurred on December 22, 2020. [*See* Docket No. 604].

## SPECIFIC BACKGROUND

10. The Debtor and Workday were parties to a Master Subscription Agreement dated June 18, 2018 whereby Workday provided certain human capital management software and related services to the Debtor. While the Debtor frequently accessed and used Workday's platform prior to the Petition Date when they had almost 1,000 employees and operated a robust business, the Debtor's use of Workday's software post-petition was very different. Post-petition the Debtor was no longer operating an active business—the XFL football league had been shuttered and almost all employees terminated—and no longer had a need for Workday services and tools relating to hiring staff, benefits management and time tracking, etc. Instead, the Debtor used the Workday

---

[2] Capitalized terms used but not otherwise defined herein shall have the same meaning ascribed to it in the Plan.

3

software for the limited purpose of accessing employment information and downloading Affordable Care Act ("ACA") data.

11. In May 2020, after the Debtor had ceased league operations and just three months prior to closing the Sale, Workday invoiced the Debtor in the amount of $252,499.98 for an "Enterprise Cloud Application Subscription Fee." *See* Motion, Exhibit 1. Then again on July 29, 2020—just one week prior to the Court approving the Sale—Workday invoiced the Debtor in the amount of $14,810.64 for another "Enterprise Cloud Application Subscription Fee." *See id.* Finally, on June 16, 2020, Workday invoiced Alpha yet again, but this time in the amount of $6,060.00 for services described as "Deployment Tenant."

12. Based on a review of the Debtor's records, the Debtor accessed the Workday platform on a limited basis post-petition to run reports and did not use or get any value from the broad array of other services for which Workday was continuing to charge the Debtor. The Debtor's access to the Workday platform and the use of Workday's service became even more remote following the Sale in August 2020.

13. Workday was aware of the Debtor's bankruptcy filing, the significant reduction in force implemented by the Debtor pre-petition and the Sale. More specifically, the Debtor informed Workday on more than one occasion of its changed circumstances and that it would not need a full year contract. Despite these facts, and the Workday POC asserting a general unsecured claim, Workday filed the Motion seeking the allowance and payment of over $187,000 in administrative expense claims.

## **OBJECTION**

14. To qualify for an administrative priority, an expense (i) must arise from a post-petition transaction with the debtor-in-possession, and (ii) must be beneficial to the debtor-in-

possession in the operation of the business. *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 314-15 (3d Cir. 2011) (citing *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 532-33 (3d Cir. 1999)).

15. "Claims for administrative expenses under § 503(b) are [to be] strictly construed because priority claims reduce the funds available for creditors and other claimants." *In re Federated Dep't Stores, Inc.*, 270 F.3d 994, 1000 (6th Cir. 2001); *see also In re ID Liquidation One, LLC*, 503 B.R. 392, 399 (Bankr. D. Del. 2013) (quoting *In re Bernard Techs., Inc.*, 342 B.R. 174, 177 (Bankr. D. Del. 2006) ("In order to 'hold administrative expenses to a minimum and to maximize the value of the bankruptcy estate, section 503(b) is narrowly construed.'"); *In re United Educ. & Software*, No. 05-1067, 2005 Bankr. LEXIS 3408, (B.A.P. 9th Cir. Oct. 7, 2005) ("Section 503(b) has been construed narrowly because administrative claims are paid directly from the bankruptcy estate and reduce the funds available for creditors and other claimants."). The burden of proving that an expense deserves administrative priority lies with the party asserting such priority. *Marcal*, 650 F.3d at 315.

### I. Workday is Entitled to No More than the Actual Benefit Received by the Debtors, not the Amount of the Subscription Fee or Other Contract Amounts

16. In order to be able to recover as an administrative expense the amounts sought in the Motion, Workday must establish that the Debtor gained actual benefit from the Master Agreement and Workday software under section 503(b) of the Bankruptcy Code.

17. There is a presumption that the contractual rate is the reasonable value of the goods or services provided to the estate under section 503(b). *See Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 42 (3rd Cir. 1989) (noting that the "actual and necessary cost and expense of preserving the estate under Section 503(b) is presumptively the rate under the service agreement"). This presumption, however, may be rebutted by the facts and circumstances

5

of the use of property or the services provided a debtor. *See ID Liquidation*, 503 B.R. at 399 ("presumption can be overcome if the objecting party provides convincing evidence to the contrary") (quoting *In re Smurfit-Stone Container Corp.*, 425 B.R. 735, 741 (Bankr. D. Del. 2010) (internal quotation marks omitted)).

18. More importantly, judicial determinations awarding an administrative expense of less than the full contract amount generally apply to fact patterns where a debtor utilizes less than the full amount of contract rights available. *In re Bridgeport Plumbing Products, Inc.*, 178 B.R. 563, 566-67 (Bankr. M. D. Ga. 1994); *see also In re CNB Lnt'l, Inc.*, 307 B.R. 363, 372 (Bankr. W.D.N.Y. 2004) (deciding that the debtor rebutted any presumption that the contract rate represented the value of the debtor's limited post-petition use of software).

