# EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11
                                          :
ALPHA ENTERTAINMENT LLC,                  :    Case No. 20-10940 (LSS)
                                          :
              Debtor.¹                     :    Ref. Docket No. 55, 146 & 181
------------------------------------------------------------x
```

## ORDER (I) APPROVING AND AUTHORIZING THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtor and

debtor in possession (the "**Debtor**"), pursuant to sections 105(a), 363, 365, and 503 of title 11 of

the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006,

9006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and

Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure for the

United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for the entry

of an order (this "**Sale Order**") authorizing and approving (a) the sale (the "**Sale**") pursuant to

that certain Asset Purchase Agreement attached hereto as **Exhibit 1** (including all exhibits and

schedules related thereto) (as may be amended, modified, or supplemented in accordance with the

terms thereof, the "**APA**"), between the Debtor and Alpha Acquico, LLC ("**Buyer**") free and clear

of all liens claims, interests, and encumbrances (except any permitted liens and encumbrances),

---

[1]  The last four digits of the Debtor's federal tax identification number, is 7778.  The Debtor's mailing address is 1266 East Main St., Stamford, CT 06902.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the APA (as defined below), or to the extent not defined therein, the Bidding Procedures Order (as defined below).

(b) approving the assumption and assignment of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code in connection with the Sale, and (c) granting related relief; and the Court having entered on May 28, 2020 that certain *Order (I) Approving Bid Procedures In Connection with the Sale of Substantially All of the Debtor's Assets; (II) Scheduling an Auction for and Hearing to Approve the Sale; (III) Approving Notice of Respective Date, Time and Place for Auction and for Hearing on Approval of Sale; (IV) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* [Docket No. 181] (the "**Bidding Procedures Order**"); and the Debtor, after an extensive marketing and sale process, and acting in accordance with the bidding procedures approved pursuant to the Bidding Procedures Order, having determined that the highest or otherwise best offer for the Purchased Assets was made by the Buyer pursuant to the APA; and the Court having conducted a hearing on August  7, 2020 (the "**Sale Hearing**"), at which time all parties in interest were offered an opportunity to be heard with respect to the Sale, to consider the approval of the Sale pursuant to the terms and conditions of the APA, and the Court having considered (i) the Motion and any objections thereto, (ii) the Sale, (iii) the arguments of counsel made, and evidence adduced, related thereto, and (iv) the full record in the chapter 11 case, including the record related to the hearing to consider the Bidding Procedures Order and the Sale Hearing held before the Court; and all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the APA, the Sale and the transactions contemplated by the APA; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its bankruptcy

26864186.3

ACTIVE 260086905

estate, its creditors, and other parties in interest in the chapter 11 case; it is hereby **FOUND, CONCLUDED, AND DETERMINED THAT**:[3]

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the chapter 11 case pursuant to Bankruptcy Rule 9014.

B.      To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      The Court has jurisdiction to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue over this chapter 11 case and the Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Court may enter a final order with respect to the Motion, the Sale, the transactions contemplated thereby, and all related relief, in each case, consistent with Article III of the United States Constitution.

D.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court finds that there is no just reason for delay in the implementation of this Sale Order, and directs entry of judgment as set forth herein.

---

[3]  All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

3

E.      The Purchased Assets constitute property of the Debtor's bankruptcy estate and title thereto is vested in the Debtor's bankruptcy estate within the meaning of section 541(a) of the Bankruptcy Code.

F.      The statutory bases for the relief requested in the Motion and provided for herein are sections 105, 363, 365, and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006 and 9014, and Local Rules 2002-1 and 6004-1.

G.      On April 13, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has continued to maintain its business and manage its property as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

H.      On April 23, 2020, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "**Committee**") in the chapter 11 case.

I.      This Court previously entered the Bidding Procedures Order, among other things:  (i) establishing certain bidding and auction procedures; (ii) scheduling the Auction (if necessary) and the Sale Hearing to consider the sale of the Purchased Assets; (iii) establishing certain procedures for noticing and determining cure amounts related to the Debtor's executory contracts and unexpired leases; (iv) approving the form and manner of notice of certain procedures, dates and deadlines in connection with the Bidding Procedures and the Sale; and (v) granting certain related relief.

J.      As evidenced by the affidavits of service and publication previously filed with the Court [Docket Nos. 199, 201, 209], and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Auction, the Sale, and the assumption and assignment of the executory contracts and unexpired

26864186.3

ACTIVE 260086905

leases to be assumed and assigned to the Buyer at Closing or thereafter pursuant to this Sale Order and the APA (collectively, the "**Assigned Contracts**") has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, and 9014, and in compliance with the Bidding Procedures Order, to each party entitled to such notice, including, as applicable:  (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Committee; (c) counsel to the Prepetition Lender; (d) all persons known or reasonably believed to have asserted an interest in the Purchased Assets; (e) the Attorneys General in the State(s) where the Purchased Assets are located; (f) all state and local taxing authorities in the State(s) where the Purchased Assets are located; (g) the Internal Revenue Service; (h) all parties that have asserted liens against the Purchased Assets; and (i) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  With respect to entities whose identities are not reasonably ascertained by the Debtor, publication of the Sale Notice once in the national edition of *The New York Times* on June 3, 2020, as evidenced by the affidavit of service filed by the Debtor at Docket No. 201 in the chapter 11 case, was, and is deemed, sufficient, and reasonably calculated under the circumstances to reach such entities.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale, and the Sale Hearing is, or shall be, required.

K.    In accordance with the provisions of the Bidding Procedures Order, the Debtor has served notices (the "**Cure Notices**") upon the counterparties to the Assigned Contracts ("**Non-Debtor Counterparties**"): (i) that the Debtor seeks to assume and assign to the Buyer the Assigned Contracts on the closing of the Sale (as such closing date may be modified pursuant to the terms of the APA, the "**Closing Date**"); and (ii) of the relevant cure amounts as stated in the

Cure Notice or as otherwise agreed by the Debtor, the Buyer and the applicable Non-Debtor Counterparty, (each, a "**Cure Cost**" and collectively, the "**Cure Costs**"). The service of such notices was good, proper, timely, reasonable, adequate, sufficient, and appropriate under the circumstances, and no other or further notice need be given in respect of establishing a Cure Cost for the Assigned Contracts.  Each of the Non-Debtor Counterparties has had a reasonable opportunity to object to the Cure Costs set forth in the applicable notice and to the assumption and assignment to the Buyer of the applicable Assigned Contract.

L. The Debtor has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion as it pertains to the Sale and provided for herein.

M. The Sale Notice provided all interested parties with timely and proper notice of the Sale, the Sale Hearing, and the Auction.

N. The disclosures made by the Debtor in the Motion, the Sale Notice, and related documents filed with the Court concerning the APA, the Auction, the Sale and the Sale Hearing were good, complete and adequate.

O. A reasonable opportunity to object and to appear and be heard with respect to the Sale, the Motion, and the relief requested therein, including but not limited to the assumption and assignment of the Assigned Contracts and the Cure Costs, has been afforded to all interested parties, including the Notice Parties.

P. The deadline to file a Cure Cost/Assignment Objection has expired. To the extent that any party timely filed a Cure Cost/Assignment Objection or Post-Auction Objection, all such Cure Cost/Assignment Objections or Post-Auction Objections have been resolved, withdrawn, overruled, or adjourned to a later hearing by agreement of the parties. To the extent that any such party did not timely file a Cure Cost/Assignment Objection or a Post-Auction

26864186.3

ACTIVE 260086905

Objection, such party shall be deemed to have consented to (i) the assumption and assignment of the Assigned Contract to the Buyer, and (ii) the proposed Cure Cost set forth on the Potential Assumption and Assignment Notice.

Q.    The Bidding Procedures set forth in the Bidding Procedures Order are non-collusive, proposed and executed in good faith as a result of arms'-length negotiations, designed to maximize the value of the Purchased Assets, and substantively and procedurally fair to all parties.

R.    The Debtor conducted the process with respect to the Sale in accordance with, and has otherwise complied in all respects with, the Bidding Procedures Order.  The sale process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Purchased Assets.  The Auction was duly noticed, and a reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Purchased Assets.

S.    The terms contained in the APA constitute the highest or otherwise best offer for the Purchased Assets, and will provide a greater recovery for the Debtor's bankruptcy estate for the Purchased Assets than would be provided by any other available alternative.  The Debtor's determination that the APA constitutes the highest or otherwise best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtor's business judgment.

T.    The APA and the Sale contemplated thereby represent a fair and reasonable offer to purchase the Purchased Assets.  No other entity or group of entities has presented a higher or otherwise better offer to the Debtor to purchase the Purchased Assets for greater economic value to the Debtor's bankruptcy estate than the Buyer.

26864186.3

ACTIVE 260086905

U.      Approval of the Motion and the APA and the consummation of the Sale contemplated thereby is in the best interests of the Debtor, its bankruptcy estate, its creditors and other parties in interest in the chapter 11 case.

V.      The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale of the Purchased Assets because, among other reasons, (i) the APA constitutes the highest or otherwise best offer for the Purchased Assets, (ii) the APA and the closing thereon will present the best opportunity to realize the value of the Purchased Assets, and (iii) any other transaction would not have yielded as favorable an economic result. The Buyer is purchasing the Purchased Assets in good faith, is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is not an "insider" (as defined under section 101(31) of the Bankruptcy Code) of the Debtor, and therefore is entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code, and otherwise has proceeded in good faith in all respects in connection with the Sale in that:  (i) the Buyer recognized that the Debtor was free to deal with any other party interested in acquiring the Assets; (ii) the Buyer complied with the Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (v) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (vi) the negotiation and execution of the APA, including the Sale contemplated thereby, were at arms'-length and in good faith.

W.      The APA and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code.  The Debtor, the Buyer and their respective agents, representatives and affiliates have not engaged in any conduct that would cause or permit the

8

APA or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

X.      The consideration provided by the Buyer pursuant to the APA:  (i) is fair and adequate, and constitutes reasonably equivalent value and fair consideration and value, under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Fraudulent Transfer Act); and (ii) will provide a greater recovery for the Debtor's bankruptcy estate and creditors than would be provided by any other reasonably practicable available alternative.

Y.      By consummating the Sale, the Buyer is not a mere continuation of the Debtor or its bankruptcy estate, and there is no continuity, no common identity, and no continuity of enterprise between the Debtor and the Buyer.  The Buyer is not holding itself out to the public as a continuation of the Debtor.  The Buyer is not a successor to the Debtor or its bankruptcy estate by reason of any theory of law or equity, and the Sale does not amount to a consolidation, merger, or de facto merger of the Buyer and the Debtor.  Neither the Buyer nor any of its agents, representatives or affiliates shall assume or in any way be responsible for any obligation or liability of the Debtor and its bankruptcy estate except as expressly provided in this Sale Order or the APA. None of the transactions contemplated by the APA, including, without limitation, the Sale or the assumption and assignment of any Assigned Contracts, is being undertaken for the purpose of hindering, delaying, or defrauding any creditors under the Bankruptcy Code, under the laws of the United States, or under the laws of any state, territory, possession, or the District of Columbia. Neither the Debtor nor the Buyer is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims or similar claims.

26864186.3

ACTIVE 260086905

Z.      The Sale neither impermissibly restructures the rights of the Debtor's creditors, nor impermissibly dictates the terms of a plan of reorganization of the Debtor.  The Sale does not constitute a *sub rosa* plan.

AA.      The Debtor, acting by and through its agents, representatives, and officers, has (i) full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, and (ii) taken all corporate action necessary to authorize and approve the APA and the consummation of the transactions contemplated thereby. The Sale has been duly and validly authorized by all necessary corporate action. No consents or approvals, other than those expressly provided for in the APA, are required for the Debtor to consummate the Sale, execute the APA, or consummate the transactions contemplated thereby.

BB.      The transfer of each of the Purchased Assets to the Buyer will be as of the Closing Date a legal, valid, and effective transfer of such assets, and vests or will vest the Buyer with all right, title, and interest to the Purchased Assets free and clear of all Encumbrances (as defined below).

CC.      Not transferring the Assets free and clear of all Encumbrances (other than Assumed Liabilities, or unless otherwise assumed in, or permitted by, the APA) of any kind or nature whatsoever, including rights or claims based on any Successor or Other Liabilities and/or applicable state, federal, or foreign law or otherwise, would adversely impact the Debtor's efforts to maximize the value of its estate, and the transfer of the Assets other than pursuant to a transfer that is free and clear of all Encumbrances (other than Assumed Liabilities or unless otherwise assumed in, or permitted by, the APA) of any kind or nature whatsoever would be of substantially less benefit to the Debtor's estate.

DD.    The Debtor may sell the Purchased Assets free and clear of all Encumbrances against the Debtor, its bankruptcy estate, or any of the Purchased Assets (unless otherwise assumed in, or permitted by, the APA) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Encumbrances against the Debtor, its bankruptcy estate, or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of such Encumbrances who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Encumbrances, if any, in each instance against the Debtor, its bankruptcy estate, or any of the Purchased Assets, attach to the cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such creditor alleges an Encumbrance, in the same order of priority, with the same validity, force, and effect that such creditor had prior to the Sale, subject to any claims and defenses that the Debtor and its bankruptcy estate may possess with respect thereto.  All other holders of Encumbrances could be compelled in a legal or equitable proceeding to accept money satisfaction of such claim or interest, or otherwise fall within section 363(f) of the Bankruptcy Code.

EE.    Vince McMahon, in his capacity as the lender (the "**Prepetition Lender**") under that certain Senior Secured Promissory Note dated as of March 25, 2020 (as amended, the "**Note**"), has consented to the sale of the Purchased Assets to the Buyer pursuant to the APA free and clear of any Encumbrances of the Prepetition Lender against the Purchased Assets, provided that cash proceeds generated from the Sale shall be paid to the Prepetition Lender upon the closing of the Sale for application to the Debtor's obligations under the Note.

26864186.3

ACTIVE 260086905

FF.     If the Sale were not free and clear of all Encumbrances (except as otherwise assumed in, or permitted by, the APA), or if the Buyer would, or in the future could, be liable for any Encumbrances (except as otherwise assumed in, or permitted by, the APA), the Buyer would not have entered into the APA and would not consummate the Sale, thus adversely affecting the Debtor, its bankruptcy estate and its creditors.

GG.     The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assigned Contracts to the Buyer pursuant to the terms of this Sale Order and the APA, in each case in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtor, its bankruptcy estate and creditors and other parties in interest.  The Assigned Contracts being assigned to the Buyer under the APA are an integral part of the APA and the Sale, and accordingly such assumptions and assignments are reasonable and enhance the value of the Debtor's bankruptcy estate.  Any non-Debtor counterparty to any Assumed Contract that has not actually filed with the Court an objection to such assumption as of the date hereof is deemed to have consented to such assumption and assignment.

HH.     The Debtor and the Buyer have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), 365(b)(1)(B), and 365(f) of the Bankruptcy Code, in connection with the sale and assumption and assignment of the Assigned Contracts to the extent provided under this Sale Order and the APA and have:  (i) cured any default existing prior to the date hereof under any of the Assigned Contracts, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts,

26864186.3

ACTIVE 260086905

within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Buyer has provided adequate assurance of future performance with respect to the Assigned Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  The Assigned Contracts are assignable notwithstanding any provisions contained therein to the contrary.

II.	Except as expressly assumed by the Buyer under the APA, the transfer of the Assets to the Buyer and the assignment to the Buyer of the Assigned Contracts will not subject the Buyer to any liability whatsoever which may become due or owing under the Assigned Contracts prior to the Closing Date (other than Cure Costs), or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of law or equity, including any Successor or Other Liabilities

JJ.	The APA and Sale must be approved and the Closing must occur promptly to preserve the value of the Purchased Assets and the Debtor's bankruptcy estate.

KK.	Given the adequacy and fair value of the consideration provided by the Buyer under the APA, the Sale constitutes a reasonable and sound exercise of the Debtor's business judgment, is in the best interests of the Debtor, its bankruptcy estate and its creditors and other parties in interest in the chapter 11 case, and should be approved.

LL.	The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Sale.

MM.	To maximize the value of the Assets and preserve the viability of the businesses to which they relate, it is essential that the Sale occur within the time constraints set

forth in the APA.  Time is of the essence in consummating the Sale. Given all of the circumstances

of the chapter 11 case and the adequacy and fair value of the Purchase Price under the APA, the

proposed Sale constitutes a reasonable and sound exercise of the Debtor's business judgment and

should be approved.   Accordingly, cause exists to waive the stay to the extent necessary, as

contemplated by Bankruptcy Rules 4001(a), 6004(h), and 6006(d) to permit the immediate

effectiveness of this Sale Order.

## **NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The relief requested in the Motion is granted as set forth herein and on the

record of the Sale Hearing, which is incorporated herein as if fully set forth in this Order.

2.      All objections to, reservations of rights regarding, or other responses to the

Motion or the relief requested therein, the APA, all other Ancillary Documents, the Sale, the entry

of this Order, or the relief granted herein, including, without limitation, any objections to Cure

Costs or relating to the cure of any defaults under any of the Assigned Contracts or to the

assumption and assignment of any of the Assigned Contracts to the Buyer by the Debtor, that have

not been withdrawn, waived, adjourned or settled by announcement to this Court during the Sale

Hearing or by stipulation filed with this Court or otherwise been resolved pursuant to the terms

thereof, including any and all reservations of rights included in such objections or otherwise, are

hereby denied and overruled on the merits with prejudice. Those parties who did not object or

withdrew their objections to the Motion or the entry of this Order in accordance with the Bidding

Procedures Order, or who withdrew their objections thereto, are deemed to have consented to the

relief granted herein for all purposes, including without limitation, pursuant to section 363(f)(2) of

the Bankruptcy Code.

26864186.3

ACTIVE 260086905

3.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this chapter 11 case pursuant to Bankruptcy Rule 9014. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

4.      Notice of the Motion, the Auction, the Sale Hearing, the Sale and the assumption and assignment of the Assigned Contracts was fair and equitable under the circumstances, and complied in all respects with the Bidding Procedures Order, section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and the Local Rules.

**Approval of the Sale of the Purchased Assets**

5.      The APA, including all other ancillary documents, and all of the terms and conditions thereof, and the Sale of the Purchased Assets to the Buyer as provided in the APA, are hereby approved in all respects.

6.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor, acting by and through its agents, representatives and officers, is authorized and empowered to take any and all actions necessary or appropriate to:  (a) consummate and close the Sale pursuant to and in accordance with the terms and conditions of this Sale Order and the APA; (b) transfer and assign all right, title, and interest to all property, licenses, and rights to be conveyed in accordance with the terms and conditions of this Sale Order and the APA; and (c) execute and deliver, perform under, consummate, and implement this Sale Order and the APA and all additional instruments and documents that may be reasonably necessary or desirable to implement this Sale Order, the APA and the Sale, including any other ancillary documents, or as may be reasonably necessary or

26864186.3

ACTIVE 260086905

appropriate to the performance of the obligations as contemplated by this Sale Order, the APA and any such other ancillary documents.

7. This Sale Order shall be binding in all respects upon the Debtor, its bankruptcy estate, all creditors, all holders of equity interests in the Debtor, all holders of any Encumbrances against the Debtor, any holders of Encumbrances against or on all or any portion of the Purchased Assets, all counterparties to any executory contract or unexpired lease of the Debtor, the Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, and any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in the chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtor's chapter 11 case, or other plan fiduciaries, plan administrators, liquidating trustees, or other estate representatives appointed or elected in the Debtor's case.  The terms and provisions of the APA and this Sale Order shall inure to the benefit of the Debtor, its bankruptcy estate, its creditors, the Buyer and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, and any other affected third parties, including all persons asserting any Encumbrances in the Purchased Assets to be sold to the Buyer pursuant to the APA, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.