19. Where only part of licensed property or software is used by a debtor-in-possession, an administrative expense claim should be awarded only for the portion used by the debtor. *In re Enron Corp.*, 279 B.R. 695, 706 (Bankr. S.D.N.Y. 2002). In *Enron*, a pipeline company argued that it was entitled to an administrative expense claim for the amount of pipeline capacity that it made available to the debtor post-petition. *Id.* at 707. The Court, however, determined that the pipeline company's administrative expense claim should be based upon the debtors' actual use of the pipeline, rather than the amount of pipeline capacity that was available post-petition. *Id.* ("[D]uring the period when there was no usage ... the [claimant] ... is not entitled to any administrative expense priority.").

20. The same is true of the Workday Agreement and the Debtor's use of the Workday software. As of the Petition Date, the Debtor terminated almost 1,000 employees and went into bankruptcy with a skeleton crew of only 18 employees. That limited figure shrunk considerably following the Sale on August 21, 2020.

21. The termination of the Debtor's XFL league operations and most of their employees resulted in modified and far more limited software needs. The Workday software, which helped the Debtor manage employee needs for an operating professional sports league, was far less prominent once the Debtor terminated league operations and had even less utility following the Sale.

22. Indeed, shortly after the bankruptcy filing, the Debtor was in discussions with Workday about how to handle the parties' agreement and the Debtor was provided assurances that Workday was going to discuss the various options going forward as a result of the bankruptcy. Workday was on notice that the Debtor was not continuing a full year contract.

23. The Plan Administrator does not dispute that the Debtor received some benefit from the use of the Workday software, but that limited benefit is not commensurate with the $250,000 Subscription Fee covering a period of time where the Debtor had no operations and almost no employees. The Debtor had no need for, and did not use, the vast majority of the Workday applications and services that Workday had been providing when the Debtor was a fully operating business, including those that exceeded any postpetition, unpaid order forms. The estate should, therefore, not be saddled with a significant administrative expense claim in favor of Workday where there was no concomitant benefit to the estate for the services being made available by Workday. *See In re B-K of Kansas, Inc.*, 99 B.R. 446, 448 (D. Kan. 1989) (limiting the franchisor's administrative expense claim to the value of those benefits received under the franchise agreement post-petition, *i.e.*, post-petition use of trademarks).

24. Workday's administrative expense claim should, therefore, at best, be limited to the actual benefit conferred on the Debtor, which amount the Plan Administrator has yet to determine as its claims reconciliation process remains ongoing. *See In re Highway Techs., Inc.*, No. 13-

7

11326 (KJC), 2015 Bankr. LEXIS 308 (Bankr. D. Del. Jan. 30, 2015) (creditor entitled to significantly reduced administrative expense claim commensurate with debtor's actual use of creditor's software post-petition). The Plan Administrator is continuing to diligently work through the claims, including Workday's assertions and any efforts to prejudice the Plan Administrator's administration is improper.

### II. Workday's Calculations are Incorrect

25. Workday not only fails to value the actual benefit that it conferred on the Debtor for the post-petition period, but even using its "Per Diem Rate" method it miscalculates the amount of its alleged administrative claim. The Motion calculates the alleged administrative expense by multiplying the Per Diem Rate under the relevant invoice by the number of days of alleged service, which is calculated from the invoice date through the Effective Date of the Plan. The Motion, however, misidentifies the Effective Date as January 21, 2021 (*see* Motion, p. 3) and thus incorrectly seeks an administrative expense claim for 30 additional days beyond the Effective Date. In the unlikely event the Court were to find the Motion and Workday's claims persuasive, the administrative expense claim should be limited to $164,856.68[3] according to the very calculations advanced by Workday.

### RESERVATION OF RIGHTS

26. The Plan Administrator reserves all rights to assert additional claims or defenses in response to Workday's Motion including without limitation any right to setoff, recoupment, or

---

[3] $152,883.38 (total days from 5/15/20 to 12/22/2020 = 221 (221 x $691.78)) plus $5,913.3 (total days from 8/29/20 to 12/22/2020 = 115 (115 x $51.42)) plus $6,060.00 = $164,856.68.

8

other arguments to otherwise limit or deny Workday's Motion to conform to the evidence and other facts that may be made known to the Plan Administrator through discovery or any hearing.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Plan Administrator respectfully requests that the Court (a) deny the Motion in part, consistent with this Objection, and (b) grant such other and further relief as may be just and proper.

Dated: November 16, 2021 **MORRIS JAMES LLP**

*/s/ Eric J. Monzo*
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
Sarah M. Ennis (DE Bar No. 5745)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
E-mail: bkeilson@morrisjames.com
E-mail: sennis@morrisjames.com

*Special Counsel for the Plan Administrator*