## Sale and Transfer of Purchased Assets

8. Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, upon the Closing Date and pursuant to and except as otherwise set forth in the APA, the Purchased Assets shall be transferred to the Buyer free and clear of all encumbrances, claims, interests, and liens accruing, arising or relating thereto any time prior to the Closing Date,

16

including the Excluded Liabilities, mortgages, restrictions, hypothecations, charges, indentures,

loan agreements, instruments, collective bargaining agreements, leases, licenses, options, deeds of

trust, security interests, other interests, conditional sale or other title retention agreements, pledges,

and other liens (including mechanics', materialman's, and other consensual and non-consensual

liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets,

contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity,

exoneration, products liability, alter-ego, environmental, or tax, decrees of any court or foreign or

domestic governmental entity, or charges of any kind or nature, if any, including any restriction

on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership,

debts arising in any way in connection with any agreements, acts, or failures to act, including any

pension liabilities, retiree medical benefit liabilities, liabilities related to the Employee Retirement

Income Security Act of 1974, liabilities related to the Internal Revenue Code, or any other liability

relating to Debtor's current and former employees, including any withdrawal liabilities or

liabilities under any collective bargaining agreement or labor practice agreement, of the Debtor or

any of the Debtor's predecessors or affiliates, claims, whether known or unknown, choate or

inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded,

perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or

unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether

arising prior to or subsequent to the commencement of the chapter 11 case, and whether imposed

by agreement, understanding, law, equity or otherwise, including claims otherwise arising under

doctrines of successor liability (other than Assumed Liabilities and Permitted Encumbrances)

(collectively, the "**Encumbrances**"), with all such Encumbrances to attach to the cash proceeds

of the Sale in the order of their priority, with the same validity, force, and effect that they now

have as against the Purchased Assets, subject to any claims and defenses the Debtor and its bankruptcy estate may possess with respect thereto.

9. On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to the Buyer pursuant to the terms set forth in this Sale Order and the APA. For the avoidance of doubt, the Excluded Assets set forth in the APA are not included in the Purchased Assets, and the Excluded Liabilities set forth in the APA are not Assumed Liabilities.

10. Subject to the terms and conditions of this Sale Order, the transfer of the Purchased Assets to the Buyer pursuant to the APA and the consummation of the Sale and any related actions contemplated thereby do not require any consents other than as specifically provided for in this Sale Order and the APA, constitute a legal, valid, and effective transfer of the Purchased Assets, and shall vest the Buyer with right, title, and interest in and to the Purchased Assets as set forth in this Sale Order and the APA, as applicable, free and clear of all Encumbrances (except as otherwise assumed in, or permitted by, the APA).

11. The Sale of the Assets is not subject to avoidance by any person or for any reason whatsoever, including, without limitation, pursuant to section 363(n) of the Bankruptcy Code and the Buyer shall not be subject to damages, including any costs, fees, or expenses under section 363(n) of the Bankruptcy Code.

12. Upon closing of the Sale, the cash proceeds of the Sale shall be used to pay the Prepetition Lender until all obligations outstanding under the Note have been paid in full in cash; provided, however, that notwithstanding the payment of the obligations related to the Note under this Sale Order, the Debtor (including any party in interest granted standing by the Court on

behalf of the Debtor's estate) shall retain the right to object or contest the validity, priority, perfection, extent, or enforceability of the liens securing the Note and, to the extent successful, to seek disgorgement of payments made thereon.  All remaining proceeds of the Sale shall be property of the estate; *provided, however*, that to the extent (A) any challenge is brought regarding the Note, including as to the validity, priority, perfection, extent or enforceability of the Note or the liens securing the Note, or (B) any other claims are asserted against the Prepetition Lender, the Prepetition Lender's rights to assert claims for reimbursement of related expenses, including, without limitation, attorney's fees and expenses, under the Note are preserved, and, subject to any challenge, the liens of the Prepetition Lender remain on such remaining proceeds to the extent of any such claims.

13.     The Buyer, to the extent provided by this Sale Order or the APA, shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor constituting Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date as provided by this Sale Order and the APA.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Purchased Assets sold, transferred, assigned, or conveyed to the Buyer on account of the filing or pendency of the chapter 11 case or the consummation of the Sale.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale.

14.     All entities that are presently, or on the Closing may be, in possession of some or all of the Purchased Assets to be sold, transferred, or conveyed (wherever located) to the

26864186.3

ACTIVE 260086905

Buyer pursuant to this Sale Order and the APA are hereby directed to surrender possession of the Assets to the Buyer on the Closing Date.

15.     Upon consummation of the Sale, if any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Encumbrances against or in the Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all Encumbrances that the person or entity has with respect to the Purchased Assets (unless otherwise assumed in, or permitted by, the APA), or otherwise, then (a) the Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets, and (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances against or in the Assets of any kind or nature (except as otherwise assumed in, or permitted by, the APA); provided that, notwithstanding anything in this Sale Order or the APA to the contrary, the provisions of this Sale Order shall be self-executing, and neither the Debtor nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.  For the avoidance of doubt, upon consummation of the Sale, the Buyer is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise notice any Encumbrances that is extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code and the related provisions of the Bankruptcy Code.

26864186.3

ACTIVE 260086905

16.     Except to the extent included in Assumed Liabilities or Permitted Encumbrances, or to enforce the APA, all entities, including all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to contracts and leases, customers, employees and former employees, dealers and sale representatives, and trade or other creditors holding Encumbrances against or in the Debtor and its bankruptcy estate or the Purchased Assets arising under or out of, in connection with, or in any way relating to, the transfer of the Purchased Assets to the Buyer, or any entities or individuals asserting any interests in the Purchased Assets, hereby are forever barred, estopped, and permanently enjoined from asserting any Encumbrances against the Buyer, the permitted successors and assigns of the Buyer, the property of the Buyer or its permitted successors and assigns, or the Assets conveyed in accordance with the APA.

17.     As of and after the Closing:  (a) each of the Debtor's creditors is hereby authorized and directed to execute such documents and take all other actions as may be necessary to release its Encumbrances in the Purchased Assets (if any) as such Encumbrances may have been recorded or may otherwise exist; and (b) any Purchased Asset that may be subject to a statutory lien, mechanic's lien or the like shall be turned over and such liens shall attach to the proceeds of the Sale in the same priority they currently enjoy with respect to the Purchased Assets, and subject to any challenge rights that may exist with respect to such alleged liens.

18.     Except as otherwise provided in the APA, the Buyer shall not have any liability or other obligation of the Debtor arising under or related to any of the Assets, including, but not limited to, any liability for any liabilities whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor, including, but not limited to, liabilities on account of any taxes arising,

26864186.3

ACTIVE 260086905

accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtor's business, which may become due or owing (a) prior to the Closing Date, or (b) from and after the Closing Date but which arise out of relate to any act, omission, circumstances, breach, default, or other event occurring prior to the Closing Date.

19.    To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, trademark, permit, registration, and governmental authorization or approval of the Debtor with respect to the Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing Date.

20.    Subject to the terms, conditions, and provisions of this Order, all Entities are hereby forever prohibited and barred from taking any action that would adversely affect or interfere (a) with the ability of the Debtor to sell and transfer the Assets to Buyer in accordance with the terms of the APA and this Order, and (b) with the ability of the Buyer to acquire, take possession of, use and operate the Assets in accordance with the terms of the APA and this Order.

## Designation Right Assets

21.    Buyer shall have the right, by written notice to Debtor no later than three (3) days prior to the Closing Date, to specify that any Contract and/or Asset that is not a Excluded Asset shall be held by Debtor (and, to the extent a Contract, not rejected pursuant to section 365 of the Bankruptcy Code) (any such Contract or asset, including those Contracts set forth on Schedule 2.5(a) to the APA which Schedule 2.5(a) may be amended by Buyer at any time no later than three (3) days prior to the Closing to treat such Contracts as Purchased Assets or Excluded Assets a "**Designation Right Asset**") for the duration of the Designation Rights Period; provided, however, that, with respect to any such Designation Right Asset, (i) Buyer shall promptly

22

reimburse Debtor on demand, and thereby be solely responsible for, all fees and costs associated with the continuation by, and (to the extent such Designation Right Asset is a Contract) ultimate assumption or rejection by, Debtor of such Designation Right Asset for the period from the Closing through the end of the Designation Rights Period (such costs, "**Continuation Costs**")); (ii) all cash collected by Debtor in respect of such Designation Right Asset shall be promptly delivered to Buyer; provided, however, that Debtor shall be entitled to deduct Continuation Costs from any cash collected by Debtor in respect of the Designation Right Asset giving rise to such costs; and (iii) the foregoing shall not affect the validity of the transfer to Buyer of any other Purchased Asset that may be related to such Designation Right Asset.

22.    As to each Designation Right Asset that is a Contract, as soon as practical after receiving further written notice(s) (each, an "**Assumption Notice**") from Buyer during the Designation Rights Period requesting assumption and assignment of any Designation Right Asset, Debtor shall take all actions required by this Sale Order or otherwise that are reasonably necessary to seek to assume and assign to Buyer pursuant to section 365 of the Bankruptcy Code such Designation Right Asset(s) set forth in an Assumption Notice.

23.    As to each Designation Right Asset that is a Contract, as soon as practical after receiving further written notice(s) from Buyer during the Designation Rights Period requesting rejection of any Designation Right Asset, Debtor shall take all actions required by this Sale Order or otherwise that are reasonably necessary to reject such contract pursuant to section 365 of the Bankruptcy Code.

## Contracts to be Assumed and Assigned

24.    Consideration of unresolved Cure Cost/Assignment Objections and Post-Auction Objections relating to Contract assignment, including with respect to any Contract that is

a Designation Right Asset, unless otherwise ordered by the Court or with the consent of the party

to any Contract that is subject to a Cure Cost/Assignment Objection or Post-Auction Objection

relating to Contract assignment, shall be considered by the Court at a date to be determined and

agreed to by the Debtor and the Buyer; *provided*, *however*, that (i) any Contract that is the subject

of a Cure Cost/Assignment Objection with respect solely to the amount of the Cure Cost may be

assumed and assigned prior to resolution of such objection, and (ii) such undisputed Cure Cost

shall be promptly cured on or after the Closing Date or as otherwise agreed to by the Buyer and

the applicable Non-Debtor Counterparty by the Buyer's payment of the applicable Cure Cost.

25.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and

subject to and conditioned upon the occurrence of the Closing Date, the Debtor's assumption and

assignment to the Buyer, and the Buyer's assumption, on the terms set forth in this Sale Order and

the APA, of the Assigned Contracts, is hereby approved in its entirety, and the requirements of

section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

26.     The Debtor is hereby authorized in accordance with sections 105(a), 363,

and 365 of the Bankruptcy Code to assume and assign to the Buyer, effective upon the Closing

Date, the Assigned Contracts free and clear of all Encumbrances (except as otherwise assumed in,

or permitted by, the APA) and execute and deliver to the Buyer such documents or other

instruments as may be necessary to assign and transfer the Assigned Contracts to the Buyer.

27.     The Debtor is hereby authorized in accordance with section 365 of the

Bankruptcy Code and the procedures set forth in the APA to assume and assign the Assigned

Contracts to the Buyer free and clear of all liens, and to execute and deliver to the Buyer such

documents or other instruments as may be necessary to assign and transfer the Assigned Contracts

to the Buyer as provided in the APA; *provided* that Designation Right Assets shall only be

26864186.3

ACTIVE 260086905

transferred free and clear upon assumption or assumption and assignment of such Designation

Right Asset.  The Buyer shall be fully and irrevocably vested with all right, title, and interest of

the Debtor under the Assigned Contracts assumed and assigned in accordance with the procedures

set forth in the APA.

28.    Upon the Closing, in accordance with sections 363 and 365 of the

Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title, and interest in

and of each Assumed Contract.

29.    The Assigned Contracts shall be transferred to, and remain in full force and

effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any

provision in any such Assumed Contract (including those of the type described in

sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such

assignment or transfer.

30.    Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, the

Buyer shall pay to the respective counterparty the Cure Amounts relating to any Assumed Contract

within seven (7) days of the later of (i) the Closing, with respect to any contracts that are set forth

in Schedule 2.9 as assumed as of the Closing, or (ii) the date on which the assumption and

assignment of a Designation Right Asset becomes effective; provided, however Cure Claims shall

not exceed the amount for each Cure Claim set forth in Schedule 2.9 of the APA or $9,229,444.25

in the aggregate; further provided, however, that the Debtor shall not be obligated to pay or

otherwise reimburse Buyer for any Cure Claims in excess of such amount.

31.    Except as otherwise agreed in writing between the Debtor and the non-

Debtor parties to the Assigned Contracts or stated on the record of the Sale Hearing, the Cure

Amounts to be paid by the Buyer for the Assigned Contracts are hereby fixed at the amounts set

26864186.3

ACTIVE 260086905

forth on **Exhibit 2** attached to this Sale Order, and the non-Debtor parties to such Assigned

Contracts are forever bound by such Cure Amounts and, upon payment of such Cure Amounts,

are hereby enjoined from taking any action against the Debtor and its bankruptcy estate, the Buyer

and all agents, representatives, affiliates, and permitted successors and assigns of the Buyer, or the

Assets with respect to any claim for cure under any Assumed Contract.

32.     The Buyer shall have no liability arising or accruing under the Assigned

Contracts on or prior to the Closing, except as otherwise expressly provided in the APA or this

Order. Unless as otherwise set forth in this Order or the APA, the Non-Debtor Counterparties to

the Assigned Contracts are barred from asserting against the Debtor, its estate, the Buyer, and their

respective successors and assigns, any default or unpaid obligation allegedly arising or occurring

before the Closing, any pecuniary loss resulting from such default, or any other obligation under

the Assigned Contracts arising or incurred prior to the Closing, other than the Cure Cost set forth

on Schedule 2.9 of the APA or such other Cure Cost as agreed to by the Debtor (with the consent

of the Buyer) or as determined by the Court.

33.     The payment of the applicable Cure Amounts (if any) shall effect a cure of

all defaults existing as of the date that such executory contracts or unexpired leases are assumed

and compensate for any actual pecuniary loss to such non-Debtor party resulting from such default.

34.     To the extent a Non-Debtor Counterparty to an Assigned Contract failed to

timely object to a Cure Cost in accordance with the Bidding Procedures Order, such Cure Cost

shall be deemed to be finally determined and any such Non-Debtor Counterparty shall be

prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at

any time, and such Cure Cost, when paid, shall be deemed to resolve any defaults or other breaches

with respect to any Assigned Contract to which it relates.

26864186.3

ACTIVE 260086905

35.      The Buyer shall have assumed the Assigned Contracts, and pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtor of such Assigned Contracts shall not be a default thereunder.  After the payment of the relevant Cure Amounts, neither the Debtor and its bankruptcy estate nor the Buyer shall have any further liabilities to the non-Debtor counterparties to the Assigned Contracts, other than the Buyer's obligations under the Assigned Contracts that accrue after the date that such Assigned Contracts are assumed.

36.      Any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Buyer of the Assigned Contracts have been satisfied.

37.      Any party having the right to consent to the assumption or assignment of any Assumed Contract that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

38.      The Buyer shall be deemed to be substituted for the Debtor as a party to the applicable Assigned Contracts, and the Debtor and its bankruptcy estate shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts. The Buyer shall have standing to object to the allowance of claims (as such term is defined in section 101(5) of the Bankruptcy Code) asserted against the Debtor or its estate that constitute obligations assumed by the Buyer pursuant to the terms of the APA, including, without limitation,

26864186.3

ACTIVE 260086905

any unresolved or disputed Assumed Liabilities, Cure Costs under the Bidding Procedures Order, or otherwise. Nothing in this Order shall divest the Debtor, or any liquidating agent or other successor or assign, of its standing or duty under the Bankruptcy Code or otherwise from reconciling claims asserted against the Debtor or its estate and objecting to any such claims that should be reduced, reclassified or otherwise disallowed, including, without limitation, under section 502(d) of the Bankruptcy Code, on grounds that a third-party is a joint or co-obligor, or any other basis under applicable law, subject to any and all defenses that such claimants may have.

39.     The Buyer has provided adequate assurance of future performance under the Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

40.     There shall be no assignment fees, increases, rent-acceleration, or any other fees charged to the Buyer or the Debtor and its bankruptcy estate as a result of the assumption and assignment of the Assigned Contracts.

41.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Assigned Contracts are forever barred and permanently enjoined from raising or asserting against the Debtor and its bankruptcy estate or the Buyer any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, existing as of the date that such Assigned Contracts are assumed or arising by reason of the Closing.

42.     Neither the Buyer nor any permitted successor or assign of the Buyer shall be responsible for or have any Encumbrances or obligations arising out of any of the contracts, agreements, or understandings that are not Assigned Contracts after the Closing Date (except as specifically provided by the APA).

26864186.3

ACTIVE 260086905

**Additional Provisions**

43.     The Debtor and the Buyer hereby waive, and shall be deemed to waive, any requirement of compliance with, and any claims related to non-compliance with, the provisions of any bulk sales, bulk transfer, or similar law of any jurisdiction that may be applicable.

44.     Following the Closing, no holder of an Encumbrance in or against the Debtor and its bankruptcy estate or the Purchased Assets shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to such Encumbrance or any actions that the Debtor and its bankruptcy estate may take in the chapter 11 case or any successor bankruptcy case.

45.     The Debtor, including its respective officers, employees and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the APA and this Sale Order.  The Debtor shall be, and it hereby is, authorized to take all such actions as may be necessary to effectuate the terms of this Sale Order and the relief granted pursuant to this Sale Order.

46.     The Buyer shall have no liability, whatsoever, in connection with Oliver Luck's claims against the Debtor or Mr. McMahon.

47.     The Sale is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts by the Buyer, if any, and the sale free and clear of all Encumbrances (unless otherwise assumed in, or permitted by, the APA), unless such authorization and consummation of such Sale are duly stayed

26864186.3

ACTIVE 260086905

pending such appeal.  The Buyer is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and as such is entitled to the full benefits and protections of such section.

48.     As a good-faith purchaser of the Purchased Assets, the Buyer has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets, and therefore the sale of the Purchased Assets may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

49.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in the chapter 11 case, any subsequent chapter 7 or chapter 11 case of the Debtor, or any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the terms of this Sale Order or the APA.

50.     The failure specifically to include any particular provisions of the APA including any of the documents, agreements, or instruments executed in connection therewith in this Sale Order shall not diminish or impair the efficacy of such provision, document, agreement, or instrument, it being the intent of this Court that the APA and each document, agreement or instrument be authorized and approved in its entirety.

51.     The Debtor shall provide Committee Counsel with any notices received pursuant to Section 9.2 of the APA.

52.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

53.     To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in the chapter 11 case, the terms of this Sale Order shall govern.

26864186.3

ACTIVE 260086905

54.     To the extent there are any inconsistencies between the terms of this Sale Order and the APA (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

55.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court.

56.     The provisions of this Sale Order are nonseverable and mutually dependent.

57.     Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.

58.     This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

31

**LAURIE SELBER SILVERSTEIN**
**UNITED STATES BANKRUPTCY JUDGE**

**Dated: August 7th, 2020**
**Wilmington, Delaware**

# **EXHIBIT 1**

APA

**ASSET PURCHASE AGREEMENT**

**BETWEEN**

**ALPHA ENTERTAINMENT LLC,**

**and**

**ALPHA ACQUICO, LLC**

**August [●], 2020**

ACTIVE 260158345
ACTIVE 258135929
51738993
 = 1 22255630 22255630

# TABLE OF CONTENTS

Article I DEFINITIONS .................................................................................................................1

Article II PURCHASE AND SALE ...............................................................................................11

2.1    Purchase and Sale of Assets.....................................................................................11
2.2    Excluded Assets .......................................................................................................12
2.3    Assumed Liabilities ..................................................................................................13
2.4    Excluded Liabilities ..................................................................................................14
2.5    Designation Rights Assets .......................................................................................15
2.6    Purchase Price and Deposit......................................................................................16
2.7    Allocation of Purchase Price.....................................................................................17
2.8    Third Party Consents.................................................................................................18
2.9    Cure Claims ..............................................................................................................18

Article III CLOSING; POST-CLOSING MATTERS ...................................................................18

3.1    Closing .....................................................................................................................18
3.2    Closing Deliverables .................................................................................................18

Article IV REPRESENTATIONS AND WARRANTIES OF SELLER ......................................20

4.1    Organization and Qualification of Seller .................................................................20
4.2    Authority of Seller ....................................................................................................20
4.3    No Conflicts; Consents ............................................................................................20
4.4    Title to Purchased Assets ........................................................................................21
4.5    Legal Proceedings; Governmental Orders................................................................21
4.6    Compliance With Laws.............................................................................................21
4.7    Brokers......................................................................................................................21
4.8    Permits ......................................................................................................................21
4.9    Intellectual Property..................................................................................................22
4.10   Employee Benefit Plans ...........................................................................................25
4.11   [Reserved].................................................................................................................25
4.12   Real Property ...........................................................................................................26
4.13   Contracts ..................................................................................................................26
4.14   Attendance and Game Information ...........................................................................27
4.15   Tangible Personal Property.......................................................................................28
4.16   Taxes.........................................................................................................................28
4.17   [Reserved].................................................................................................................28
4.18   Absence of Certain Changes.....................................................................................29
4.19   Certain Fees ..............................................................................................................29
4.20   No Other Representations and Warranties.................................................................29

Article V REPRESENTATIONS AND WARRANTIES OF BUYER...........................................29

5.1    Organization of Buyer...............................................................................................29
5.2    Authority of Buyer ....................................................................................................29

5.3     No Conflicts; Consents ..................................................................................30
5.4     Brokers .........................................................................................................30
5.5     Sufficiency of Funds ....................................................................................30
5.6     Legal Proceedings ........................................................................................30
5.7     "As Is" Transaction .....................................................................................30

Article VI COVENANTS ...............................................................................................31

6.1     Conduct of Business Prior to the Closing ....................................................31
6.2     Certain Restricted Conduct ..........................................................................32
6.3     Access to Information ...................................................................................33
6.4     Notice of Certain Events ..............................................................................34
6.5     Employees and Employee Benefits ..............................................................34
6.6     Confidentiality; Public Announcements; Use of Intellectual Property ........35
6.7     Books and Records .......................................................................................36
6.8     [Reserved] ....................................................................................................36
6.9     Closing Conditions .......................................................................................36
6.10    Bulk Sales Laws ...........................................................................................36
6.11    Receivables ..................................................................................................36
6.12    Transfer Taxes ..............................................................................................37
6.13    Prorations .....................................................................................................37
6.14    Further Assurances .......................................................................................37
6.15    Cooperation ..................................................................................................37
6.16    Bankruptcy Court Matters ............................................................................38

Article VII CONDITIONS TO CLOSING ....................................................................39

7.1     Conditions to Obligations of All Parties ......................................................39
7.2     Conditions to Obligations of Buyer .............................................................39
7.3     Conditions to Obligations of Seller .............................................................40

Article VIII TERMINATION .........................................................................................41

8.1     Termination ..................................................................................................41
8.2     Effect of Termination ...................................................................................42
8.3     Exclusive Remedies .....................................................................................42
8.4     Specific Performance ...................................................................................43

Article IX MISCELLANEOUS ......................................................................................43

9.1     Expenses .......................................................................................................43
9.2     Notices ..........................................................................................................43
9.3     Interpretation ................................................................................................44
9.4     Headings .......................................................................................................45
9.5     Severability ...................................................................................................45
9.6     Entire Agreement ..........................................................................................45
9.7     Successors and Assigns ................................................................................45
9.8     Affiliate Acquisitions ...................................................................................45

| | | |
|---|---|---|
| 9.9 | No Third-Party Beneficiaries | 45 |
| 9.10 | Amendment and Modification; Waiver | 46 |
| 9.11 | Non-Recourse | 46 |
| 9.12 | Governing Law; Submission to Jurisdiction; Waiver of Jury Trial | 46 |
| 9.13 | Counterparts | 47 |
| 9.14 | Survival | 47 |

## SCHEDULES

| **Name** | **Schedule** |
|---|---|
| Inventory | 2.1(b) |
| Assigned Contracts | 2.1(c) |
| Intellectual Property Assets | 2.1(d) |
| Permits | 2.1(e) |
| Tangible Personal Property | 2.1(f) |
| Excluded Cash and Cash Equivalents | 2.2(a) |
| Excluded Assets | 2.2(e) |
| Excluded Claims | 2.2(k) |
| Assumed Cure Claims | 2.3(c) |
| Designation Rights Assets | 2.5(a) |
| Cure Claims | 2.9 |
| Required Consents and Notices | 4.3 |
| Legal Proceedings | 4.5(a) |
| Seller Brokers | 4.7 |
| Required Permits | 4.8 |
| Intellectual Property Agreements | 4.9(b) |
| Intellectual Property Encumbrances | 4.9(c) |
| Intellectual Property Exclusive Rights | 4.9(d) |
| Intellectual Property Infringement | 4.9(e) |
| Seller Licensed Intellectual Property Assets | 4.9(i) |
| Personal Data | 4.9(k) |
| Employee Benefit Plans | 4.10(a) |
| Employee Benefit Plans Outstanding Payments | 4.10(c) |
| Leased Property Condemnation Proceedings | 4.12(b) |
| Real Property Leases | 4.12(d) |
| Real Property Lease Defaults | 4.12(e) |
| Material Contracts | 4.13 |
| Attendance | 4.14 |
| Personal Property Leases | 4.15 |
| Outstanding Tax Returns | 4.16(a)(i) |
| Taxes Paid | 4.16(a)(ii) |
| Tax Returns | 4.16(d) |
| Insurance Policies | 4.17(a) |
| Absence of Certain Changes | 4.18 |
| Buyer Brokers | 5.4 |

**EXHIBITS**

| Name | Exhibit |
| --- | --- |
| Bill of Sale | Exhibit A |
| Assignment and Assumption Agreement | Exhibit B |
| IP Assignment Agreement | Exhibit C |

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), dated as of August [●], 2020, (the "***Effective Date***") is entered into by and between Alpha Entertainment LLC, a Delaware limited liability company ("***Seller***"), and Alpha Acquico, LLC, a Delaware limited liability company ("***Buyer***").

**WHEREAS**, Seller is in the business of and has operated the XFL, a professional American football league (the "***Business***");

**WHEREAS**, Seller commenced a voluntary case for reorganization (the "***Bankruptcy Case***") under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") on April 13, 2020 (the "***Petition Date***");

**WHEREAS**, Seller wishes to sell, transfer, convey, assign and deliver to Buyer, and Buyer wishes to purchase, take delivery of and assume from Seller, substantially all of the assets and certain specified liabilities of the Business, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code;

**WHEREAS**, the Purchased Assets (as defined below) and Assumed Liabilities (as defined below) are assets and liabilities of Seller that are to be purchased and assumed by Buyer pursuant to the Sale Order (as defined below) all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code; and

**WHEREAS**, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms have the meanings specified or referred to in this <u>Article I</u>:

"***Accounts Receivable***" has the meaning set forth in <u>Section 2.1(a)</u>.

"***Action***" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, examination, assessment, notice of violation, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory, or otherwise, whether at law or in equity.

1

"***Affiliate***" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"***Agreement***" has the meaning set forth in the preamble.

"***Allocable Consideration***" has the meaning set forth in <u>Section 2.7</u>

"***Allocation Schedule***" has the meaning set forth in <u>Section 2.7</u>.

"***Alternative Transaction***" means a transaction or series of related transactions pursuant to which Seller, at the conclusion of the Auction and subject to Bankruptcy Court approval, accepts a bid for all or a substantial and material portion of the Purchased Assets or any group of assets that includes all or a substantial and material portion of the Purchased Assets, from a Person other than Buyer or any Affiliate of Buyer (or a group or joint venture that includes Buyer or any Affiliate of Buyer), as the highest or best offer, in accordance with the Bidding Procedures Order.

"***Ancillary Documents***" means the Bill of Sale, the Assignment and Assumption Agreement, the IP Assignment Agreement, and the other agreements, instruments and documents required to be delivered pursuant to this Agreement or in connection with the transactions contemplated hereunder or at the Closing.

"***Assigned Contracts***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***Assigned Leases***" means those real property leases that constitute Assigned Contracts as set forth in <u>Schedule 2.1(c)</u> of the Disclosure Schedules.

"***Assignment and Assumption Agreement***" has the meaning set forth in <u>Section 3.2(a)(ii)</u>.

"***Assumed Liabilities***" has the meaning set forth in <u>Section 2.3</u>.

"***Assumption Notice***" has the meaning set forth in <u>Section 2.5(b)</u>.

"***Auction***" means an auction conducted by Seller in accordance with the Bid Procedures.

"***Bankruptcy Case***" has the meaning set forth in the Recitals.

"***Bankruptcy Code***" has the meaning set forth in the Recitals.

"***Bankruptcy Court***" has the meaning set forth in the Recitals.

"***Base Amount***" has the meaning set forth in <u>Section 2.6(a)</u>.

"***Bid Procedures***" means the bidding procedures approved by the Bankruptcy Court for purposes of seeking bids for the purchase of the Purchased Assets at the Auction.

"***Bidding Procedures Order***" means the order of the Bankruptcy Court entered by the Bankruptcy Court appearing at Docket No. 181 that, among other things, established a date by which qualified bids meeting the requirements approved in the Bidding Procedures Order must be submitted by bidders and established procedures for the Auction process.

"***Bill of Sale***" has the meaning set forth in <u>Section 3.2(a)(i)</u>.

"***Books and Records***" has the meaning set forth in <u>Section 2.1(m)</u>.

"***Business***" has the meaning set forth in the Recitals.

"***Business Confidential Information***" has the meaning set forth in <u>Section 6.6(a)</u>.

"***Business Day***" means any day except Saturday, Sunday, or any other day on which commercial banks located in Wilmington, Delaware are authorized or required by Law to be closed for business.

"***Buyer***" has the meaning set forth in the preamble.

"***Buyer Closing Certificate***" has the meaning set forth in <u>Section 7.3(d)</u>.

"***Buyer Core Representations***" has the meaning set forth in <u>Section 7.3(a)</u>.

"***Buyer Default Termination***" has the meaning set forth in <u>Section 2.6(b)</u>.

"***Buyer Material Adverse Effect***" means a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.

"***Buyer Related Parties***" means Buyer and its Affiliates, and their respective fiduciaries, shareholders, equity holders, financing sources, members, managers, partners, directors, divisions, officers, managers, executives, employees, independent contractors, freelancers, consultants and other Representatives, and the successors and assigns of each of them.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 <u>et</u> <u>seq.</u>), and any Laws promulgated thereunder.

"***Claims***" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"***Closing***" has the meaning set forth in <u>Section 3.1</u>.

"***Closing Date***" has the meaning set forth in <u>Section 3.1</u>.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Competing Bid***" has the meaning set forth in <u>Section 6.16(a)</u>.

"***Confidentiality Agreement***" means the letter agreement entered into by Seller and The Garcia Companies, dated May 28, 2020.

"***Continuation Costs***" has the meaning set forth in <u>Section 2.5(a)</u>.

"***Contracts***" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, and all other agreements, commitments, and legally binding arrangements, whether written or oral.

"***Cure Claims***" has the meaning set forth in <u>Section 2.9</u>.

"***Customer Information***" has the meaning set forth in <u>Section 4.9(m)</u>.

"***Default***" means (a) a violation, breach, or default, (b) the occurrence of an event that, with the passage of time, the giving of notice, or both, would constitute a violation, breach, or default, or (c) the occurrence of an event that, with or without the passage of time, the giving of notice, or both, would give rise to a right of damages, specific performance, termination, cancellation, renegotiation, or acceleration (including the acceleration of payment).

"***Deposit***" has the meaning set forth in <u>Section 2.6(b)</u>.

"***Designation Right Asset***" has the meaning set forth in <u>Section 2.5(a)</u>.

"***Designation Rights Period***" means the period through the earlier of (i) the date of the entry of an order by the Bankruptcy Court confirming a chapter 11 plan of Seller, which confirmation shall take place no earlier than seventy (70) days after the Closing Date, or (ii) ninety (90) days from and after the Closing Date.

"***Disclosure Schedules***" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"***Dollars***" or "***$***" means the lawful currency of the United States.

"***Effective Date***" has the meaning set forth in the preamble.

"***Employee Benefit Plan***" means any "employee benefit plan" (as defined in ERISA § 3(3)) and any other employee benefit arrangements or payroll practices, including, without limitation, bonus plans, consulting or other compensation agreements, incentive, equity or equity-based compensation, or deferred compensation arrangements, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical insurance, life insurance or scholarship programs maintained, sponsored, or contributed or required to be contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has any liability.

"***Encumbrance***" means any charge, Claim, including, without limitation, claims or liability based on successor liability theories or otherwise under any theory of Law or equity, community property interest, pledge, deed of charge, condition, equitable interest, lien (statutory or other), option, warrant, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership, whether secured or unsecured, perfected

or unperfected, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"***ERISA Affiliate***" means any Person that, at any relevant time, is or was treated as a single employer with Seller for purposes of Code § 414.

"***Escrow***" has the meaning set forth in <u>Section 2.6(b)</u>.

"***Escrow Agent***" has the meaning set forth in <u>Section 2.6(b)</u>.

"***Excluded Assets***" has the meaning set forth in <u>Section 2.2</u>.

"***Excluded Contracts***" has the meaning set forth in <u>Section 2.2(b)</u>.

"***Excluded Liabilities***" has the meaning set forth in <u>Section 2.4</u>.

"***FIRPTA Certificate***" has the meaning set forth in <u>Section 7.2(f)</u>.

"***Governmental Authority***" means any federal, state, local, or foreign government, any political subdivision thereof, any agency or instrumentality of such government or political subdivision, any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of Law), any arbitrator, court, or tribunal of competent jurisdiction, or any other administrative, executive, judicial or regulatory body.

"***Governmental Order***" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any Governmental Authority.

"***Initial Deposit***" has the meaning set forth in <u>Section 2.6(b)</u>.

"***Insurance Policies***" has the meaning set forth in <u>Section 2.2(j)</u>.

"***Intellectual Property***" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("***Patents***"); (b) trademarks (registered, unregistered and at common law), service marks (registered and at common law), brands, certification marks, logos, slogans, all trade dress rights, corporate names, identifying symbols, emblems, trade names, service names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by any of the foregoing, and all registrations, applications for registration, and renewals of any of the foregoing ("***Trademarks***"); (c) copyrights, works of authorship, moral rights and other copyrightable subject matter, whether or not copyrightable, whether or not registered under national copyright laws, and all registrations,

ACTIVE 258135929

applications for registration, and renewals of any of the foregoing ("***Copyrights***"); (d) Internet domain names, and Social Media Accounts and user names (including "handles"), whether or not Trademarks, all associated web addresses, URLs, websites and web pages, social media sites and pages (including, without limitation, Facebook, Instagram, Twitter, Tiktok and YouTube), film libraries, and all content and data thereon or relating thereto, whether or not constituting Copyrights; (e) mask works, and all registrations, applications for registration, and renewals thereof; (f) industrial designs, and all Patents, registrations, applications for registration, and renewals thereof; (g) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information (including customer and supplier lists, pricing and cost information, business and marketing plans and proposals), databases, data compilations and collections, tools, methods, processes, techniques, and all rights therein; (h) computer programs, operating systems, applications, firmware, and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof; (i) all advertising and promotional materials; (j) all documentation and media constituting, describing or relating to the above, including manuals, memoranda and records; and (k) all other intellectual or industrial property and proprietary rights.

"***Intellectual Property Agreements***" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts, whether written or oral, relating to any Intellectual Property to which Seller is a party, beneficiary, or otherwise bound, including, but not limited to, any Contract pursuant to which (i) Seller grants to any third Person any right to use (including through releases, immunities from suit or covenants not to sue) any of the Intellectual Property Assets and (ii) Seller receives from any third Person any right to use (including through releases, immunities from suit or covenants not to sue) such third Person's Intellectual Property.

"***Intellectual Property Assets***" means all Intellectual Property that is owned by Seller, including those assets listed on Schedule 2.1(d) of the Disclosure Schedules, together with all (i) royalties, fees, income, payments, and other proceeds hereafter due or payable to Seller with respect to such Intellectual Property; and (ii) Claims and causes of action with respect to such Intellectual Property, whether accruing before, on, or after the date hereof, including all rights to and Claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation, or other violation thereof.

"***Inventory***" has the meaning set forth in Section 2.1(b).

"***IP Assignment Agreement***" has the meaning set forth in Section 3.2(a)(iii).

"***Law***" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement, or rule of law of any Governmental Authority.

"***Leased Property***" means all of the real property leased or subleased by Seller, including pursuant to the Assigned Leases.

"***Liabilities***" means any and all debts, Losses, liabilities, claims (including Claims), obligations, or commitments of any nature whatsoever, asserted or unasserted, known or unknown,

6

absolute or contingent, accrued or unaccrued, matured or unmatured, perfected or unperfected, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise), whether contingent, at law or in equity or otherwise, including any claims or liability based on successor liability theories or otherwise under any theory of Law or equity, and including all costs and expenses related thereto.

"*Licensed Intellectual Property*" means all Intellectual Property in which Seller holds any rights or interests granted by other Persons, including third party Intellectual Property made available to Seller under an open source license.

"*Losses*" means losses, damages, liabilities, deficiencies, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and costs.

"*Material Adverse Effect*" means a condition, fact or circumstance that, in the aggregate, has had or could reasonably be expected to have a material adverse effect on any of (a) the Business, the Assumed Liabilities or the Purchased Assets or Seller's condition (financial or otherwise), operations, performance, or results of operations, in each case taken as a whole; (b) the ability of Seller to perform Seller's obligations under the Sale Documents in a timely manner; or (c) the validity or enforceability of the Sale Documents or the rights and remedies of Seller under any of the Sale Documents; provided, however, in the case of clause (a), a Material Adverse Effect will not be deemed to include any effect to the extent resulting from or arising in connection with (i) changes or effects arising from or as a result of the commencement of the Bankruptcy Case and the Seller cancelling a portion of XFL Games for the 2020 season, (ii) general economic or political conditions or events or conditions arising from changes in business or economic conditions generally affecting the entertainment or sporting industries, (ii) any changes in applicable Laws or accounting rules, or (iv) any natural or man-made disaster, acts of God, terrorism, war (whether or not declared), epidemic, or pandemic (including changes or effects resulting from COVID-19); provided, however, that the foregoing clauses shall not include, and therefore the determination of "Material Adverse Effect" shall not exclude any event, change, circumstance, or occurrence that affects any one or more of the Business, the Purchased Assets, or the Assumed Liabilities in a disproportionate manner when compared to the effect of the same on other Persons engaged in the industries in which Seller conducts the Business.

"*Material Contracts*" has the meaning set forth in Section 4.13.

"*Multiemployer Plan*" means any "multiemployer plan" (as defined in ERISA § 3(37)) contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has any liability.

"*Next-Highest Bid*" has the meaning set forth in the Bid Procedures.

"*Next-Highest Bidder*" has the meaning set forth in the Bid Procedures.

"*Non-Recourse Parties*" has the meaning set forth in Section 9.11.

"*Order*" means any judgment, order, writ, decree, injunction, or other determination whatsoever of any Governmental Authority or any other entity or body whose finding, ruling, or

ACTIVE 258135929

holding is legally binding or is enforceable as a matter of right (in any case, whether preliminary or final).

"*Ordinary Course*" means the ordinary course of business consistent with past custom and practice, subject to any Orders of the Bankruptcy Court and Seller's status as, and operation of the Business as, debtors-in-possession, including actions taken by Seller that Seller determines are reasonable or prudent for Seller to take in connection with events surrounding any pandemic or public health emergency caused by COVID-19.

"*Outside Date*" has the meaning set forth in <u>Section 3.1</u>.

"*Permitted Encumbrances*" means (a) liens for Taxes not yet due and payable; and (b) mechanics', carriers', workmen's, repairmen's, or other like liens arising or incurred in the Ordinary Course.

"*Permit*" means any permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances, and similar rights obtained, or required to be obtained, from Governmental Authorities.

"*Person*" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"*Personal Data*" shall mean:  (i) any information that directly or indirectly identifies a natural person, including that person's name, street address, telephone number, e-mail address, photograph, social security number or tax identification number, driver's license number, passport number, personal identification number, government-issued identifier, credit card number, bank information, or customer or account number, health information, device identifier, IP address, biometric identifier, persistent identifier, or any other piece of information that alone or in combination with other information directly or indirectly collected, held or otherwise managed by Seller allows the identification or location of or contact with a natural person or a particular machine or device, (ii) any other information if such information is defined as "personal data", "information", "personally identifiable information", "individually identifiable health information," or "personal information" or similar or comparable term under any Law, including without limitation any Privacy Law; and (iii) any information that is associated, directly or indirectly (by, for example, records linked via unique keys), with any of the foregoing.

"*Personal Property Leases*" has the meaning set forth in <u>Section 4.15</u>.

"*Petition Date*" has the meaning set forth in the Recitals.

"*Pre-Closing Tax Period*" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"*Privacy Law*" shall mean all Laws and Orders (including U.S. laws respecting unfair and deceptive trade practices, the California Consumer Privacy Act, HIPAA, the Gramm-Leach-Bliley Act, the Fair Credit Reporting Act, the Telephone Consumer Protection Act and the CAN SPAM Act, the Electronic Communications Privacy Act), contractual obligations, applicable rules, codes

8

of conduct, or other requirements of self-regulatory bodies, and applicable industry standards (including, to the extent applicable, the PCI Data Security Standard), as it may in each case be amended from time to time, that pertains to (i) privacy, cybersecurity or data protection, (ii) consumer protection, (iii) restrictions or obligations related to the access to, collection, use, disclosure, transfer, transmission, storage, security, hosting, disposal, retention, interception or other processing of Personal Data or (iv) marketing, communications, including laws regulating the initiation, transmission, or receipt of commercial communications.

"***Privacy Policy***" means the privacy policy maintained by Seller in the Ordinary Course.

"***Privileged Communications***" means all records, information, ledgers, files, invoices, documents, work papers, work product, drafts, presentations, analysis, correspondence, summaries, or similar items that, in whole or part, constitute privileged communications between Seller and Seller's counsel or other professional advisors; <u>provided</u>, <u>however</u> that Privileged Communications shall not include communications primarily related to football operations.

"***Purchase Price***" has the meaning set forth in <u>Section 2.6(a)</u>.

"***Purchased Assets***" has the meaning set forth in <u>Section 2.1</u>.

"***Real Property Leases***" has the meaning set forth in <u>Section 4.12(d)</u>.

"***Registered Intellectual Property Assets***" has the meaning set forth in <u>Section 4.9(a)</u>.

"***Rejection Notice***" has the meaning set forth in <u>Section 2.5(c)</u>.

"***Release***" has the meaning set forth in CERCLA.

"***Representative***" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants, financing sources and other agents of such Person.

"***Sale Documents***" means this Agreement and the Ancillary Documents.

"***Sale Motion***" means the motion filed by Seller with the Bankruptcy Court on April 21, 2020 Docket No. 55, seeking approval of the Bid Procedures and the authority to sell the Purchased Assets pursuant to the Bid Procedures.

"***Sale Order***" has the meaning set forth in <u>Section 6.16(b)</u>.

"***Seller***" has the meaning set forth in the preamble.

"***Seller Closing Certificate***" has the meaning set forth in <u>Section 7.2(e)</u>.

"***Seller Core Representations***" has the meaning set forth in <u>Section 7.2(a)</u>.

"***Seller's Knowledge***" or any other similar knowledge qualification means the actual knowledge after reasonable inquiry of Jeffrey Pollack, Basil DeVito and Thomas Van Wazer.

ACTIVE 258135929

"***Seller Related Parties***" means Seller and its Affiliates, and their respective fiduciaries, shareholders, equity holders, members, managers, partners, directors, divisions, officers, managers, executives, employees, independent contractors, freelancers, consultants and other Representatives, and the successors and assigns of each of them.

"***Social Media Accounts***" means any and all accounts, profiles, pages, feeds, registrations and other presences on or in connection with any (i) social media or social networking website or online service, (ii) blog or microblog, (iii) mobile application, (iv) photo, video or other content-sharing website, (v) virtual game world or virtual social world, (vi) rating and review website, (vii) wiki or similar collaborative content website or (viii) message board, bulletin board, or similar forum.

"***Social Media Platform***" has the meaning set forth in Section 4.9(n).

"***Social Media Terms***" has the meaning set forth in Section 4.9(n).

"***Successful Bid***" has the meaning set forth in the Bid Procedures.

"***Successful Bidder***" has the meaning set forth in the Bid Procedures.

"***Supplemental Deposit***" has the meaning set forth in Section 2.6(b).

"***Tangible Personal Property***" has the meaning set forth in Section 2.1(f).

"***Tax***" or "***Taxes***" means (a) all federal, state, local, foreign and other net income, gross income, gross receipts, sales, use, production, alternative or add-on minimum, value added, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties and (b) any liability for the payment of amounts determined by reference to amounts described in clause "(a)" as a result of being or having been a member of any group of corporations that files, will file, or has filed Tax Returns on a combined, consolidated or unitary basis, as a result of any obligation under any agreement or arrangement (including any Tax allocation, Tax indemnity or Tax sharing agreement), as a result of being a transferee or successor, or otherwise.

"***Tax Return***" means any return, declaration, report, claim for refund, information return, or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"***Transfer Taxes***" has the meaning set forth in Section 6.12(a).

"***Transferred Employee***" has the meaning set forth in Section 6.5(b).

"***XFL Games***" means football games played in connection with the Business, whether pre-season, regular season, post-season or otherwise.

## ARTICLE II

## PURCHASE AND SALE

2.1    **Purchase and Sale of Assets**.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code and subject to the terms and conditions set forth herein and the Sale Order, at the Closing, Seller shall sell, assign, transfer, convey, and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances other than Permitted Encumbrances, all of Seller's right, title, and interest in, to, and under all of the assets, properties, and rights of every kind and nature, whether real, personal, or mixed, tangible or intangible (including goodwill), wherever located, and whether now existing or hereafter acquired (other than the Excluded Assets and the Designation Rights Assets subject to Section 2.5(e)) (collectively, the "***Purchased Assets***"), including, without limitation, the following:

(a)    all accounts or notes receivable (whether current or non-current) held by Seller, including receivables from credit card processors and allowances due from landlords under Assigned Leases, and any security, Claim, remedy or other right related to any of the foregoing ("***Accounts Receivable***");

(b)    all inventory, merchandise, finished goods, raw materials, works in progress, packaging, supplies, parts and other inventories (including, without limitation the items listed on Schedule 2.1(b)), whether in the physical possession of Seller or another party ("***Inventory***");

(c)    all Contracts, including Intellectual Property Agreements, set forth on Schedule 2.1(c) (the "***Assigned Contracts***"), which shall include the Assigned Leases;

(d)    all Intellectual Property Assets, (including, without limitation the assets listed on Schedule 2.1(d));

(e)    all Permits set forth on Schedule 2.1(e) (in each case to the extent transferable under applicable law and without the consent of any Governmental Authority);

(f)    all furniture, fixtures (excluding real property fixtures), equipment, uniforms, machinery, motor vehicles, tools, point of sale systems, vehicles, office equipment, supplies, computers, tablets, hardware, information technology infrastructure, telephones, assets leased to third parties pursuant to any Assigned Contracts, and other tangible personal property of any kind (including, without limitation the items listed on Schedule 2.1(f)) (the "***Tangible Personal Property***");

(g)    except as set forth in Section 2.2(g), Section 2.2(i) or Section 2.2(k), all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business, the Purchased Assets, or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

(h)    [reserved]

(i)        except as set forth in <u>Section 2.2(g), Section 2.2(i)</u> or on <u>Schedule 2.2(k)</u>, all Claims, refunds, rights of recovery, rights of set-off, rights of recoupment, and related sums and fees, including all Claims, rights, lawsuits, rights of recovery, objections, causes of action, avoidance actions and similar rights of Seller arising under or pursuable through Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date) and all proceeds thereof;

(j)        all of Seller's rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Purchased Assets;

(k)        except as set forth in <u>Section 2.2</u>, all security deposits, and other deposits;

(l)        to the extent transferable, all rights of Seller (i) under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with current or former employees and agents of Seller or with third parties, including, without limitation, non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the sale of the Seller's assets and all rights of Seller, whether under a Contract or otherwise, concerning obligations not to disclose Business Confidential Information and all obligations not to compete with the Business that any current or former employee owes to Seller and (ii) to telephone and facsimile numbers and email addresses and to receive regular mail related to the Purchased Assets;

(m)        originals, or where not available, copies, of all books and records, including, but not limited to, books of account and ledgers, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, marketing and promotional surveys, material and research and files relating to the Intellectual Property Assets and the Intellectual Property Agreements, except books and records related to entity governance (*e.g.*, limited liability company books and records, minute books and capitalization records), and books and records that constitute Privileged Communications ("***Books and Records***");

(n)        to the extent transferable, all rights to Licensed Intellectual Property obtained by Seller pursuant to Intellectual Property Agreements that are Assigned Contracts;

(o)        all goodwill and the going concern value of the Business; and

(p)        except for the Excluded Assets expressly set forth in <u>Section 2.2</u> and the Designation Rights Assets, all other assets of Seller.

2.2        **Excluded Assets**.  Notwithstanding the foregoing, the Purchased Assets shall not include the following assets (collectively, the "***Excluded Assets***"):

(a)        cash and cash equivalents except as set forth in <u>Schedule 2.2(a)</u>;

(b)        after expiration of the Designation Rights Period, all Contracts that have not been assumed and assigned to the Buyer pursuant to this Agreement (the "***Excluded Contracts***");

(c)     the organizational documents, minute books, membership records, Tax Returns, books of account, or other records having to do with the Seller's organizational existence as a limited liability company;

(d)     all Employee Benefit Plans and assets attributable thereto and the right to recover such assets;

(e)     the assets, properties, and rights specifically set forth on Schedule 2.2(e);

(f)     all Permits not otherwise set forth on Schedule 2.1(e);

(g)     deposits held by Seller in connection with any Excluded Contracts and Claims with respect thereto;

(h)     the rights that accrue or will accrue to Seller under the Sale Documents;

(i)     all prepaid insurance, utility and tax deposits, and Taxes and Tax refunds owing to Seller to the extent attributable to a Pre-Closing Tax Period and Claims with respect thereto;

(j)     all casualty insurance, title insurance, liability insurance, and other insurance policies of Seller and any Affiliates and Claims thereunder, including each Seller's director and officer insurance policies, fiduciary policies, or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon), and any of Seller's rights, Claims, demands, proceedings, credits, causes of action, or rights of set off thereunder ("*Insurance Policies*");

(k)     all Claims (including insurance claims) or causes of action set forth on Schedule 2.2(k);

(l)     all receivables (including any accounts receivable) that relate to any Excluded Asset or Excluded Liability and the right to recover such receivables; and

(m)     books and records that constitute Privileged Communications.

Subject to Section 2.5, Buyer shall have the right, exercisable in Buyer's sole discretion at any time prior to the date that is three (3) days prior to the Closing Date, to designate any one or more of Seller's assets, properties, and rights as Excluded Assets or Designation Rights Assets; provided, however, that any exercise of such right shall not affect the Purchase Price. For the avoidance of doubt, Buyer shall not have the right to specify that any Contract and/or asset that is an Excluded Asset shall be treated as a Purchased Asset.

2.3     **Assumed Liabilities**. Subject to the terms and conditions set forth herein, effective at the time of the Closing, Buyer shall assume and agree to pay, perform, and discharge only the following Liabilities of Seller (collectively, the "*Assumed Liabilities*"), and no other Liabilities:

(a)     all Liabilities arising under the Assigned Contracts but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date and do not

13

arise from any failure to perform, improper performance, warranty, or other Default by Seller or any other Person on or prior to the Closing;

(b)      all Liabilities arising from the conduct of the Business or the use or operation of the Purchased Assets by Buyer from and after the Closing;

(c)      all Cure Claims set forth on <u>Schedule 2.3(c)</u>, which Cure Claims shall not exceed the amount for each Cure Claim set forth on <u>Schedule 2.3(c)</u> or $9,229,444.25 in the aggregate.

(d)      all obligations for the pro-rated portion Rents, Taxes, utilities, and prepaid expenses allocable to Buyer in accordance with <u>Section 6.13</u>.

2.4      **Excluded Liabilities**.  Notwithstanding the provisions of <u>Section 2.3</u> or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform, or discharge any Claims against or Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "***Excluded Liabilities***") and such Excluded Liabilities shall be retained by and remain the sole Liabilities of Seller.  Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)      any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers, and any other Person;

(b)      any Liability for (i) Taxes of Seller (or any member or Affiliate of Seller) including any Liability for Taxes of Seller (or any member or Affiliate of Seller) for which Buyer may be liable under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law; (ii) Taxes relating to or arising from the Business, the Purchased Assets, or the Assumed Liabilities for any Pre-Closing Tax Period; and (iii) all Transfer Taxes;

(c)      any Liabilities relating to or arising out of the Designation Rights Assets and Excluded Assets (unless and until such time as a Designation Rights Asset or an Excluded Asset, with respect to the Liabilities exclusively relating to or arising out of such Designation Rights Asset or Excluded Asset, becomes a Purchased Asset pursuant to the terms of this Agreement and only to the extent expressly set forth in <u>Section 2.3</u> with respect to any such Purchased Asset);

(d)      any Liabilities in respect of any pending or threatened Action arising out of, relating to, or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(e)      any product Liability or similar claim for injury to a Person or property that arises out of or is based upon any express or implied representation, warranty, agreement, or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label, or warn of hazards or other

14

related product defects of any products at any time manufactured or sold or any service performed by Seller;

(f)     any recall, design defect, or similar claims of any products manufactured or sold or any service performed by Seller prior to the Closing;

(g)     any Liabilities of Seller arising under or in connection with any Employee Benefit Plan providing benefits to any present or former employee of Seller;

(h)     any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors, or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, or employee deferred compensation, including stock option plans, grants, and agreements, severance, retention, termination, or other payments;

(i)     any Liabilities for injury to a Person that arises out of or related to the Business prior to the Closing, including any Loss, damage, or injury sustained by any present or former employee or independent contractor of Seller or any other Person while engaging in athletic activities in connection with the Business prior to the Closing, including XFL Games, practices, warm-ups, training and other activities;

(j)     all trade accounts payable of Seller;

(k)     any Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders, or work orders that do not constitute part of the Purchased Assets that are issued by the Business's customers to Seller on or before the Closing and only to the extent expressly set forth in Section 2.3 with respect to any such Purchased Asset;

(l)     any Liabilities to indemnify, reimburse, or advance amounts to any present or former officer, director, employee, agent or other Person of Seller (including with respect to any breach of fiduciary obligations by same);

(m)     any Liabilities under (i) the Excluded Contracts or (ii) any other Contracts (a) that are not validly and effectively assigned to Buyer pursuant to this Agreement; or (b) to the extent such Liabilities arise out of or relate to a breach (excluding Cure Claims) by Seller of such Contracts prior to the Closing;

(n)     any Liabilities associated with debt, loans, or credit facilities of either or both Seller and the Business; and

(o)     any Liabilities arising out of, in respect of, or in connection with the failure by Seller or any of its Affiliates to comply with any Law or Governmental Order.

2.5     **Designation Rights Assets**.

(a)     Buyer shall have the right, by written notice to Seller no later than three (3) days prior to the Closing Date, to specify that any Contract and/or asset that is not an Excluded

<div align="center">15</div>

Asset shall be held by Seller (and, to the extent a Contract, not rejected pursuant to Section 365 of the Bankruptcy Code) (any such Contract or asset, including those Contracts set forth on Schedule 2.5(a) which Schedule 2.5(a) may be amended by Buyer at any time no later than three (3) days prior to the Closing Date (other than with respect to the addition of an Excluded Asset to Schedule 2.5(a)) to treat such Contracts as Purchased Assets or Excluded Assets a "***Designation Right Asset***") for the duration of the Designation Rights Period; provided, however, that, with respect to any such Designation Right Asset, (i) Buyer shall promptly reimburse Seller on demand, and thereby be solely responsible for, all costs associated with the continuation by, and (to the extent such Designation Right Asset is a Contract) ultimate assumption or rejection by, Seller of such Designation Right Asset for the period from the Closing through the end of the Designation Rights Period (such costs, "***Continuation Costs***")); (ii) all cash collected by Seller in respect of such Designation Right Asset shall be promptly delivered to Buyer; provided, however, that Seller shall be entitled to deduct Continuation Costs from any cash collected by Seller in respect of the Designation Right Asset giving rise to such costs; and (iii) the foregoing shall not affect the validity of the transfer to Buyer of any other Purchased Asset that may be related to such Designation Right Asset.

(b)      As to each Designation Right Asset that is a Contract, as soon as practical after receiving further written notice(s) (each, an "***Assumption Notice***") from Buyer during the Designation Rights Period requesting assumption and assignment of any Designation Right Asset, Seller shall, subject to Buyer's demonstrating adequate assurance of future performance thereunder, take all actions required by the Sale Order or otherwise that are reasonably necessary to seek to assume and assign to Buyer pursuant to section 365 of the Bankruptcy Code such Designation Right Asset(s) set forth in an Assumption Notice.

(c)      As to each Designation Right Asset that is a Contract, as soon as practical after receiving further written notice(s) (each, a "***Rejection Notice***") from Buyer during the Designation Rights Period requesting rejection of any Designation Right Asset, Seller shall take all actions required by the Sale Order or otherwise that are reasonably necessary to reject such contract pursuant to section 365 of the Bankruptcy Code.

(d)      Seller and Buyer agree and acknowledge that the covenants set forth in this Section 2.5 shall survive the Closing.

(e)      Notwithstanding anything in this Agreement to the contrary, (i) on the date any Designation Right Asset is assumed and assigned to Buyer pursuant to this Section 2.5, such Designation Right Asset shall be deemed a Purchased Asset (and, for the avoidance of doubt, in the event such Designation Right Asset is a Contract, such Designation Right Asset shall be deemed an Assigned Contract) for all purposes under this Agreement and no further consideration shall be required to be paid for any Designation Right Asset that is assumed and assigned to Buyer, and (ii) Buyer shall not have the right to specify that any Contract and/or asset that is an Excluded Asset shall be treated as a Purchased Asset.

2.6      **Purchase Price and Deposit**.

(a)      The aggregate purchase price for the Purchased Assets shall be Fifteen Million Dollars ($15,000,000) (the "***Base Amount***"), plus the assumption of the Assumed

16

Liabilities (collectively, the "***Purchase Price***").  At the Closing, Buyer shall (i) pay by wire transfer of immediately available funds the Base Amount <u>minus</u> the Deposit as provided in <u>Section 3.2(b)</u>, and (ii) direct the Escrow Agent to disburse the Deposit to Seller.

(b)     Concurrently with Buyer's delivery of this Agreement, Buyer shall deposit into a segregated account (the "***Escrow***") maintained by Seller's outside legal counsel (the "***Escrow Agent***") cash in immediately available funds by wire transfer in an amount equal to ten percent (10%) of the Base Amount (the "***Initial Deposit***").  If Buyer is declared the Successful Bidder or Next-Highest Bidder at the Auction, Buyer shall, if necessary, within one (1) Business Day of the close of the Auction, supplement the Initial Deposit such that Buyer's deposit shall be equal to an amount that is ten (10%) percent of the Base Amount payable as part of the Successful Bid or Next-Highest Bid, as applicable (the "***Supplemental Deposit***," and together with the Initial Deposit, the "***Deposit***").  Upon receipt of any portion of the Deposit, the Escrow Agent shall immediately place the Deposit into a non-interest-bearing escrow account.  The Deposit shall become nonrefundable upon Seller's valid termination of this Agreement pursuant to <u>Section 8.1(c)(i)</u> (a "***Buyer Default Termination***").  At the Closing, the Deposit shall be delivered to Seller and credited toward payment of the Purchase Price.  In the event the Deposit becomes non-refundable by reason of a Buyer Default Termination and Seller is not then in material Default of this Agreement, (i) Escrow Agent shall immediately disburse the Deposit to Seller to be retained by Seller for Seller's own account as liquidated damages in respect of Buyer's breach, which shall constitute the sole and exclusive remedy of Seller in the event of a Buyer Default Termination in lieu of all other rights and remedies that Seller may have against Buyer or any Buyer Related Party at law; <u>provided</u>, <u>however</u>, that the foregoing shall not limit any Person's obligations under the Confidentiality Agreement, and (ii) Buyer and Seller shall execute any joint instructions reasonably necessary to permit the Escrow Agent to make such disbursement.  The parties agree that the Deposit is a reasonable estimate of Seller's damages in the event of a Buyer Default Termination and Seller is not then in material Default of this Agreement.  Except for a Buyer Default Termination, if this Agreement is terminated other than pursuant to <u>Section 8.1(c)(i)</u>, Escrow Agent, upon five (5) days' written notice to the Escrow Agent and Seller of Buyer's request to disburse the Deposit, shall pay the Deposit to Buyer and, at Buyer's request, Buyer and Seller shall execute any joint instructions reasonably necessary to permit the Escrow Agent to make such disbursement.

(c)     Notwithstanding anything in this Agreement to the contrary, Buyer and any other Person who has any obligation to withhold or deduct from any consideration payable or otherwise deliverable pursuant to this Agreement shall be entitled to withhold and deduct such amounts as Buyer or such other Person is required to deduct and withhold therefrom under the Code or any provision of state, local or foreign Law; <u>provided</u>, <u>however</u>, that Buyer shall notify Seller at least two (2) Business Days before the Closing Date of any such required withholding. To the extent that amounts are so deducted or withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding were made.

2.7     <u>**Allocation of Purchase Price**</u>.  Seller and Buyer agree that the Purchase Price as well as any other items constituting consideration for the Purchased Assets for any applicable Tax purposes (the "***Allocable Consideration***") will be allocated among the Purchased Assets in a manner consistent with Section 1060 of the Code and any Treasury Regulations promulgated

<div align="center">17</div>

thereunder.  Buyer will, no later than ninety (90) days following the Closing Date, prepare and deliver to Seller a schedule setting forth the allocation of the Allocable Consideration in accordance with the preceding sentence (the "***Allocation Schedule***").  If Seller does not object to any items set forth in the Allocation Schedule within ten (10) days after Seller's receipt of the Allocation Schedule, the Allocation Schedule shall be deemed final and binding on both Buyer and Seller.  If Seller delivers notice of an objection to any items set forth in the Allocation Schedule to Buyer within ten (10) days after Seller's receipt of the Allocation Schedule, Buyer and Seller shall work in good faith to resolve any objection for a period of fifteen (15) days.  If at the end of such fifteen-day period any objection remains unresolved, either Buyer or Seller may submit such matter for determination to the Bankruptcy Court.  Neither Buyer nor Seller will take any position that is contrary to or inconsistent with the Allocation Schedule for any Tax purpose, including with respect to any Tax Return (including amended Tax Returns).  In the event that the Allocation Schedule is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other party and the parties will consult in good faith as to how to resolve such dispute in a manner consistent with the Allocation Schedule.

2.8    **Third Party Consents**.  To the extent that Seller's rights under any Contract or Permit constituting a Purchased Asset or any other Purchased Asset may not be assigned to Buyer under Section 363 or 365 of the Bankruptcy Code and a third party objects to assignment and it is determined by the Bankruptcy Court that the Seller is incapable as a matter of law of assigning that particular Purchased Asset, this Agreement shall not constitute an agreement to assign the same until applicable required consent(s) are obtained; provided, however, that, subject to the satisfaction or waiver of the conditions contained in Article VII, the Closing shall occur notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof, and Seller and Buyer, each at its own expense, shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent(s) as promptly as possible.

2.9    **Cure Claims**.  With respect to each of the Assigned Contracts assigned to Buyer on the Closing Date or during the Designation Rights Period, Buyer shall pay promptly after the Closing Date or after entry of order approving assumption and assignment of a Contract designated in accordance with Section 2.5 all amounts necessary to cure any monetary Default (as distinct from curing all Defaults or failures to comply with provisions thereunder that may not be cured by the mere payment of money) that are required to be paid pursuant to section 365 of the Bankruptcy Code in order to assume and assign the Assigned Contracts to Buyer, which Cure Claims set forth on Schedule 2.9 shall not exceed $9,229,444.25 in the aggregate (collectively, the "***Cure Claims***").

## ARTICLE III

## CLOSING; POST-CLOSING MATTERS

3.1    **Closing**.  Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "***Closing***") shall take place remotely via the exchange of documents and signatures on a date mutually acceptable by the parties, but in any event no later than August 21, 2020 (the "***Outside Date***").  The date on which the Closing is occurs is herein referred to as the "***Closing Date***."

3.2    **Closing Deliverables**.

(a)     At the Closing, Seller shall deliver to Buyer the following:

(i)     A bill of sale in the form of <u>Exhibit A</u> hereto (the "***Bill of Sale***"), duly executed by Seller, transferring the Tangible Personal Property included in the Purchased Assets to Buyer;

(ii)     An assignment and assumption agreement in the form of <u>Exhibit B</u> hereto (the "***Assignment and Assumption Agreement***"), duly executed by Seller, effecting the assignment to and assumption by Buyer of the Assigned Contracts and the Assumed Liabilities;

(iii)     an assignment agreement to assign the Intellectual Property Assets in the form of <u>Exhibit C</u> hereto (the "***IP Assignment Agreement***"), duly executed by Seller, effecting the assignment to and assumption by Buyer of the Intellectual Property Assets;

(iv)     originals (or, to the extent originals are not available, copies) of all Assigned Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to the Buyer through Seller's datasite;

(v)     physical possession of all of the Purchased Assets capable of passing by delivery at the location where such Purchased Assets are located with the intent that title in such Purchased Assets shall pass by and upon delivery;

(vi)     the Seller Closing Certificate;

(vii)     the FIRPTA Certificate;

(viii)     a copy of the Sale Order entered by the Bankruptcy Court;

(ix)     joint instructions to the Escrow Agent to deliver the Deposit to Seller; and

(x)     all other instruments of transfer, assumption, filings, or documents, reasonably requested by Buyer in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)     At the Closing, Buyer shall deliver to Seller the following:

(i)     the Base Amount minus the Deposit by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer;

(ii)     the Bill of Sale, Assignment and Assumption Agreement and IP Assignment Agreement, in each case duly executed by Buyer;

(iii)     the Buyer Closing Certificate;

(iv)     the certificate of the duly authorized officer of Buyer required by <u>Section 7.3(d)</u>; and

ACTIVE 258135929

(v)    joint instructions to the Escrow Agent to deliver the Deposit to Seller.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated herein, subject to the entry of the Sale Order, Seller represents and warrants to Buyer that the statements contained in this <u>Article IV</u>, except as set forth in the correspondingly numbered Schedule of the Disclosure Schedules, are true and correct as of the date hereof and as of the Closing Date.

4.1    **Organization and Qualification of Seller**.  Seller is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and has all organizational power and authority to own, operate, and lease the properties and assets now owned, operated, or leased by Seller, including the Purchased Assets, and to carry on the Business.  Seller is duly qualified or authorized to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or leased by it requires such qualification or authorization except to the extent that the failure to be so qualified or authorized would not have a Material Adverse Effect.

4.2    **Authority of Seller**.  The execution and delivery by Seller of this Agreement and the Ancillary Documents to which Seller is a party, the performance of the obligations of Seller contemplated hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action, subject to the approval of the Bankruptcy Court, and no other limited liability company action on the part of Seller is necessary to authorize the execution and delivery by Seller of this Agreement and the Ancillary Documents to which Seller is a party, the performance of the obligations of Seller contemplated hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby.  Seller has the right and all power, authority, and legal capacity to enter into and perform its obligations under this Agreement and the Ancillary Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby.  This Agreement and each of the Ancillary Documents to which Seller is a party has been duly and validly executed and delivered by Seller and constitutes the legal, valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, subject to the approval of the Bankruptcy Court through the terms of the Sale Order.

4.3    **No Conflicts; Consents**.  The execution, delivery, and performance by Seller of this Agreement and the Ancillary Documents to which Seller is a party, the consummation of the transactions contemplated hereby and thereby, and the compliance by Seller with any of the provisions hereof do not and will not result in the creation or imposition of any Encumbrance on any Purchased Asset, or conflict with or result in any Default under (a) Seller's certificate of formation, limited liability company agreement, operating agreement or comparable organizational documents, (b) subject to entry of the Sale Order, any applicable Law, (c) subject to entry of the Sale Order, any Assigned Contract or Purchased Asset, or (d) subject to entry of the Sale Order, any Order of any Governmental Authority applicable to Seller relating to the Purchased

ACTIVE 258135929

Assets, other than, in the case of clauses (b), (c) and (d), such Defaults that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except for entry of the Sale Order and except as otherwise set forth on Schedule 4.3, (i) no consent, waiver, approval, Permit, Governmental Order, authorization of, declaration with, or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the Ancillary Documents to which Seller is a party, the compliance by Seller with any of the provisions hereof and thereof or the consummation of the transactions contemplated hereby and thereby and (ii) there is no Contract binding upon Seller requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement.

4.4  **Title to Purchased Assets**.  (a) Seller has good, valid, and marketable title to, or a valid and subsisting leasehold interest in, all of the Purchased Assets; and (b) as of the Closing Date and subject to the entry of the Sale Order, Buyer will acquire good, valid, and marketable title in and to, or in the case of leased Purchased Assets, a valid and subsisting leasehold interest in, each of the Purchased Assets, free and clear of Encumbrances (other than Assumed Liabilities and Permitted Encumbrances).  The Purchased Assets constitute all of the assets, rights, interests and properties of every nature and kind whatsoever used (to the extent Seller holds rights, title, and interest in such tangible personal property) or held for use by Seller to conduct and operate the Purchased Assets and the Business in all material respects as conducted and operated by Seller prior to March 10, 2020.   No Person other than Seller is engaged in the operation of, or holds rights, title, and interest in, the Purchased Assets or assets that are used or useful in the operation of the Business.

4.5  **Legal Proceedings; Governmental Orders**.

(a)  Except as set forth in Schedule 4.5(a), there are no Actions pending or, to Seller's Knowledge, threatened by or against Seller or any of its members relating to or affecting the Business, the Purchased Assets, or the Assumed Liabilities that if determined adversely to Seller would result in a Material Adverse Effect.

(b)  There are no outstanding Governmental Orders and no unsatisfied judgments, penalties, or awards against, relating to, or affecting the Business that would have a Material Adverse Effect.

4.6  **Compliance With Laws**.  Seller has at all times been in material compliance with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of its assets, including the Purchased Assets.

4.7  **Brokers**.  Except as set forth in Schedule 4.7, no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Seller.

4.8  **Permits**.  Schedule 4.8 sets forth a complete and correct list of all Permits required to conduct and operate the Business as conducted and operated by Seller prior to March 10, 2020.  Except as set forth on Schedule 4.8, (a) Seller is and has at all times been in compliance with the

terms, provisions, conditions and requirements of each such Permit and no event has occurred which, with notice or the lapse of time, or both, would constitute a Default or violation of any term, condition, provision or requirement of any Permit; and (b) no Action is pending by any Governmental Authority, no notice of violation of any Permit has been received from any Governmental Authority and, to Seller's Knowledge, no Action is threatened by any Governmental Authority seeking the revocation, limitation or non-renewal of any such Permit in each case that would have a Material Adverse Effect.

4.9   **Intellectual Property**

(a)   All material registration, maintenance and renewal fees in connection with all Intellectual Property Assets for which Seller has received or applied for a registration or issuance, including, without limitation, any patent, patent application, copyright registration or application therefor, and trademark, trade name, service mark, domain name registration or application therefor ("Registered Intellectual Property Assets"),that are or will be due for payment on or before the Closing have been or will be timely paid and all necessary documents and certificates in connection with the Registered Intellectual Property Assets that are or will be due for filing on or before the Closing Date have been or will be timely filed with the relevant Governmental Authority for the purposes of prosecuting and maintaining the Registered Intellectual Property Assets.  To the maximum extent provided for by, and in accordance with, applicable Laws, Seller has recorded each assignment of Registered Intellectual Property Assets to Seller by a third Person that is Registered Intellectual Property Assets with each relevant Governmental Authority.

(b)   Schedule 4.9(b) sets forth all Intellectual Property Agreements to which Seller is a party.  Except as set forth on Schedule 4.9(b), Seller has not received any notice of any Default under any Intellectual Property Agreement

(c)   Except as set forth on Schedule 4.9(c), all Intellectual Property Assets are owned solely and exclusively by Seller, and such ownership is and will be free and clear of any Encumbrances other than Permitted Encumbrances.  Seller has obtained a valid and enforceable assignment sufficient to irrevocably transfer all rights in the Intellectual Property Assets (including the right to seek past and future damages with respect thereto) to Seller that did not automatically vest in Seller.  All Licensed Intellectual Property is licensed to Seller pursuant to valid and enforceable Intellectual Property Agreements. All Intellectual Property Assets and, to Seller's Knowledge, all Licensed Intellectual Property, is valid and enforceable, and, to Seller's Knowledge, there are no facts or circumstances that would render any Intellectual Property Assets or Licensed Intellectual Property invalid or unenforceable or that would constitute fraud or a misrepresentation with respect to any Intellectual Property Assets or, to Seller's Knowledge, Licensed Intellectual Property, or that would otherwise affect the enforceability thereof.

(d)   Except as set forth on Schedule 4.9(d), Seller has not: (i) transferred full or partial ownership of, or granted any exclusive license of or exclusive right to use, or authorized the retention of any exclusive rights to use or joint ownership of, any Intellectual Property Asset or Licensed Intellectual Property to any other Person; or (ii) permitted the Seller's rights in any material Intellectual Property Asset or Licensed Intellectual Property to lapse.

22

(e)     Except as set forth on Schedule 4.9(e), the operation of the Business as conducted prior to March 10, 2020 has not and does not: (i) infringe, misappropriate, or otherwise violate and shall not infringe, misappropriate, or otherwise violate when conducted any Intellectual Property of any Person (including any right of publicity); or (ii) constitute unfair competition or trade practices under applicable Laws of any jurisdiction. Seller has not received notice from any Person claiming that the operation of the Business or any Intellectual Property Asset or Licensed Intellectual Property infringes, misappropriates, or otherwise violates any Intellectual Property of any Person or constitutes unfair competition or trade practices under the Laws of any jurisdiction (nor to the Seller's Knowledge is there any basis therefor).  There are no Intellectual Property Agreements between the Seller and any third Person with respect to any Intellectual Property Asset or Licensed Intellectual Property under which there is any dispute, including any dispute: (x) regarding the scope of such Intellectual Property Agreement or (z) otherwise relating to any party's performance under such Intellectual Property Agreement other than any monetary default that can be cured in connection with the assumption and assignment of the applicable underlying Intellectual Property Agreement.

(f)     The Intellectual Property Assets together with the Licensed Intellectual Property constitute all the Intellectual Property: (i) used, practiced, exploited in or necessary to the conduct of the operation of the Business as conducted prior to March 10, 2020; and (ii) necessary to enable Buyer and its Affiliates to operate the Business immediately after the Closing in substantially the same manner as such Business was conducted prior to March 10, 2020.

(g)     To Seller's Knowledge, no Person has materially infringed, misappropriated or otherwise violated, or is materially infringing, misappropriating or otherwise violating, any Intellectual Property Asset or Licensed Intellectual Property.  There are no Actions before any Governmental Authority against any Person with respect to any Intellectual Property Asset or, to Seller's Knowledge, Licensed Intellectual Property.  Seller has the sole and exclusive right to bring a claim or suit against a third Person for infringement, misappropriation or other violation of any Intellectual Property Asset and to collect any damages or other amounts payable by such third Person to Seller as a result thereof.

(h)     Seller has taken commercially reasonable measures required or necessary to protect the confidentiality of its trade secrets and the trade secrets of any third Person provided or made available to Seller.  To Seller's Knowledge, there has been no loss of, or any unauthorized access to or disclosure of, such trade secrets.

(i)     Except as set forth on Schedule 4.9(i), none of the Intellectual Property Assets included in the Purchased Assets have been licensed by Seller to any other Person.

(j)     Seller has taken commercially reasonable and appropriate steps as required by Law and consistent with industry standards to safeguard the availability, security and integrity of the information technology and data processing systems and the data and information stored thereon (including from infection by contaminants and from unauthorized access).  There have been no unauthorized intrusions or breaches of the security of Seller's information technology and data processing systems or any other unauthorized access to or use of Seller's information technology and data processing systems.

ACTIVE 258135929

(k)     Schedule 4.9(k) describes each category of Personal Data collected or processed by or for Seller in connection with the Business. Seller and all third Persons acting on behalf of Seller or that have access to Personal Data collected or maintained by or for Seller materially comply, and, to Seller's Knowledge, have always materially complied with the Privacy Policy.  The execution, delivery and performance of this Agreement, and the subsequent transfer of all Personal Data maintained by for Seller to Buyer is and will be compliant with the Privacy Policy.  Seller has not received any notice, communication or correspondence regarding any actual, alleged or suspected violation of any Privacy Law by Seller.  There is no, and there has been no, complaint to, or any audit, proceeding, investigation (formal or informal) or Action, in each case, against or pertaining to the Seller by any Governmental Authority, with respect to the collection, obtainment, interception, compilation, creation, retention, storage, security, disclosure, transfer, disposal, use, or other processing of any Personal Data by or for Seller.

(l)     To Seller's Knowledge, Seller has at all times materially complied with data security obligations pursuant to Privacy Laws, and has at all times had commercially reasonable and appropriate technical or organizational security measures in place to protect Personal Data maintained or processed by or for Seller against loss and against unauthorized access, use, modification, loss, disclosure or other misuse, including information security protocols from third-party vendors that include appropriate controls that have been regularly tested and reviewed by such vendors.   To Seller's Knowledge, no unauthorized access to, or unauthorized use, modification, disclosure, or other misuse of, any data, including Personal Data maintained or processed by or for Seller has occurred.  To Seller's Knowledge, Seller has obtained written agreements from all Persons to which Seller has provided access to Personal Data that comply with Privacy Laws and that bind, and have at all times bound, such Persons to at least the same restrictions, obligations, and conditions that apply to Seller with respect to such information, and which at minimum bind, and have at all times bound, such Persons to implement reasonable and appropriate means for protecting such information.

(m)     Seller has sole and exclusive ownership, free and clear of any Encumbrances other than Permitted Encumbrances, of all customer contact information, customer correspondence and customer purchasing histories relating to its customers (the "Customer Information").  To Seller's Knowledge, no Person other than Seller possesses any claims or rights with respect to the use of the Customer Information.  Seller's use of the Customer Information is in material compliance with the Privacy Policy.

(n)     To Seller's Knowledge, Seller is compliant with terms of use and other Contracts, including all policies and guidelines incorporated therein, applicable to its use of any Social Media Accounts ("Social Media Terms").  To Seller's Knowledge, no provider of any service, application or platform on which Seller has a Social Media Account (each, a "Social Media Platform") has delivered notice to Seller that it was in violation of any Social Media Terms.  No Action has been made, given, filed or commenced (or, to Seller's Knowledge, threatened) to or against Seller alleging any fact that, if true, would cause any of the representations and warranties in this Section 4.9(n) to be inaccurate.

(o)     Seller and its Affiliates shall not retain any Intellectual Property Assets as of the Closing.

ACTIVE 258135929

4.10    **Employee Benefit Plans**.

(a)    Schedule 4.10(a) sets forth a complete and accurate list of Seller's Employee Benefit Plans.  Seller has provided to, or made available in Seller's datsite to, Buyer true, correct, and complete copies of each Employee Benefit Plan (including (i) all plan and related trust documents and all amendments thereto, (ii) the most recent Forms 5500 for the past one (1) year and schedules thereto, (iii) the most recent financial statements and actuarial valuations for the past one (1) year, (iv) the most recent IRS determination letter, (v) the most recent summary plan descriptions (including letters or other documents updating such descriptions, and (vi) written descriptions of all non-written agreements relating to the Employee Benefit Plans).  Except as set forth on Schedule 4.10(a), each Employee Benefit Plan has been established, maintained, funded and administered in material compliance with its terms and all applicable requirements of ERISA, the Code, and other applicable Laws.  Except as set forth on Schedule 4.10(a), each Employee Benefit Plan which is intended to be qualified within the meaning of Code § 401(a) is so qualified and has received a favorable determination letter from the Internal Revenue Service upon which it may rely, and nothing has occurred that is reasonably likely to adversely affect the qualified status of such Employee Benefit Plan or which could reasonably be expected to result in the revocation of such favorable determination.  Neither Seller nor any trade or business (whether or not incorporated) which are or have ever been under common control, or which are or have ever been treated as a single employer, with Seller under Section 414(b), (c), (m) or (o) of the Code sponsors, maintains, contributes to or has any liability with respect to any "employee pension plans," as defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code, including without limitation, any Multiemployer Plan or any plan subject to Sections 4063 or 4064 of ERISA.

(b)    Seller is not a party to any Multiemployer Plan.  As of the date of this Agreement, Seller has not incurred any unsatisfied withdrawal liability with respect to any Multiemployer Plan, and Seller is not bound by any contract or has any liability described in Section 4204 of ERISA.

(c)    Except as set forth on Schedule 4.10(c), with respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date shall have been timely made in accordance with the terms of the applicable Employee Benefit Plan, any agreement relating thereto, and applicable Law.

(d)    None of the Employee Benefit Plans which are "welfare benefit plans" within the meaning of Section 3(1) of ERISA provide for continuing benefits or coverage for any participant or any beneficiary of a participant post-termination of employment except as may be required under COBRA.

(e)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any employee of Seller, (ii) increase any benefits otherwise payable under any Employee Benefit Plan, or (iii) result in acceleration of the time of payment or vesting of any such benefits.

4.11    **[Reserved]**.

4.12    **Real Property**.

(a)    The Leased Property constitutes all of the real property used by Seller in connection with the Business.

(b)    Except as set forth on Schedule 4.12(b), to Seller's Knowledge, none of the Leased Property is subject to an eminent domain or condemnation proceeding.

(c)    Seller does not own any real property in fee.

(d)    Schedule 4.12(d) lists each lease or sublease, including all amendments, modifications or supplements thereof, pursuant to which Seller is lessee, sublessee, lessor or sublessor or otherwise occupies any Leased Property (collectively, the "***Real Property Leases***"), together with the parties thereto, and date of, each Real Property Lease, and the full street address of each parcel subject to a Real Property Lease.  Seller has delivered (or otherwise made available through Seller's datasite) to Buyer a correct and complete copy of each Real Property Lease, together with all amendments thereto.

(e)    Seller has good and valid leasehold interests in the real property conveyed by the Real Property Leases.  Each Real Property Lease is in full force and effect, and is valid and enforceable in accordance with its terms.  Seller has not received any notice of any Default by Seller under any of the Real Property Leases that are currently in effect and eligible to be assumed by Buyer.  Except as a result of the filing of the Bankruptcy Case or as set forth on Schedule 4.12(e), there has been no Default by Seller under any of the Real Property Leases.

4.13    **Contracts**.

(a)    Schedule 4.13 lists the following Contracts to which Seller is a party or by which it is bound and that are currently in effect (or by which the Purchased Assets may be bound or affected) (all Contracts listed or required to be listed herein, whether or not disclosed on Schedule 4.13, are referred to as "***Material Contracts***") as of the date of this Agreement:

(i)    all Real Property Leases;

(ii)    all employment, confidentiality and/or noncompetition Contracts with current employees of Seller and Contracts with current independent contractors or consultants (or similar arrangements) engaged in connection with the Business;

(iii)    all Contracts under which Seller leases personal property in connection with the Business;

(iv)    all Contracts with any material supplier of the Business;

(v)    all Contracts with any Governmental Authority related to the Business;

(vi)    all Contracts with any labor union or association representing any employees of Seller;

26

(vii)    all Contracts for the sale after the date hereof of any Purchased Asset owned or used by Seller;

(viii)    all Contracts relating to the acquisition by Seller of any operating business or the capital stock of any other Person;

(ix)    all Intellectual Property Agreements;

(x)    all Contracts that involve any Assigned Contracts;

(xi)    that regard the employment, services, consulting, termination or severance from employment relating to or for the material benefit of any director, officer, employee, independent contractor or consultant of Seller;

(xii)    all Contracts related to sports wagering activities;

(xiii)    all Contracts pursuant to which Seller grants or receives sponsorship rights; and

(xiv)    all Contracts pursuant to which Seller grants any third party any broadcast, distribution or transmission rights, whether by radio, television, digital, satellite or otherwise.

(b)    Seller has delivered (or otherwise made available through Seller's datasite) to Buyer true and complete copies of such Material Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof.

(c)    Each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of Seller and, to the Seller's Knowledge, of the other parties thereto, enforceable against such other parties in accordance with such Material Contract's terms and, upon consummation of the transactions contemplated hereby and payment of any Cure Claims, shall continue in full force and effect regardless of either or both notice and the lapse of time without Default, penalty or other adverse consequence.  Except as set forth on <u>Schedule 4.13</u>, there has not been any Default by Seller under any Material Contract, nor, to Seller's Knowledge, has there been any Default by any other party to any Material Contract.  Except as set forth on <u>Schedule 4.13</u>, no party to any of the Material Contracts has exercised any termination rights with respect thereto, and no party has given notice of any significant dispute with respect to any Material Contract.

4.14    **Attendance and Game Information**.  <u>Schedule 4.14</u> sets forth, with respect to the XFL Games played between February 8, 2020 and March 12, 2020: (i) the total attendance across all such XFL Games and at each such XFL Game; (ii) the average percentage of available seats sold across all such XFL Games and at each such XFL Game; (iii) the average attendance across all such XFL Games and at each such XFL Game; (iii) the total ticket sales across all such XFL Games and at each such XFL Game; (iv) the total number of season tickets sold across all stadiums and at each stadium; and (v) the average number of television viewers across all such XFL Games and per each such XFL Game.

ACTIVE 258135929

4.15    **Tangible Personal Property**.    Schedule 4.15 sets forth all leases of personal property ("***Personal Property Leases***") relating to personal property used or owned by Seller or to which Seller is a party or by which the properties or assets of Seller are bound.  Except as set forth on Schedule 4.15,  Seller has not received any  notice of any default or event that with notice or lapse of time or both would constitute a Default  by Seller under any of the Personal Property Leases contemplated to be assumed by Seller and assigned to Buyer other than in respect of any such Default  (or prospective Default, as the case may be) that can be cured in connection with the assumption and assignment of the applicable underlying Personal Property Lease.

4.16    **Taxes**.

(a)    (i) Except as set forth in Schedule 4.16(a)(i), all Tax Returns required to be filed with respect to the Business and the Purchased Assets have been timely filed with the appropriate taxing authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained) and all such Tax Returns are true, correct and complete in all material respects, and (ii) except as set forth on Schedule 4.16(a)(ii) of the Disclosure Schedules, all Taxes required to be paid with respect to the Business and the Purchased Assets (whether or not shown on any Tax Return) have been paid.

(b)    Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, third party or otherwise with respect to the Business and the Purchased Assets, and all Tax Returns required to be filed with respect thereto have been properly completed and timely filed.

(c)    To Seller's Knowledge, no Action is pending, proposed or threatened in writing with respect to Taxes of or relating to the Business or the Purchased Assets.

(d)    Schedule 4.16(d) of the Disclosure Schedules lists all the states, localities and foreign jurisdictions with respect to which Seller or any of its Affiliates is required to file a Tax Return with respect to the Business or the Purchased Assets. No claim has ever been made by a taxing authority in a jurisdiction where Taxes have not been paid or Tax Returns have not been filed with respect to the Business or the Purchased Assets asserting that Tax Returns must be filed or Taxes may be due in such jurisdiction with respect to the Business or the Purchased Assets.

(e)    There is no lien for Taxes upon any of the Purchased Assets nor, to the knowledge of Seller, is any Tax authority in the process of imposing any lien for Taxes on any of the Purchased Assets, other than liens for Taxes that are not yet due and payable.

(f)    No statute of limitations in respect of Taxes of or relating to the Business or the Purchased Assets has been waived nor has any extension of time with respect to a Tax assessment or deficiency in respect of Taxes of or relating to the Business or the Purchased Assets has been agreed to, other than any waiver or exclusion which has expired.

(g)    Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

4.17    [**Reserved**]

4.18    **Absence of Certain Changes**.  Except (a) as set forth on Schedule 4.18 and (b) for the commencement or pendency of the Bankruptcy Case, since the Petition Date there has been no event or condition that has had (or is reasonably likely to result in) a Material Adverse Effect.

4.19    **Certain Fees**.  Except for the fees and expenses of Houlihan Lokey, for which Seller shall be solely responsible, Seller has not incurred any liability for any investment banking fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the transactions contemplated hereunder for which Buyer could be liable.

4.20    **No Other Representations and Warranties**.  Except for the representations and warranties contained in this Article IV (including the related portions of the Disclosure Schedules), neither Seller nor any other Person has made or makes and expressly disclaims any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Buyer and its Representatives, management presentations, or in any other form in expectation of the transactions contemplated hereby or as to the future revenue, profitability, or success of the Business, or any representation or warranty arising from statute or otherwise in law.  Except for the representations and warranties contained in this Article IV (including the related portions of the Disclosure Schedules), Seller expressly (i) disclaims and negates any representation or warranty, express or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of title, merchantability or fitness for a particular purpose, or of the probable success or profitability of the ownership, use, or operation of the Business or the Purchased Assets by Buyer after the Closing Date), and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to Buyer by any Representative of any Seller).

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF BUYER

As a material inducement to Seller to enter into this Agreement and to consummate the transactions contemplated herein, subject to the entry of the Sale Order, Buyer represents and warrants to Seller that the statements contained in this Article V are true and correct as of the date hereof and as of the Closing Date.

5.1    **Organization of Buyer**.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware.

5.2    **Authority of Buyer**.  Buyer has full power and authority to enter into this Agreement and the Ancillary Documents to which Buyer is a party, to carry out Buyer's obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Buyer of this Agreement and any Ancillary Document to which Buyer is a party, the performance by Buyer of Buyer's respective obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and

thereby have been duly authorized by all requisite corporate or other entity action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution, and delivery by Seller) this Agreement constitutes a legal, valid, and binding obligation of Buyer enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally.  When each Ancillary Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution, and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Buyer enforceable against Buyer in accordance with the respective terms of such Ancillary Documents, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally.

5.3    **No Conflicts; Consents**.  The execution, delivery, and performance by Buyer of this Agreement and the Ancillary Documents to which Buyer is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not:  (a) violate or conflict with any provision of the organizational documents of Buyer; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order other than (i) consents, approvals or authorizations of, or declarations or filings with the Bankruptcy Court, and (ii) any such action or filing as to which the failure to make or obtain would not have a Buyer Material Adverse Effect.

5.4    **Brokers**.  Except as set forth on Schedule 5.4, no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document to which Buyer is a party based upon arrangements made by or on behalf of Buyer.

5.5    **Sufficiency of Funds**.  Buyer has sufficient cash on hand or other sources of available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

5.6    **Legal Proceedings**.  There are no Actions pending or, to Buyer's knowledge, threatened against Buyer before any Governmental Authority expected to have a Buyer Material Adverse Effect.

5.7    **"As Is" Transaction**.  **BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV ABOVE, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY TANGIBLE PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR THAT IS THE SUBJECT OF ANY ASSIGNED LEASE OR ASSIGNED CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS THAT ARE THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY BUYER AT THE CLOSING, THE ZONING**

**OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY, THE TERMS, AMOUNT, VALIDITY, OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY EXPRESSLY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH BUYER'S ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>ARTICLE IV</u>, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS." FURTHERMORE BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF THE ASSIGNED CONTRACTS FORMING PART OF THE PURCHASED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT NOTWITHSTANDING ANY AND ALL OUTSTANDING DEFAULTS AND OTHER CLAIMS FOR FAILURES TO COMPLY WITH THE PROVISIONS OF SUCH CONTRACTS. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, NOTHING IN THIS AGREEMENT SHALL LIMIT BUYER'S ABILITY TO PURSUE ANY INTENTIONAL FRAUD CLAIM AGAINST ANY SELLER OR ANY OTHER PERSON.**

<div align="center">

**ARTICLE VI**

**COVENANTS**

</div>

6.1     <u>**Conduct of Business Prior to the Closing**</u>.  From the date hereof until the Closing, except as consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Seller shall use commercially reasonable efforts to maintain and preserve intact the Purchased Assets (and all goodwill relating thereto) and all respective relationships with customers, vendors, creditors, employees, landlords, agents, and any other Person having business relationships with them in the Ordinary Course.  Without limiting the generality of the foregoing, during the period from the date of this Agreement to the Closing, except as otherwise contemplated by this Agreement or as Buyer shall otherwise consent in advance in writing (which consent shall not be unreasonably withheld or delayed), Seller shall do the following:

ACTIVE 258135929

(a)     pay all undisputed post-petition bills and invoices for post-petition goods or services promptly when due (including, without limitation, any post-petition lease payments with respect to any Real Property Leases that are Assigned Contracts) through the Closing Date;

(b)     use its commercially reasonable efforts to keep and maintain possession of and compliance with the terms of all Permits necessary or required by Law to own, lease and operate its respective properties (including the Purchased Assets) and to carry on the Business or that are material to the operation of the Business or the Purchased Assets, including by taking all actions and submitting all payments, applications, and filings necessary to renew any such Permit due to expire at any time before the Closing Date;

(c)     protect, defend and maintain the validity and enforceability of all Intellectual Property Assets and all Intellectual Property licensed to it, including by taking all actions and timely submitting all payments and filings due before the Closing Date; and

(d)     maintain insurance coverage with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained by the Business and Seller as of the date hereof.

6.2     **Certain Restricted Conduct**.  Except as Buyer shall otherwise consent in advance in writing (which consent shall not be unreasonably withheld or delayed), during the period from the date of this Agreement to the Closing, Seller shall not, with respect to the Purchased Assets:

(a)     other than in the Ordinary Course, sell, lease, license, transfer, or dispose of any Purchased Assets;

(b)     other than in the Ordinary Course, authorize or enter into any Contract, arrangement, or commitment;

(c)     abandon, cancel, permit to lapse or otherwise dispose of or forfeit to the public any rights in, to or for the use of any Intellectual Property Assets or any Intellectual Property licensed to it that are part of the Purchased Assets;

(d)     (i) sell, license exclusively or on a preferential basis or assign to any Person or enter into any Contract to sell, license exclusively or on a preferential basis or assign to any Person any rights to any Intellectual Property Assets that are part of the Purchased Assets; (ii) license or otherwise grant any rights in, to or under any Intellectual Property Assets that are part of the Purchased Assets; (iii) amend, modify or extend any Intellectual Property Agreement that is an Assigned Contract; or (vi) grant a release, immunity or covenant not to sue under any Intellectual Property Asset or Licensed Intellectual Property;

(e)     other than in the Ordinary Course, authorize, undertake, make, or enter into any commitments obligating Seller to (i) make or accelerate any capital expenditures or (ii) undertake or approve any material renovation or rehabilitation of any Leased Property;

(f)     (i) increase any compensation payable to or to become payable to, or enter into or amend any employment, severance or other agreement with, any of Seller's officers, directors or salaried employees, (ii) increase any compensation payable to or to become payable

32

by Seller to any other employee of Seller, except in the Ordinary Course, (iii) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any officer, director or employee, (iv) create or adopt any new Employee Benefit Plan or amend or terminate or increase the coverage or benefits available under any existing Employee Benefit Plan, (v) hire any employee or individual independent contractor with annual compensation in excess of $[100,000] (except to the extent such hire is in replacement of an existing employee with comparable compensation), or enter into any employment, severance, deferred compensation, consulting, non-competition or similar agreements to which Seller is a party or involving a director, officer, employee or independent contractor of Seller, or (vi) assume, enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization relating to the Business, any employee, or any Purchased Asset;

(g)     acquire any material properties or assets that would be Purchased Assets or sell, assign, transfer, convey, lease or otherwise dispose of any Purchased Assets (except acquisitions of Inventory, equipment and similar assets in the Ordinary Course);

(h)     cancel or compromise any debt or Claim or waive or release any right of Seller that constitutes a Purchased Asset;

(i)     resolve any Liability that would be an Assumed Liability;

(j)     transfer, to the extent that following such transfer such amounts would be treated as Excluded Assets, any security deposits, prepaid rentals, unbilled charges, fees, deposits, cash, cash equivalents or negotiable instruments, in each case constituting Purchased Assets;

(k)     satisfy any Excluded Liability with a Purchased Asset; or

(l)     authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

6.3     **Access to Information**.

(a)     From and after the date of this Agreement until the Closing Date, Seller shall, upon reasonable advance notice, afford, and shall cause its officers, employees, attorneys, investment banks, financial advisors, and other agents to afford, Buyer's officers, independent public accountants, counsel, consultants, and other Representatives, reasonable access during normal business hours to the Purchased Assets and all records pertaining to the Purchased Assets, including, without limitation, all properties, books, accounts, documents, offices, warehouses or other facilities of or relating to the Business, and to officers and other employees of Seller for the purposes of evaluating the Business; provided, however, notwithstanding the foregoing, (x) Buyer shall not be entitled to access to any materials containing Privileged Communications, and (y) Buyer shall have no right to perform invasive or subsurface investigations of the Leased Property. Buyer shall, and shall instruct Buyer's Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided pursuant to this Section 6.3.

33

(b)     Buyer may not communicate with any counterparties to Assigned Contracts without the prior written consent of Seller, which shall not be unreasonably delayed, withheld or conditioned.

6.4     **Notice of Certain Events**.

(a)     From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i)     any fact, circumstance, event or action the existence, occurrence, or taking of which (A) has had a Material Adverse Effect, (B) has resulted or, with notice, the passage of time or both may result  in any representation or warranty made by Seller hereunder not being true and correct, or (C) has resulted or, with notice, the passage of time or both may result in the failure of any of the conditions set forth in Section 7.2 to be satisfied;

(ii)     any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the transactions contemplated by this Agreement;

(iii)     any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)     any Actions commenced or, to Seller's Knowledge, threatened, against, relating to, or involving or otherwise affecting the Business, the Purchased Assets, or the Assumed Liabilities.

(b)     Buyer's receipt of information pursuant to this Section 6.4 shall not operate as a waiver or otherwise affect any representation, warranty, or agreement given or made by Seller in this Agreement (including Section 8.1(b)) and shall not be deemed to amend or supplement the Disclosure Schedules.

6.5     **Employees and Employee Benefits**.

(a)     Seller shall be solely responsible, and Buyer shall have no obligation whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor, or consultant of Seller, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension, or profit sharing benefits or severance pay for any period relating to service with Seller at any time on or prior to the Closing Date.

(b)     Buyer may, at its sole discretion, offer employment to all employees of Seller or to only those employees of Seller desired by Buyer, or to no employees, and Seller shall cooperate with Buyer in connection with such offers of employment.  Any employee of Seller who accepts an offer of employment from Buyer pursuant to this Section 6.5(b) shall be a "***Transferred Employee***".

(c)     Nothing herein, express or implied, shall confer upon any employee or former employee or any other Person of Seller any rights or remedies (including any right to

employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of this Agreement.  Buyer and Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third Person, including any employee or former employee of Seller.

(d)     Seller shall retain liability for, and Buyer shall not acquire or assume, any litigation related to any employee or any employment, benefit or related matters of Seller arising prior to the Closing, whether a Claim in respect thereto is brought on, before, or after the Closing Date.

(e)     Unless agreed to otherwise in writing by the Buyer and the Transferred Employee, all Transferred Employees shall be employees "at-will".

6.6     **Confidentiality; Public Announcements; Use of Intellectual Property**.

(a)     Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement (other than as may be permitted or required under this Agreement), information provided to, or reviewed or accessed by, Buyer or its Representatives pursuant to this Agreement.  If this Agreement is terminated for any reason prior to the Closing, the Confidentiality Agreement and the provisions of this Section 6.6 shall nonetheless continue in full force and effect.  From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall cause its or their respective Representatives to hold, in confidence all Evaluation Material (as such term is defined in the Confidentiality Agreement) and any and all other information, whether written or oral, concerning the Business (the "***Business Confidential Information***"), except to the extent that Seller can show that such information (a) is generally available to and known by the public other than as a result of an act or omission of Seller, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates or their respective Representatives from and after the Closing on a non-confidential basis from sources which are not prohibited from disclosing such information by a legal, contractual, fiduciary or other obligation.  If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed; provided, however, that Seller shall use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information and fully cooperate with Buyer's efforts to obtain such protective order or such other reasonable assurances.  Upon execution of this Agreement, Buyer agrees, and Buyer shall direct, its respective Representatives to comply with the Confidentiality Agreement.  Buyer shall be responsible for any breach by any of its Representatives of the terms of the Confidentiality Agreement or this Section 6.6 expressly applicable to its Representatives.

(b)     Neither Buyer nor Seller shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other, such approval not to be unreasonably withheld, conditioned, or delayed, unless a press release or public announcement is required by applicable Law or an Order of the Bankruptcy Court or, in the case of Buyer, is otherwise consistent with the Confidentiality

35

Agreement. The parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and shall make any applicable disclosures regarding this Agreement (i) to the Bankruptcy Court and (ii) as contemplated by the Bidding Procedures Order. Notwithstanding the foregoing or anything to the contrary in this Agreement, after the Closing, Buyer and its Affiliates shall have the right to issue any press releases and make any public announcements concerning the Business and the Purchased Assets in its and their sole and absolute discretion.

(c)     Seller shall cease to make use of any Intellectual Property related to the Purchased Assets after the Closing Date.

6.7     **Books and Records**.  In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing, the continuing administration of the Bankruptcy Case (including the pursuit of any avoidance, preference or similar actions), or for any other reasonable purpose, for a period of two (2) years after the Closing, Buyer shall:  retain the Books and Records relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Seller; and upon reasonable notice and at the sole cost and liability of Seller, afford Seller's Representatives reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such Books and Records.  Reasonable access to Books and Records shall include (i) the right of Seller's professionals to copy, at Seller's expense, such documents and records as Seller may request in furtherance of the purposes described above; and (ii) Buyer's copying and delivering to Seller such documents or records as Seller may request, but only to the extent Seller furnishes Buyer with reasonably detailed written descriptions of the materials to be so copied and Seller reimburses Buyer for the reasonable costs and expenses thereof; provided, however, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Buyer.  Notwithstanding anything to the contrary set forth herein, in no event shall Buyer be required to provide to Seller pursuant to this Section 6.7 any books, records or other information (x) created or developed by Buyer or any other Person after the Closing or (y) to the extent that the provision of any such books, records or information would result in, or could reasonably be expected to result in, a waiver of any privilege or a violation of any applicable confidentiality obligation.

6.8     [**Reserved**].

6.9     **Closing Conditions**.  From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in Article VII hereof.

6.10    **Bulk Sales Laws**.  The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

6.11    **Receivables**.  From and after the Closing, if Seller or any of Seller's Affiliates receives or collects any funds relating to any Accounts Receivable or any other Purchased Asset, Seller or its Affiliate shall remit such funds to Buyer within five (5) Business Days after its receipt thereof.  From and after the Closing, if Buyer or its Affiliate receives or collects any funds relating

36

to any Excluded Asset, Buyer or Buyer's Affiliate shall remit any such funds to Seller within five (5) Business Days after its receipt thereof.

6.12    **Transfer Taxes**.

(a)    Any sales, purchase, transfer, stamp, documentary, stamp, value added, use or similar taxes that may be payable by reason of the sale of the Purchased Assets under this Agreement or the transactions contemplated herein ("***Transfer Taxes***") shall be borne and timely paid one-hundred percent (100%) by Buyer.

(b)    [Reserved]

6.13    **Prorations**.  Rent, Taxes (other than Transfer Taxes discussed in Section 6.12), utilities, and prepaid expenses related to the Purchased Assets shall be prorated between Seller and Buyer as of the Closing Date.  The portion of any such Taxes that are treated as arising during or attributable to the Pre-Closing Tax Period for purposes of this Agreement shall be:

(a)    in the case of Taxes (i) based upon, or related to, income, receipts, profits, wages, capital or net worth; (ii) imposed in connection with the sale, transfer or assignment of property; or (iii) required to be withheld, deemed to be equal to the amount which would be payable if the taxable year for such purposes ended on the Closing Date; and

(b)    in the case of any other Taxes, including any property Taxes, deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period, without regard to the date of assessment.

All obligations due in respect of periods prior to and including the Closing Date (other than Cure Claims), including any Pre-Closing Tax Period, shall be the obligations of Seller, and all obligations due in respect of periods after the Closing Date to the extent related to the Purchased Assets shall be the obligations of and shall be paid in full or otherwise satisfied by Buyer.  Seller shall provide reimbursement for any Tax or other obligation for which it is liable pursuant to this Section 6.13 that is payable or paid by Buyer within twenty (20) days after written demand therefore.  Rent shall be prorated on the basis of a thirty (30) day month.

6.14    **Further Assurances**.  Subject to the terms and conditions of this Agreement, following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.  Effective as of the Closing, Seller hereby irrevocably designates and appoints Buyer and its duly authorized officers and agents as Seller's lawful attorney-in-fact, to act for and on Seller's behalf and stead, and to execute and deliver any and all documents, agreements, instruments, and applications, and to do any and all acts contemplated by this Section 6.14.  Seller acknowledges and agrees that the foregoing appointment is irrevocable and constitutes a power coupled with an interest.

6.15    **Cooperation**.

ACTIVE 258135929

(a)     Seller and Buyer shall cooperate with one another reasonably and in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assigned Contracts or Intellectual Property Assets, in connection with the consummation of the transactions contemplated hereby, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

(b)     [Reserved].

6.16    **Bankruptcy Court Matters**.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a "***Competing Bid***").  From the Effective Date and until the designation of a Successful Bidder at the Auction, Seller is permitted to cause Seller's Representatives and Affiliates to initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by, any Person (in addition to Buyer and Buyer's Affiliates, agents, and Representatives) in connection with any sale or other disposition of the Purchased Assets subject to compliance with, and the limitations set forth in, the Bidding Procedures Order and this Agreement.  In addition, until the designation of a Successful Bidder at the Auction, Seller may respond to any inquiries or offers to purchase all or any part of the Purchased Assets or equity interests in Seller and perform any and all other acts related thereto that are required under the Bankruptcy Code, the Bidding Procedures Order, or other applicable Law, including supplying information relating to the Business and the assets of Seller or any of its Affiliates to prospective purchasers.

(b)     If Buyer is designated as the Successful Bidder, Seller shall use commercially reasonable efforts to make any filings, take all actions and obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement and the Ancillary Documents as promptly as practicable following the date hereof.  Seller will in accordance with the terms of the Bid Procedures seek an order of the Bankruptcy Court pursuant to the Sale Motion consistent with the terms of this Agreement and reasonably acceptable to Buyer (the "***Sale Order***") that (i) approves the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement and authorizes Seller to proceed with the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement; (ii) includes a specific finding that Buyer is a good faith purchaser of the Purchased Assets within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections of section 363(m) of the Bankruptcy Code; (iii) states that the sale of the Purchased Assets to Buyer shall be free and clear of all Encumbrances other than Permitted Encumbrances; and (iv) approves Seller's assumption and assignment to Buyer of the Assigned Contracts pursuant to section 365 of the Bankruptcy Code subject to Buyer's ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Assigned Contracts.  Buyer shall provide a copy of such financial information as may be required by the Bankruptcy Court to demonstrate Buyer's ability to assume, or to take an assignment of, the Assigned Contracts.  Both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Sale Order.

ACTIVE 258135929

(c)     After the selection of the Successful Bidder at the Auction, neither Seller, its Affiliates, nor their respective Representatives shall solicit or negotiate any offer or proposal from any third Person with respect to an acquisition of or investment in Seller, its Affiliates or any of the Purchased Assets.

(d)     Seller and Buyer agree that, in the event that Buyer is not the Successful Bidder at the Auction, and the Alternative Transaction with the Successful Bidder does not close, if, and only if, Buyer is the Next-Highest Bidder, Buyer shall consummate the transactions set forth in this Agreement upon the terms and subject to the conditions as set forth herein, including the Purchase Price as the same may be modified by Buyer at the Auction.  Buyer acknowledges that time is of the essence in achieving the Closing and shall undertake commercially reasonable efforts to reach the Closing in a timely manner subject to the terms and conditions set forth in this Agreement.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1     **Conditions to Obligations of All Parties**.  The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)     The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case, authorizing the transactions as set forth in this Agreement and approving this Agreement under sections 105(a), 363, and 365 of the Bankruptcy Code, in form and substance reasonably acceptable to Seller and Buyer, and as of the Closing Date the Sale Order shall be in full force and effect, shall not then be stayed, shall not have been vacated or reversed, and shall be a final order not subject to appeal; and

(b)     No injunction, stay, or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays, or prohibits the consummation of the transactions set forth in this Agreement.

7.2     **Conditions to Obligations of Buyer**.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Seller contained in Section 4.1 (Organization and Qualification of Seller), Section 4.2 (Authority of Seller), Section 4.3 (No Conflicts; Consents), Section 4.4 (Title to the Purchased Assets) and Section 4.7 (Brokers) (collectively, the "*Seller Core Representations*") the representations and warranties of Seller contained in Article IV of this Agreement shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of

39

that specified date in all respects).  The representations and warranties of Seller contained in the Seller Core Representations shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)    Seller shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by Seller prior to or on the Closing Date; provided, however, that, with respect to agreements, covenants, and conditions that are qualified by materiality, Seller shall have performed such agreements, covenants, and conditions, as so qualified, in all respects.

(c)    Seller shall have delivered to Buyer duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.2(a).

(d)    [Reserved].

(e)    Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in Section 7.2(a), Section 7.2(b) and Section 7.2(g) have been satisfied (the "*Seller Closing Certificate*").

(f)    Buyer shall have received a certificate pursuant to Treasury Regulations Section 1.1445-2(b) (the "*FIRPTA Certificate*") that Seller is not a foreign person within the meaning of Section 1445 of the Code duly executed by Seller.

(g)    No Material Adverse Effect with respect to Seller, the Business or the Purchased Assets shall have occurred since the date of this Agreement.

7.3    **Conditions to Obligations of Seller**.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)    Other than the representations and warranties of Buyer contained in Section 5.1 (Organization of Buyer), Section 5.2 (Authority of Buyer) and Section 5.4 (Brokers) (collectively, the "*Buyer Core Representations*") the representations and warranties of Buyer contained in this Agreement delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.  The representations and warranties of Buyer contained in the Buyer Core Representations shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by Buyer prior to or on the Closing Date; provided, however, that, with respect to agreements, covenants, and conditions that are qualified by

ACTIVE 258135929

materiality, Buyer shall have performed such agreements, covenants, and conditions, as so qualified, in all respects.

(c)     Buyer shall have delivered to Seller duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in <u>Section 3.2(b)</u>.

(d)     Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in <u>Section 7.3(a)</u> and <u>Section 7.3(b)</u> have been satisfied (the "***Buyer Closing Certificate***").

## ARTICLE VIII

## TERMINATION

8.1     <u>**Termination**</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Buyer;

(b)     by Buyer by written notice to Seller if:

(i)     Buyer is not then in material breach of any provision of this Agreement and there has been a breach of, inaccuracy in, or failure to perform any representation, warranty, covenant, or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in <u>Section 7.1</u> or <u>Section 7.2</u>, and such breach, inaccuracy, or failure has not been cured by Seller within ten (10) Business Days of Seller's receipt of written notice of such breach from Buyer;

(ii)     any of the conditions set forth in <u>Section 7.1</u> or <u>Section 7.2</u> shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Outside Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the material covenants, agreements, or conditions hereof to be performed or complied with by Buyer prior to the Closing; or

(iii)     if (A) Buyer is not selected as the Successful Bidder or the Next-Highest Bidder at the Auction, (B) the Sale Order approving this Agreement has not been entered by August 11, 2020, (C) the Closing has not occurred by the Outside Date, or (D) Seller closes an Alternative Transaction; or

(c)     by Seller by written notice to Buyer if:

(i)     Seller is not then in material breach of any provision of this Agreement and there has been a breach of, inaccuracy in, or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in <u>Section 7.1</u> or <u>Section 7.3</u>, and such breach, inaccuracy or failure has not been cured by Buyer within ten (10) Business Days of Buyer's receipt of written notice of such breach from Seller;

ACTIVE 258135929

(ii)    any of the conditions set forth in <u>Section 7.1</u> or <u>Section 7.3</u> shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Outside Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(iii)    if, after the entry of the Sale Order and following compliance by Seller in all material respects with this Agreement and the Bid Procedures, Seller enters into a definitive agreement with respect to an Alternative Transaction and the Bankruptcy Court enters an Order approving such Alternative Transaction.

(d)    by Buyer or Seller in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable; and

(e)    if the Bankruptcy Court enters an Order that otherwise precludes the consummation of the transactions set forth herein on the terms and conditions set forth in this Agreement.

8.2    **Effect of Termination**.  In the event of the termination of this Agreement in accordance with this <u>Article VIII</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any party (or any member, stockholder or Representative of such party) hereto except as set forth in this <u>Article VIII</u>, <u>Section 2.6(b)</u>, <u>Section 6.6(a)</u>, <u>Section 6.6(b)</u> and <u>Article IX</u> hereof.  The provisions of <u>Section 2.6(b)</u> (Deposit), <u>Section 6.6(a)</u> (Confidentiality), <u>Section 6.6(b)</u> (Public Announcements), this <u>Article VIII</u> and <u>Article IX</u> (Miscellaneous) shall survive any termination hereof.  Notwithstanding the foregoing, the termination of this Agreement shall not relieve Seller of liability for its breach of this Agreement prior to such termination.

8.3    **Exclusive Remedies**.  Seller, on behalf of itself and the Seller Related Parties, acknowledges and agrees that any disbursement of the Deposit to Seller pursuant to <u>Section 2.6(b)</u> shall be deemed liquidated damages and shall be the sole and exclusive recourse of the Seller Related Parties against the Buyer Related Parties for any loss or damage suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Buyer or the failure of the transactions contemplated by this Agreement to be consummated, and upon payment of the Deposit in accordance with <u>Section 2.6(b)</u>, (i) no Buyer Related Party shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby and (ii) no Seller Related Party will have any right of recovery, whether arising under contract Law, tort Law or any other theory of Law, against, and no personal liability shall attach to any Buyer Related Party, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Law, or otherwise; <u>provided</u>, <u>however</u>, that the foregoing shall not limit any Person's obligations under the Confidentiality Agreement. For the avoidance of doubt, under no circumstances will the Seller Related Parties be entitled to, nor will any Seller Related Party accept,

monetary damages in connection with the termination of this Agreement in excess of the amount of the Deposit.

8.4   **Specific Performance**.

(a)     The parties acknowledge and agree that (i) irreparable damage to Buyer would occur in the event that any of the provisions of this Agreement are not performed by Seller in accordance with their specific terms or are otherwise breached or threatened to be breached by Seller, and (ii) either or both damages and remedies at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by Seller. Accordingly, Buyer shall be entitled to obtain equitable relief (without the posting of any bond or other security) with respect to any such breach, including,. without limitation. any one or more of a mandatory injunction, specific performance of any one or more of such covenants, promises, or agreements, and an order enjoining Buyer from any threatened, or from the continuation of any actual, breach of the covenants, promises, or agreements contained in this Agreement.  Buyer's right to equitable relief, including specific performance and injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement.  The rights set forth in this Section 8.5 shall be in addition to any other rights which Buyer may have at law or in equity in connection with this Agreement.  If any Action is brought to enforce this Agreement against Seller, Seller shall waive the defense that there is an adequate remedy at law and agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law, or inequitable for any reason.  The right to specific performance, injunctive, and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, Buyer would not have entered into this Agreement.

(b)     Notwithstanding anything to the contrary contained in this Agreement, under no circumstance shall Seller have the right to seek injunctive or other equitable relief with respect to any breach, alleged breach or threatened breach by Buyer or otherwise under this Agreement.

## ARTICLE IX

## MISCELLANEOUS

9.1   **Expenses**.  Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees, and disbursements of counsel, financial advisors, and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.  Each party shall be responsible for the payment of one-half of any expenses or fees payable to the Escrow Agent.

9.2   **Notices**.  All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of

ACTIVE 258135929

the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 9.2</u>):

<div style="margin-left:2em;">

| | |
|---|---|
| If to Seller: | Alpha Entertainment LLC |
| | 1266 East Main Street |
| | Stamford, CT 06902 |
| | United States |
| | Attention:  Jeffrey Pollack |
| | Email:  jnp727@xfl.com |

with a copy (that shall not constitute notice) to:

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
United States
Attention:  Matthew B. Lunn
Email:  mlunn@ycst.com

| | |
|---|---|
| If to Buyer: | Alpha Acquico, LLC |
| | c/o Grant, Tani, Barash & Altman, Inc. |
| | 9100 Wilshire Boulevard, Suite 1000 West |
| | Beverly Hills, CA 90212 |
| | Attention:  Howard Altman |
| | Email:  haltman@gtba.com |

with a copy (that shall not constitute notice) to:

Sidley Austin LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Attention:  Matthew Thompson and Vijay Sekhon
Email: mthompson@sidley.com and vsekhon@sidley.com

</div>

9.3    **Interpretation**.    For purposes of this Agreement, (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.  Unless the context otherwise requires, references herein to:  (x) Articles, Sections, Disclosure Schedules, Schedules, and Exhibits mean the Articles and Sections of, and Disclosure Schedules, Schedules, and Exhibits attached to, this Agreement; (y) an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) a statute means such statute as amended from time to time and

ACTIVE 258135929

includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules, Schedules, and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

9.4 **Headings**. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

9.5 **Severability**. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

9.6 **Entire Agreement**. This Agreement and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits, the Schedules, and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control. In the event of any inconsistency between (i) either or both this Agreement and any Ancillary Agreement and (ii) the Sale Order, the terms of the Sale Order will control.

9.7 **Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and the parties' respective successors and permitted assigns. Neither party may assign such party's rights or obligations hereunder without the prior written consent of the other party; provided, however, that prior to the Closing Date, Buyer may, without the prior written consent of Seller, assign all or any portion of Buyer's rights under this Agreement to any of any one or more of Buyer's Affiliates and Buyer's Affiliates' financing sources. No assignment shall relieve the assigning party of any of such assigning party's obligations hereunder.

9.8 **Affiliate Acquisitions**. Notwithstanding anything to the contrary contained in this Agreement including Section 9.7, Buyer may elect to have any or all of the Purchased Assets conveyed or transferred to, or any or all of the Assumed Liabilities assumed by, one or more of its Affiliates as may be designated by Buyer from time to time prior to the Closing.

9.9 **No Third-Party Beneficiaries**. This Agreement is for the sole benefit of the parties hereto, their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

9.10    **Amendment and Modification; Waiver**.  This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.11    **Non-Recourse**.  The parties acknowledge that (i) no direct or indirect equity holder or lender of any party, (ii) no member of any board of managers or special committee of any party or any Affiliate of any party and (iii) no past, present or future director, officer, committee member, employee, incorporator, member, partner or direct or indirect equity holder or lender of any party (such Persons described in clauses (i)-(iii) above, the "***Non-Recourse Parties***") is a party to this Agreement or, except as expressly contemplated therein as parties thereto, any Ancillary Agreement.  The parties further acknowledge that none of the Non-Recourse Parties, whether individually or collectively, shall have any liability whatsoever of any kind or description for any Liabilities of any party under this Agreement or, except as expressly contemplated therein as parties thereto, any Ancillary Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby or thereby.  Accordingly, the parties hereby agree that in the event (a) there is any alleged breach or alleged default or breach or default by any party under this Agreement or any of the Ancillary Agreements or (b) any party has or may have any Claim arising from or relating to the terms of this Agreement or any Ancillary Agreement, no party shall, or shall have any right to, commence any proceedings or otherwise seek to impose any Liability whatsoever of any kind or description on or against the Non-Recourse Parties, whether collectively or individually, by reason of such alleged breach, default or claim, except and only to the extent that a Non-Recourse Party is expressly contemplated in an Ancillary Agreement as a party to such Ancillary Agreement.

9.12    **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a)    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND, WHERE STATE LAW IS IMPLICATED, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

(b)    BUYER AND SELLER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT; OR (ii) THE PURCHASED ASSETS AND ASSUMED LIABILITIES ASSUMED PURSUANT TO OR ARISING OUT OF THIS AGREEMENT OR ANY

46

ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT, AND BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.  EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.13    **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

9.14    **Survival**.  The representations and warranties of Seller and Buyer contained in this Agreement or in any certificate delivered pursuant hereto shall not survive, and shall terminate at, the Closing, and neither Seller nor Buyer shall have liability after the Closing for any breach of any of its representations or warranties contained in this Agreement or in any certificate delivered pursuant hereto.  The covenants or other agreements of Seller and of Buyer contained in this Agreement or in any certificate delivered pursuant hereto that are to be performed prior to Closing shall not survive, and shall terminate at, the Closing, and neither Seller nor Buyer shall have liability after the Closing for any breach of any such covenant or other agreement contained in this Agreement or in any certificate delivered pursuant hereto.  The covenants and other agreements of Seller and Buyer contained in this Agreement or in any certificate delivered pursuant hereto that are to be performed after the Closing shall survive the Closing for the period contemplated by their terms (or if no such survival period is contemplated, then indefinitely).

*[Signature page follows]*

47

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

**SELLER:**

Alpha Entertainment LLC


By: _____
Name:
Title:


**BUYER:**

Alpha Acquico, LLC


By: _____
Name:
Title:

**DISCLOSURE SCHEDULE**

**TO THE**

**ASSET PURCHASE AGREEMENT**

**BETWEEN**

**ALPHA ENTERTAINMENT LLC**

**and**

**ALPHA ACQUICO, LLC**

**August [•], 2020**

## DISCLAIMER

This disclosure schedule (this "***Disclosure Schedule***") has been prepared and delivered by Seller (as defined herein) in connection with the *Asset Purchase Agreement*, dated as of August [•], 2020 (the "***Agreement***"), by and between Alpha Entertainment LLC, a Delaware limited liability company ("***Seller***"), and Alpha Acquico, LLC, a Delaware limited liability company ("***Buyer***").

Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement. Section 9.3 (*Interpretation*) of the Agreement shall apply to the interpretation of this Disclosure Schedule, *mutatis mutandis*.

This Disclosure Schedule is provided confidentially and is subject to the terms and conditions of the Agreement. The information provided in this Disclosure Schedule is being provided solely for the purpose of making disclosures to Buyer under the Agreement. Any item or matter required to be disclosed on a particular section of this Disclosure Schedule pursuant to the Agreement shall be deemed to have been disclosed if information for such item or matter complying with such disclosure requirements is set forth in another section of this Disclosure Schedule, to the extent reasonably apparent that such information applies to such particular section of this Disclosure Schedule.

The inclusion of any matter, information, or item in this Disclosure Schedule shall not be deemed to constitute an admission of any liability by Seller to Buyer or any third party or otherwise imply that any such matter, information, or item is material or creates a measure for materiality or any other similar term or concept for the purposes of the Agreement or that any such matter, information, or item did not arise in the Ordinary Course.

Matters reflected in this Disclosure Schedule are not necessarily limited to matters required by the Agreement to be reflected in this Disclosure Schedule. Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar nature. In addition, the disclosure of any matter in this Disclosure Schedule is not and shall not be deemed an admission that such matter actually constitutes noncompliance with, or a violation of applicable Law, contract, or other topic to which such disclosure is applicable. In no event shall the disclosure of matters disclosed in this Disclosure Schedule be deemed or interpreted to broaden any of the Seller's representations and warranties, obligations, covenants, conditions, or agreements contained in the Agreement.

In disclosing this information, Seller expressly does not waive, and expressly reserves any rights under, any attorney-client privilege associated with such matter, information, or item, or any protection afforded by the work-product doctrine with respect to any of the matters, information, or items disclosed herein.

The headings contained in this Disclosure Schedule are intended solely for convenience of reference and shall not affect the rights of the parties to the Agreement nor be deemed to modify or influence the interpretation of the information contained in this Disclosure Schedule or the Agreement.

ACTIVE 260087146

ACTIVE 260087146

## Schedule 2.2(k)

### Actions and Claims

- Any Claims or Actions involving or relating to directors and officers of Seller Related Parties (other than Jeffrey Pollack, Basil DeVito and Thomas Van Wazer) that are covered by any and all director and officer insurance policies or recoveries.

- Any Claims, Actions, refunds, rights of recovery, rights of set-off, rights of recoupment, and related sums and fees against, involving or related to (i) Raine Advisors LLC, (ii) World Wrestling Entertainment, Inc., (iii) JPMorgan Chase, NA (solely with respect to the Standard Ticketmaster Merchant U.S. Payment Instrument Processing Agreement between JPMorgan Chase, NA, Paymentech, LLC and the Seller), (iv) Oliver Luck, or (v) Vince McMahon, including all Claims, rights, lawsuits, rights of recovery, objections, causes of action, avoidance actions and similar rights of Seller against such Persons arising under or pursuable through Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date) and all proceeds thereof.

- All rights of setoff, rights of recoupment and related sums and fees, except for such rights of setoff and rights of recoupment with respect to any Assigned Contract.

- All rights to object to any filed or scheduled Claims on any basis, including without limitation under section 502(d) of the Bankruptcy Code, on grounds that a third-party is a joint or co-obligor, or any other basis under applicable law.

## **EXHIBIT 2**

Cure Amounts

| Counterparty Name and Address | General Description | Contract Type | Cure Amount |
|---|---|---|---|
| 1266 Main Street Stamford, LLC c/o Barings LLC One Financial Plaza, Suite 1700 Hartford, CT 06103 | Office Facility Agreement | Office Facility Lease Agreement | $12,500.50 |
| 1266 Main Street Stamford, LLC c/o Barings LLC One Financial Plaza, Suite 1700 Hartford, CT 06103 | Life/Safety Generator Agreement | Generator Agreement | $0.00 |
| ADP LLC One ADP Blvd Roseland, NJ 07068 | Payroll Processing Agreement | Payroll Management Agreement | $0.00 |
| ADP LLC One ADP Blvd Roseland, NJ 07068 | Payroll Tax Processing Agreement | Payroll Management Agreement | $0.00 |
| Amazon Web Services 410 Terry Ave North Seattle, WA 98109-5210 | Cloud Services | Services agreement | $3,714.68 |
| American Broadcasting Companies, Inc. 77 West 66th Street New York, NY 10023 | Broadcast rights agreement | Broadcast Agreement | $0.00 |
| American Express Merchant Services 200 Vesey Street New York, NY 10285 | Credit Card Processing Agreement | Credit Card Processing Agreement | $984,429.82 |
| Anheuser Busch 2420 W 26th Avenue, Suite 275D Denver, CO 80211 | XFL Sponsorship Agreement | Sponsorship Agreement | $0.00 |
| Anheuser Busch, LLC One Busch Place St. Louis, MO 63118 | XFL Sponsorship Agreement | Sponsorship Agreement | $0.00 |
| Anschutz Southern California Sports Complex, LLC 18400 Avalon Blvd. Los Angeles, CA 90015 | Venue Use Agreement | Team Facility Lease Agreement | [$22,318.48][1] |
| AT&T Mobility 208 S. Akard St. Dallas, TX 75202 | Voice/ Wireless Data Services Agreement | Services Agreement | $0.00 |
| barrettSF 250 Sutter St, Suite 200 San Francisco, CA 94108 | Creative Services Agreement | Services Agreement | $0.00 |

[1] Cure objection deadline set for August 10, 2020.

| Counterparty Name and Address | General Description | Contract Type | Cure Amount |
|---|---|---|---|
| BreakingT LLC<br>4601 Fairfax Dr. Suite 1200<br>Arlington, VA 22203 | License Agreement | Consumer Products License Agreement | [$0.00][2] |
| Canto Inc.<br>625 Market Street, Suite 600<br>San Francisco, CA 94105 | Digital Asset Management | Asset Management Agreement | $0.00 |
| City of Plant City<br>302 W. Reynolds Street<br>Plant City, FL 33563 | Practice Facility and Storage Agreement | Team Facility Lease Agreement | $0.00 |
| Connect<br>2323 Ross Avenue, Suite 1700<br>Dallas, TX 75201 | Consulting Services | Consulting Agreement | $97,123.47 |
| Crossroads Developers Associates LLC<br>1 International Boulevard, 11th Floor<br>Mahwah, NJ 07495 | Practice Facility and Storage Agreement | Team Facility Lease Agreement | $37,700.38 |
| D.A. International<br>1904 Occidental Ave. South<br>Seattle, WA 98134 | Storage Facility Agreement | Storage Agreement | $0.00 |
| De Lage Landen Financial Services<br>1111 Old Eagle School Rd<br>Wayne, PA 19087 | Equipment Leasing | Leasing Agreement | $19,388.82 |
| Delaware North<br>250 Delaware Avenue<br>Buffalo, NY 14202 | Licensing Agreement | Licensing Agreement | $0.00 |
| E-Z Storage Takoma Park<br>1352 Holton Lane<br>Takoma Park, MD 20912 | Storage Facility Agreement | Storage Agreement | $0.00 |
| El Rinconsito<br>2606 70th Avenue E, Suite 104<br>Fife, WA 98424 | Sponsorship Agreement | Sponsorship Agreement | $0.00 |
| Elevate Sports Ventures LLC<br>4949 Marie DeBartolo Way<br>Santa Clara, CA 95054 | Consulting Agreement | Consulting Agreement | $856,175.49 |
| ESPN, Inc.<br>ESPN Plaza<br>Bristol, CT 06010 | Broadcast Rights Agreement | Broadcast Agreement | $0.00 |
| Evolution Media (CAA)<br>405 Lexington Ave, 20th Floor<br>New York, NY 10174 | Media Advisory Services | Media Agreement | $500,000.00 |

---

[2] Cure objection deadline set for August 10, 2020.

| Counterparty Name and Address | General Description | Contract Type | Cure Amount |
|---|---|---|---|
| Fairly Group<br>1800 S Washington St, STE 400<br>Amarillo, TX 79102 | Insurance Services | Insurance Services Agreement | $0.00 |
| Fanatics<br>8100 Nations Way<br>Jacksonville, FL 32256 | Licensing Agreement | Licensing Agreement | $0.00 |
| FanDuel Inc.<br>Betfair Interactive US LLC<br>123 Town Square Place #195<br>Jersey City, NJ 07310 | Partnership Agreement | Letter Agreement | $0.00 |
| Fantasy Sport Shark, LLC<br>1187 Coast Village Road, #10-M<br>Montecito, CA 93108 | Sponsorship Agreement | Sponsorship Agreement | $0.00 |
| Fidelity<br>245 Summer St<br>Boston, MA 02210 | 401K Plan provider | Adoption Agreement | $0.00 |
| Fox Broadcasting Company, LLC<br>10201 West Pico Blvd.,<br>Building 100<br>Los Angeles, CA 90035 | Broadcast Rights Agreement | Broadcast Agreement | $0.00 |
| Fox Sports 1, LLC<br>10201 West Pico Blvd.,<br>Building 100<br>Los Angeles, CA 90035 | Broadcast Rights Agreement | Broadcast Agreement | $0.00 |
| Greenfly, Inc.<br>225 Arizona Avenue #300<br>Santa Monica, CA 90401 | Content Production Services | Service Agreement | [$0.00][3] |
| Half Lion<br>1723 W. Valley Highway E, #101<br>Summer, WA 98390 | Sponsorship Agreement | Sponsorship Agreement | $0.00 |
| Hiltzik Strategies LLC<br>99 Madison Avenue, 17th Fl.<br>New York, NY 10016 | Communication Strategy Services | Binding Letter Agreement | $0.00 |
| JP Morgan Chase NA<br>8181 Communications Parkway<br>Plano, TX 75024 | Merchant Payment Processing Agreement | Payment Processing Agreement | $4,475,233.35 |
| Kinduct Technologies Inc.<br>Purdy's Wharf Tower 2<br>1969 Upper Water St, Suite 201<br>Halifax, Nova Scotia B3J 3R7<br>Canada | Services and License Agreement | Software License and Services Agreement | [$0.00][4] |

[3] No cure notice issued to date.  Confirming with Seller the applicable cure amount.
[4] Cure objection deadline set for August 10, 2020.

| Counterparty Name and Address | General Description | Contract Type | Cure Amount |
|---|---|---|---|
| Lou Fusz Soccer Club<br>1 Ram's Way<br>St. Louis, MO 63045 | Office and Practice Facility Agreement | Office and Practice Facility Lease Agreement | $23,130.33 |
| M3 Commercial Moving & Logistics<br>2950 & 2550 E Mohawk Lane, Phoenix, AZ 85050; 12337 Cutten Road, Houston, TX 77066; 1515 W. Mable Street, Anaheim, CA 92802 | Storage Facility Agreement | Storage Agreement | $0.00 |
| Machete Group Inc.<br>2626 Persa Street<br>Houston Texas, 77098 | Consulting Services Agreement | Consulting Agreement | $156,201.90 |
| Maingate<br>7900 Rockville Road<br>Indianapolis, IN 46214 | Licensing Agreement | Licensing Agreement | $0.00 |
| Navex Global, Inc.<br>550 Meadows Road, Suite 500<br>Lake Oswego, OR 97035 | Master Services Agreement | Software Subscription Services Agreement | [$0.00][5] |
| Onix: Google G Suite Reseller<br>18519 Detroit Ave<br>Lakewood, OH 44107 | License Agreement | License Agreement | $2,838.81 |
| PayPal Inc.<br>2211 North First Street<br>San Jose, CA 95131 | Payment Processing | Payment Processing Agreement | $0.00 |
| Precious Vodka<br>1202 S. Southern Street<br>Seattle, WA 98108 | Sponsorship Agreement | Sponsorship Agreement | $0.00 |
| Presidio<br>200 Glastonbury Blvd, Suite 100<br>Glastonbury, CT 06033 | Cloud Services | Service Agreement | $0.00 |
| Presidio<br>200 Glastonbury Blvd, Suite 100<br>Glastonbury, CT 06033 | Identity and Management Services | Service Agreement | $15,484.55 |
| Presidio Networked<br>200 Glastonbury Blvd, Suite 100<br>Glastonbury, CT 06033 | Networking and Cloud Services | Consulting Agreement | $16,400.48 |
| Rangers Baseball LLC<br>1000 Ballpark Way<br>Arlington, TX 76011 | Practice Facility and Storage Agreement | Team Facility Lease Agreement | $0.00 |

[5] Cure objection deadline set for August 10, 2020.

| Counterparty Name and Address | General Description | Contract Type | Cure Amount |
|---|---|---|---|
| Rangers Baseball LLC<br>1000 Ballpark Way, Suite 400<br>Arlington, TX 76011 | Venue Use Agreement | Team Facility Lease Agreement | $283,957.60 |
| Rank & Rally<br>1111 S. Figueroa Street, Suite 3100<br>Los Angeles, CA 90015 | Licensing Agreement | Licensing Agreement | $0.00 |
| RingCentral Inc.<br>20 Davis Dr.<br>Belmont, CA 94002 | Cloud based telecom services | Service Agreement | $0.00 |
| Salesforce.com, Inc.<br>Salesforce Tower<br>415 Mission St., 3rd Fl.<br>San Francisco, CA 94105 | Master Subscription Agreement | Master Subscription Agreement | [$0.00][6] |
| SHI International<br>290 Davidson Ave<br>Somerset, NJ 08873 | Microsoft Office 365 Pro Plus Agreement | Service Agreement | $25,608.32 |
| Slack<br>500 Howard St<br>San Francisco, CA 94105 | Cloud based messaging and collaboration services | Service Agreement | $0.00 |
| Sportradar AG<br>Feldlistrasse 2, CH-9000<br>St. Gallen, Switzerland | Data Feed Agreement | Data Feed Marketing Agreement | [$0.00][7] |
| SSM Medical Group, LLC<br>1173 Corporate Lake Drive<br>St. Louis, MO 63132 | Medical Provider Services Agreement | Medical Provider Services Agreement | [$0.00][8] |
| SSM Medical Group, Inc.<br>12312 Olive Blvd., Ste. 600<br>St. Louis, MO 63141 | Sponsorship Agreement | Sponsorship Agreement | [$0.00][9] |
| Tampa Sports Authority<br>Raymond James Stadium, 4201 N. Dale Mabry Highway, Tampa, FL 33607 | Venue Use Agreement | Team Facility Lease Agreement | [$0.00][10] |
| The Action Network<br>275 Madison Ave, Suite 512<br>New York, NY 10016 | Content Partnership and Services | Letter Agreement | $0.00 |
| The Gatorade Company<br>555 West Monroe, Suite 10-2<br>Chicago, IL 60661 | Sponsorship Agreement | Sponsorship Agreement | $0.00 |

[6] Cure objection deadline set for August 10, 2020.
[7] Cure objection deadline set for August 10, 2020.
[8] Cure objection deadline set for August 10, 2020.
[9] Cure objection deadline set for August 10, 2020.
[10] No cure notice issued to date. Confirming with Seller the applicable cure amount.

| Counterparty Name and Address | General Description | Contract Type | Cure Amount |
|---|---|---|---|
| The Normal Brand<br>396A N. Euclid Avenue<br>St. Louis, MO 63108 | Licensing Agreement | Licensing Agreement | $20,694.00 |
| The Topps Company<br>1 Whitehall Street<br>New York, NY 10004 | Licensing Agreement | Licensing Agreement | $0.00 |
| TSG Interactive US Services Limited<br>DCOTA Office Center,<br>1855 Griffin Road, Suite C450<br>Dania Beach, FL 33004 | Marketing and Operations Agreement | Gaming Agreement | $0.00 |
| University of Houston<br>TDECU Stadium<br>3700 Cullen Boulevard<br>Houston, TX | Venue Use and Practice Facility Agreement | Team Facility Lease Agreement | [$729,444.25] [11] |
| Vegas Sports Information Network, Inc.<br>3033 Simpson Street<br>Evanston, IL 60201 | Production Agreement | Production Agreement | $0.00 |
| Wavemaker Global LLC<br>825 7th Avenue<br>New York, NY 10019 | Marketing Agreement | Master Services Marketing Agreement | [$0.00][12] |
| Wincraft, Inc.<br>960 East Mark Street<br>P.O. Box 888<br>Winona, MN 55987 | Licensing Agreement | Licensing Agreement | $0.00 |
| Workday Inc.<br>6230 Stoneridge Mall Rd<br>Pleasanton, CA 94588 | Software and Related Services Agreement | Service Agreement | $6,060.00 |
| World Wrestling Entertainment, Inc.<br>1241 E Main Street<br>Stamford, CT 06902 | Shared Services Agreement | Shared Services Agreement | $203,424.65 |
| WWE Media Services<br>1241 E Main Street<br>Stamford, CT 06902 | Shared services for content and media | Shared Services Agreement | $0.00 |
| XOS Digital, Inc.<br>181 Ballardvale Street<br>Wilmington, MA 01887 | Master Services Agreement | Product and Software Agreement | [$453,605.00] [13] |

---

[11] University of Houston filed a limited objection on July 31, 2020 with respect to an additional $112,500.00 that it believes may be owed in the event the contract is assumed and assigned to Buyer.
[12] Cure objection deadline set for August 10, 2020.
[13] Cure objection deadline set for August 10, 2020.

| Counterparty Name and Address | General Description | Contract Type | Cure Amount |
|---|---|---|---|
| Zoom Video Communications, Inc.<br>55 Almaden Blvd, 6th Floor<br>San Jose, CA 95113 | Cloud based video conferencing service | Service Agreement | $0.00 |